1  DANIEL F. POLSENBERG (SBN 2376)
   ABRAHAM G. SMITH (SBN 13,250)
2  J. CHRISTOPHER JORGENSEN (SBN 5382)
   KORY J. KOERPERICH (SBN 14,559)
3  LEWIS ROCA ROTHGERBER CHRISTIE LLP
   3993 Howard Hughes Parkway, Suite 600
4  Las Vegas, Nevada 89169-5996
   (702) 949-8200
5  DPolsenberg@LewisRoca.com
   ASmith@LewisRoca.com
6  CJorgensen@LewisRoca.com
   LWigginton@LewisRoca.com
7  KKoerperich@LewisRoca.com

8  *Attorneys for Plaintiff*

9              UNITED STATES DISTRICT COURT
                  DISTRICT OF NEVADA
10

11 SCOTT FREEMAN, M.D., individually     Case No. 2:22-cv-01433-RFB-VCF
   and as trustee for the SCOTT
12 MITCHELL FREEMAN REVOCABLE              **[PROPOSED] THIRD**
   LIVING TRUST, dated March 10, 2012,    **AMENDED COMPLAINT**
13 for itself and as assignee of
   FERDINAND BELGA;                        ***(Jury Trial Demanded)***
14
                   Plaintiff,
15
        *vs.*
16
   STEPHEN HURST; NICO FORTE;
17 CERUVIA LIFESCIENCES f/k/a CH TAC,
   LLC f/k/a SAVANT TAC, LLC; CAREY
18 TURNBULL; RUSSELL BURBANK; and
   BPM LLP; SAVANT HWP, INC.;
19 SAVANT HWP HOLDINGS, LLC; and
   SAVANT ADDICTION MEDICINE, LLC,
20
                   Defendants,
21
        *and*
22
   SAVANT ADDICTION MEDICINE, LLC;
23 SAVANT HWP HOLDINGS, LLC; and
   SAVANT HWP, INC.
24
              Nominal Defendants.
25

26

27

28

1

## TABLE OF CONTENTS

INTRODUCTION .................................................................................. 1

PARTIES ........................................................................................... 3

JURISDICTION AND VENUE ............................................................... 4

FACTS ............................................................................................. 5

    A.    Savant Inc. Formation (2009-2012):  Conspiracy Begins Between Hurst and Turnbull .................................................. 5

        *1.    2009-2017: Savant's Trade-Secret BOL-148/LSD Program* ... 6

        *2.    2012: Hurst Enters into a Secret  Partnership with Turnbull* . 9

        *3.    2013: Savant Inc. Reorganizes: The Four  Original Savant Entities* ............................................................... 10

        *4.    Hurst Fraudulently Induces Freeman and Savant Investors to Sign the LLC Operating Agreements* ..................................... 13

    B.    2013-2017: Theft of Savant Trade Secrets ............................. 16

        *1.    Turnbull Joins Savant Addiction  and Savant Neglected Disease* ..................................................................... 17

        *2.    2013-2017: Hurst and Turnbull Secretly  Form Savant TAC, Concealing Its Existence  and Purpose from Savant Members* ................................................................... 17

        *3.    2017-2018: Hurst and Turnbull Secretly  Divert Savant Holdings's BOL-148/LSD Assets to Ceruvia* ....................... 18

        *4.    2012-Present: Hurst and Turnbull Conceal  their Theft of Savant's Trade Secrets* ..................................................... 20

    C.    Formation of MindMed (2018-2019): Continuation of the Pattern. 22

        *1.    2018-2019: Hurst Cheats Belga Out of a Finder's Fee* ........... 23

        *2.    Further Fraud in Backdated Options* ..................................... 26

i

LEWIS ROCA

3. *Hurst Moves 18-MC to Savant Addiction  without Savant Holdings's Approval* .................................. 28

4. *Hurst Misrepresents His Authority  in the Formation of MindMed* .......................................... 29

5. *Hurst Misrepresents His Right to Maintain  Control over the Savant Addiction Voting Bloc* ................................ 31

6. *Hurst Wields his Control Over MindMed  to the Company's Detriment* ......................................... 35

7. *Hurst and Turnbull Conspire to Force  Freeman out of MindMed* ............................................. 38

a. Reason 1 for Freeman's Elimination: MindMed's unsafe human trials ............................................... 38

b. Reason 2 for Freeman's elimination: LSD manufacturing crisis .... 39

c. Reason 3 for Freeman's Elimination: Freeman's work on the BOL-148 patents ............................................. 39

d. Hurst orchestrates unsubstantiated and nonactionable workplace complaints ........................................... 40

e. Hurst and Turnbull extort Freeman's resignation under threat of "corporate theft" ......................................... 41

D. 2021-2021: Hurst and Turnbull Steal MindMed's LSD  and BOL-148 Intellectual Property ................................. 43

1. *Hurst Had Installed Ceruvia  Loyalists at MindMed* ........... 44

2. *Hurst Dissuades Freeman from Finding an LSD Manufacturer for MindMed, Creating a Crisis* ................. 45

3. *Hurst and Turnbull Misrepresent their  Relationship to Sabotage MindMed's Clinical  Trials and Extract a Non-Compete for Ceruvia* ................................... 47

4. *Hurst Arranges to Clean Up His Involvement* ................ 50

5. *Ceruvia Goes Public in 2021* ................................ 51

6. *The Misappropriation Is a Direct  Result of Freeman's Elimination* .............................................. 52

ii

E.   2014-Present: Hurst Uses Freeman's  Loans as Leverage to Maintain  Control of Savant and MindMed ..................................... 52

   1.   *Freeman's Loans* .................................................... 53

   2.   *Hurst Causes Savant's Default  on the Notes and Warrants* . 55

   3.   *Hurst and Freeman Reach  an Accord and Satisfaction* ....... 55

   4.   *Hurst Delays Performance to Maintain  His Power to Exercise the MindMed Shares* ............................................... 57

   5.   *Hurst Reneges on the Accord and Satisfaction* ..................... 59

F.   2020-2022: Hurst and Burbank Conspire to Conceal Hurst's Misappropriation and to Paper over Hurst's Self-Dealing .............. 60

   1.   *2020-2021: Hurst Delays and Breaches Agreements to Distribute the Locked-Up MindMed Shares* ........................... 60

   2.   *2021: Hurst Votes the Shares in His Personal Interest* .......... 64

   3.   *2021-Present: Hurst Retains a Friendly Trustee to  Paper Over His Self-Dealing* ................................................... 65

   a.   Hurst resigns from Savant Addiction and falsely promises independence and accountability .................................... 65

   b.   Burbank covers for Hurst, hides behind counsel, and conceals the companies' records ......................................... 66

   c.   Burbank blocks distribution and refuses to issue proxies for the 2022 annual general meeting .......................................... 70

   d.   Burbank blocks proxy rights for the 2023 annual general meeting, torpedoing  the proxy campaign for Freeman's election .. 72

   e.   Burbank ignores the instructions of the members whose interests he nominally represents ..................................... 73

G.   2021-Present: Hurst, Forte, and Burbank  Enable Embezzlement at Savant Inc. .......................................................... 74

H.   Burbank Continues to Thwart the  Majority-in-Interest and Evades Accountability ................................................... 77

CLAIMS .......................................................... 79

iii

A.    RICO Claims ......................................................................... 79

FIRST CLAIM FOR RELIEF CIVIL RICO (18 U.S.C. § 1961 ET SEQ.) (HURST, TURNBULL, AND BURBANK) ............................................................. 79

Direct and Derivative for Savant Inc.,  Savant Holdings, and Savant Addiction .................................................................. 79

1.    *Direct Claim by Freeman* ............................................... *79*

a.    Parties and Standing ..................................................... 79

b.    RICO Enterprise and its Effect on Interstate Commerce ............... 80

c.    Hurst's mail and wire fraud in formation of Savant Holdings and Savant Addiction ................................................. 81

d.    Hurst's mail and wire fraud in the formation of Ceruvia ............. 84

e.    Turnbull's fraud in the formation of Ceruvia ....................... 85

f.    Hurst's and Turnbull's theft of trade secrets from Savant .......... 86

g.    Hurst's and Turnbull's theft of trade secrets from MindMed ......... 87

h.    Hurst's mail and wire fraud in the contract with Belga ............. 89

i.    Hurst's mail and wire fraud in the loan accord to maintain control of Savant Addiction's voting bloc ............................. 91

j.    Burbank's mail and wire fraud in aiding and abetting Hurst's Fraud in the loan Accord .............................................. 94

k.    Hurst's wire Fraud in Freeman's Separation from MindMed ........ 96

l.    Hurst's and Turnbull's wire Fraud in the November 2020 Ceruvia Deal ......................................................... 97

m.    Hurst's wire fraud in the delay of distributing shares to maintain control of Savant Addiction's voting bloc ......................... 99

n.    Burbank's fraud—in the delay of distributing shares and failure to issue proxies—to maintain control of Savant Addiction's voting bloc .................................................................. 101

2.    *Derivative Claims and Predicate  Acts Harming Nonparties* ............................................................. *103*

a.    Hurst's fraud in the delay of distributing shares to maintain control of Savant Addiction's voting bloc ......................... 103

b.    Burbank's fraud in the delay of distributing shares to maintain control of Savant Addiction's voting bloc ......................... 105

iv

c.   Hurst's and Burbank's Fraud in the Distribution of MindMed Shares to Hurst.................................................................. 106

d.   Hurst's and Forte's Fraud in the Distribution of Savant Inc. Shares and Money ............................................................. 107

e.   Burbank's and BPM's promulgation of fraudulent capitalization tables ........................................................................... 108

f.   Hurst's and Turnbull's Fraud in the Sewell Patent Assignment . 109

g.   Hurst's and Forte's Fraud in the Formation of MindMed............ 110

h.   Adequacy of representation  and demand futility ........................ 112

3.   *Pattern of Racketeering in Interstate* Commerce................. 115

4.   *Management of the Enterprise* ............................................. 116

5.   *Ongoing Enterprise*.............................................................. 118

SECOND CLAIM FOR RELIEF CIVIL RICO (NRS 207.470) (HURST, TURNBULL, AND BURBANK) ......................................................... 121

Direct and Derivative for Savant Inc.,  Savant Holdings, and Savant Addiction................................................................. 121

B.   Misappropriation of the BOL-148/LSD Program and  Other Abuses of Power through Savant and Ceruvia ......................................... 129

THIRD CLAIM FOR RELIEF BREACH OF OPERATING AGREEMENTS (HURST, BURBANK, BPM, TURNBULL)............................................ 129

Derivative for Savant Addiction and Savant Holdings ................... 129

FOURTH CLAIM FOR RELIEF DEFENSE OF TRADE SECRETS ACT (18 U.S.C. § 1836) (HURST, TURNBULL, AND CERUVIA)................................. 136

Direct and Derivative for Savant Inc. and Savant Holdings .......... 136

FIFTH CLAIM FOR RELIEF UNIFORM TRADE SECRETS ACT (NRS CHAPTER 600A)  (HURST, TURNBULL, AND CERUVIA)........................... 141

Direct and Derivative for Savant Inc. and Savant Holdings .......... 141

SIXTH CLAIM FOR RELIEF USURPATION OF BUSINESS OPPORTUNITY AND WRONGFUL  INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE  (HURST, TURNBULL, AND CERUVIA)................................. 145

Direct and Derivative for Savant Inc. and Savant Holdings .......... 145

v

LEWIS ROCA

SEVENTH CLAIM FOR RELIEF BREACH OF FIDUCIARY DUTY AND DUTY OF LOYALTY (HURST, BURBANK, BPM, AND FORTE) .............................. 150

    Direct and Derivative for Savant Inc., Savant Holdings, and Savant Addiction................................................................................. 150

EIGHTH CLAIM FOR RELIEF FRAUDULENT MISREPRESENTATION (HURST, TURNBULL, CERUVIA, AND BURBANK, BPM) .......................... 158

    Direct and Derivative for Savant Inc., Savant Holdings, and Savant Addiction................................................................................. 158

    *1.    Direct Claim by Freeman*........................................................ *159*

a.    Hurst's fraud in formation of Savant Holdings and Savant Addiction ............................................................................... 159

b.    Hurst's fraud in the transfer of 18-MC to Savant Addiction ........ 161

c.    Hurst's fraud in the delay of distributing shares to maintain control of Savant Addiction's voting bloc...................................... 163

d.    Fraud in the formation of Ceruvia.................................... 166

    Hurst's fraud in the formation of Ceruvia.................................... 166

    Turnbull and Ceruvia's fraud in the formation of Ceruvia ............. 169

    Burbank's and BPM's Misrepresentations Regarding Formation of Ceruvia.............................................................. 170

e.    Burbank's and BPM's Misrepresentations in Promulgating Fraudulent Capitalization Tables to Distribute MindMed Shares ...................................................................................... 172

f.    Hurst's and Turnbull's Fraud in Freeman's Separation from MindMed ................................................................................. 176

g.    Hurst's and Turnbull's Fraud in the November 2020 Ceruvia Deal........................................................................................ 178

    Freeman's Reliance and Damages ........................................ 180

h.    Hurst's Fraud in the Contract with Belga ................................. 181

    *2.    Derivative Claims* ................................................. *182*

a.    Hurst's fraud in the formation of Ceruvia.................................. 182

b.    Hurst's, Burbank's, and BPM's fraud in release of shares based on inaccurate capitalization tables ................................................ 183

c.    Hurst's, Burbank's, and BPM's Fraud in Burbank's appointment 185

vi

LEWIS ROCA

      d.    Turnbull and Ceruvia's fraud in the formation of Ceruvia ........... 186

      e.    Hurst's and Forte's Fraud in the Formation of MindMed ............ 187

      f.    Hurst's, Forte's, and Burbank's  fraud at Savant Inc. ................... 188

      g.    Adequacy of representation  and demand futility ........................ 190

            Reliance and Damages ....................................................... 194

NINTH CLAIM FOR RELIEF CONSPIRACY (HURST, TURNBULL, FORTE, BURBANK, AND BPM) ...................................................................... 195

            Direct and Derivative for Savant Inc. and Savant Holdings ......... 195

         *1.*    *Conspiracy by Turnbull, Hurst, Burbank, and BPM in the Theft of Savant Trade Secrets* ............................................... 195

         *2.*    *Conspiracy by Hurst and Turnbull to  Interfere with Freeman's Employment,  Investment, and Influence at MindMed* ............................................................................. 197

         *3.*    *Conspiracy by Hurst, Burbank, and BPM to Deprive Freeman and Savant Holdings Members of MindMed Shares and Voting Rights* ....................................................... 200

         *4.*    *Conspiracy by Hurst, Burbank, and BPM, together with Ng and Olson, to Defraud Freeman in the Loan Accord* ........... 204

         *5.*    *Conspiracy by Hurst, Burbank, BPM, and Forte  to Embezzle from Savant Inc.* ................................................... 208

         *6.*    *Conspiracy by Hurst, Burbank, BPM,  to Embezzle from Savant Holdings and Savant Addiction Using Fraudulent Capitalization Tables* ........................................................... 210

         *7.*    *Adequacy of representation and demand futility* ................. 212

    C.    Belga Consulting Agreement ........................................ 215

TENTH CLAIM FOR RELIEF BREACH OF CONTRACT AND BAD FAITH (SAVANT ADDICTION) ................................................................... 215

ELEVENTH ALTERNATIVE CLAIM FOR RELIEF UNJUST ENRICHMENT (HURST, SAVANT INC., AND SAVANT ADDICTION) ................................... 216

TWELFTH CLAIM FOR RELIEF PROMISSORY OR EQUITABLE ESTOPPEL (SAVANT ADDICTION) ................................................................... 218

vii

LEWIS ROCA

D.     Freeman Accord and Satisfaction ....................................... 218

THIRTEENTH CLAIM FOR RELIEF BREACH OF CONTRACT AND BAD FAITH (SAVANT INC. AND SAVANT ADDICTION) ....................................... 218

FOURTEENTH CLAIM FOR RELIEF BREACH OF FIDUCIARY DUTY (HURST) ....................................................................................................... 221

FIFTEENTH ALTERNATIVE CLAIM FOR RELIEF UNJUST ENRICHMENT (HURST, SAVANT INC., AND SAVANT ADDICTION)................................... 222

      1.    *Unjust Enrichment from  Leveraging Freeman's Loans* ...... 222

      2.    *Delay in Distributing MindMed Shares* ............................... 223

      3.    *Unjust Enrichment from the Savant Trade Secrets* ............. 225

      4.    *Burbank's Unjust Enrichment from his Trustee Fees* .......... 226

      5.    *Hurst's and Forte's Unjust Enrichment at Savant Inc.* ....... 227

FIFTEENTH CLAIM FOR RELIEF PROMISSORY OR EQUITABLE ESTOPPEL  (SAVANT INC., AND SAVANT ADDICTION) ............................. 228

SEVENTEENTH CLAIM FOR RELIEF FRAUDULENT MISREPRESENTATION  (HURST, SAVANT INC., SAVANT ADDICTION, AND BURBANK) ....................................................................................... 229

      1.    *Hurst's Fraud in the Loan Accord to Maintain Control of Savant Addiction's Voting Bloc* ............................................ 229

      2.    *Burbank's and BPM's aiding and abetting Hurst's Fraud in the Accord* ........................................................................... 232

E.     Accounting and Declaratory Relief ....................................... 234

SIXTEENTH CLAIM FOR RELIEF ACCOUNTING (SAVANT ADDICTION, SAVANT HOLDINGS, AND SAVANT INC.) ....................................... 234

SEVENTEENTH CLAIM FOR RELIEF DECLARATORY JUDGMENT (ALL DEFENDANTS) ........................................................................................ 235

PRAYER FOR RELIEF ................................................................................. 236

VERIFICATION ........................................................................................... 237

viii

1

CERTIFICATE OF SERVICE ................................................................................ 238

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

LEWIS ROCA

Scott Freeman, M.D., individually and as trustee for the Scott Mitchell Freeman Revocable Living Trust, dated March 10, 2012, for itself and as assignee of Ferdinand Belga ("plaintiff" or "Freeman") alleges as his complaint:

## INTRODUCTION

1.      This case involves the fraudulent schemes of defendants Stephen Hurst ("Hurst") and Carey Turnbull ("Turnbull"), in service of their conspiracy and criminal enterprise with the drug-development companies that Hurst controls, as well as with Turnbull and the drug-development company that he controls, Ceruvia Lifesciences ("Ceruvia"). With Turnbull's assistance and plaintiff's money and equity, Hurst has wielded that control to enrich himself at the expense of plaintiff and the nominal defendants. While the details of these schemes are complex, Hurst followed a pattern: he took advantage of unsuspecting business partners' trust to gain control over companies, compartmentalized key information so only he or his trusted circle had access to it, and engaged in self-dealing, and subsequently used others to paper over Hurst's involvement or otherwise block inquiry into the misconduct.

2.      In 2009, three individuals—Hurst, a patent lawyer and businessman; Freeman, a medical doctor and researcher; and William Boulanger, a chemist—met in San Francisco to form a partnership for researching and developing drugs.

3.      The three founders decided to focus on the development of pharmaceutical drugs with psychoactive components to treat mental health conditions, including anxiety, addiction, and attention deficit and hyperactivity disorder. The resulting company became known as "Savant."

4.      Hurst and Freeman took the lead on building Savant. It was agreed that Hurst would be CEO and handle the corporate affairs, as he was a patent attorney by trade, and Freeman would be Chief Medical Officer with

1

responsibility for the clinical development of drugs. Hurst and Freeman agreed to equally split compensation, salary, stock, and stock options.

5.      Nevertheless, Hurst grew disenchanted with the arrangement and began to devise a strategy for him and Turnbull, an investor in Savant, to siphon off intellectual property from Savant to benefit themselves at the expense of Freeman and the other investors.

6.      Initially, Hurst kept the Savant investors in the dark. He named himself Chairman and CEO of Savant and used his position to ensure that only curated information was shared with Freeman and other investors. Later, through a series of corporate transactions that usurped the voting rights of Freeman and the other members, Hurst assumed effective authority over both Savant and a publicly traded spinoff company, Mind Medicine, Inc. ("MindMed").

7.      With Savant's members rendered powerless by Hurst's corporate machinations, he was able to set up a secret company, Savant TAC, with Savant member Turnbull, which later became known as Ceruvia, to hide its existence from the Savant members. Hurst and Turnbull then stole trade secrets, intellectual property, and other assets, first from Savant and later MindMed, a Savant spinoff, to Ceruvia through a series of coordinated transactions between Hurst and Turnbull, for their benefit. Subsequently, through a cadre of accomplices, including counsel, board members, and a trustee, Hurst covered up his misconduct through a coordinated effort to hide the books and records and intimidate anyone who asked questions through threats of legal action. The mechanics of the Hurst-Turnbull criminal collaboration that plaintiff has thus far unearthed are set forth below.

LEWIS ROCA

## PARTIES

8.     Scott Freeman was a resident of and domiciled in Las Vegas, Nevada until January 1, 2022. Since January 1, 2022, Freeman is a resident of and domiciled in the U.S. Virgin Islands.

9.     Freeman is the trustee and sole beneficiary of the Scott Mitchell Freeman Revocable Living Trust, dated March 10, 2012 (the "Trust"), a Nevada trust holding approximately 38.89 percent of the membership interests of defendant Savant HWP Holdings, LLC ("Savant Holdings") and 7.12 percent of the shares of Savant HWP, Inc. ("Savant Inc.").

10.    The Trust is also the assignee of claims belonging to Ferdinand Belga, an individual domiciled in and a resident of Illinois.

11.    Defendant Steven Hurst is an individual domiciled in and a resident of Sparks, Nevada. Hurst is the sole owner of defendant Sunray Asset Management, Inc. ("Sunray"), a Nevada corporation doing business in Nevada. Through Sunray, Hurst is the beneficial owner of 39 percent of Savant Holdings's membership interests and 7.06 percent of Savant Inc.'s shares.



12.    Defendant Nico Forte ("Forte") is an individual domiciled in and a resident of Sacramento, California. Forte is on the Board of Directors of Savant Inc. and is employed by MindMed.

LEWIS ROCA

13.     Defendant Ceruvia Lifesciences ("Ceruvia") is a Delaware limited liability company headquartered in Greenwich, Connecticut. Ceruvia was previously known as CH TAC, LLC ("CH TAC") and Savant TAC, LLC ("Savant TAC"). Except as otherwise noted, any reference to Ceruvia includes a reference to CH TAC and Savant TAC.

14.     Defendant Carey Turnbull is an individual domiciled in and a resident of Greenwich, Connecticut. Turnbull is an investor in Savant Addiction Medicine, LLC ("Savant Addiction") and the founder and CEO of Ceruvia.

15.     Defendant Savant HWP Holdings, LLC is a limited liability company organized under the laws of the state of Delaware. Upon information and belief, Savant Holdings is headquartered in Reno, Nevada.

16.     Defendant Savant HWP, Inc. is a Delaware corporation. Upon information and belief, Savant Inc. is headquartered in Reno, Nevada.

17.     Defendant Savant Addiction Medicine, LLC is a limited liability company organized under the laws of the state of Delaware. Upon information and belief, Savant Addiction is headquartered in Reno, Nevada.

18.     Defendant Russell Burbank, at all times relevant hereto, was and is a resident of and domiciled in San Francisco, California. Hurst appointed Burbank, as senior managing director of BPM LLP, to be the liquidating trustee for Savant Addiction and Savant Holdings.

19.     Defendant BPM LLP is a limited liability partnership with principal offices in Walnut Creek, California and which has partners or offices in California, Washington, Oregon, India, and the Cayman Islands. Except as otherwise noted, any reference to Burbank includes a reference to BPM LLP.

## JURISDICTION AND VENUE

20.     This Court has subject-matter jurisdiction over the claims arising under 18 U.S.C. § 1961 *et seq.* pursuant to 28 U.S.C. § 1331.

4

LEWIS ROCA

21.     This Court has supplemental jurisdiction over plaintiff's state law claims pursuant to 28 U.S.C. § 1367. Plaintiff's state law claims are so related to plaintiff's federal law claims that they form part of the same case or controversy.

22.     Plaintiff takes no position on whether this Court would independently have jurisdiction under 28 U.S.C. § 1332 but notes that defendant Hurst is a Nevada citizen for purposes of 28 U.S.C. § 1441(b)(2).

23.     Venue is proper in the District of Nevada pursuant to 28 U.S.C. § 1391(b)(2) because the underlying acts, omissions, injuries, and related facts giving rise to plaintiff's claims occurred within this district.

24.     In addition, under 18 U.S.C. § 1964(c) and *Tafflin v. Levitt*, 493 U.S. 455 (1990), venue is appropriate and in service of the ends of justice because plaintiff has been injured in this district "by reason of a violation of § 1962," and defendants have minimum contacts with the United States.

## FACTS

**A.     Savant Inc. Formation (2009-2012):**
**Conspiracy Begins Between Hurst and Turnbull**

25.     In 2009, three individuals—Hurst, a patent lawyer and businessman; Freeman, a medical doctor and researcher; and William Boulanger, a chemist—met in San Francisco to form a venture for researching and developing drugs.

26.     The three founders decided to focus on the development of pharmaceutical drugs with psychoactive components to treat mental health conditions, including anxiety, addiction, and attention deficit and hyperactivity disorder. The resulting company became known as "Savant."

27.     On August 25, 2009, Savant Inc. was incorporated in Delaware.

28.     Between 2009 and 2012 Freeman loaned Savant Inc. $195,000 (Ex. 1).

5

29.     Freeman was a director of Savant Inc. until 2014, and is currently its chief medical officer (CMO).

30.     Freeman agreed to let Hurst, a patent attorney by trade, be chair of the board and chief executive officer (CEO) because Hurst represented that he and Freeman were to be equally compensated so that their interests are aligned.

31.     Freeman and Hurst agreed that they were fiduciaries of the company, particularly because Hurst stated that initial investors included close friends and family members.

32.     Hurst and Freeman agreed to split compensation, including salary, bonus, stock, and stock options (Ex. 2), as memorialized in an e-mail from Hurst:

> . . . . [W]e will continue to share equally in equity compensation in Savant and it's [sic] affiliated entities and in salaried compensation.

33.     Over the next several years, Savant Inc. licensed four drugs: 18-MC to treat addiction, BOL-148 and LSD to treat cluster headaches and other neurological diseases, and benznidazole to treat Chagas disease.

### 1.     2009-2017: Savant's Trade-Secret BOL-148/LSD Program

34.     In or around 2011, Savant Inc. developed a program in psychedelics that included LSD and BOL-148.[1] As is common for early-stage pharmaceutical drug companies, a patent and related intellectual property were essential to attracting capital from outside investors to further this program.

35.     BOL-148 had two patents: one owned by Harvard University and the other by Dr. R. Andrew Sewell ("Sewell"). In or around 2012, Savant Inc.

---

[1] Except as specifically noted, references to "BOL-148" or the "BOL-148 program" include LSD.

LEWIS ROCA

1   licensed the Harvard patent and developed a draft license agreement for the

2   Sewell patent (Ex. 3).

3       36.    Sewell conducted a study of patients with cluster headaches and

4   found that LSD is superior to standard drugs in treating them. Sewell also

5   studied BOL-148, an LSD congener that did not have a hallucinogenic side ef-

6   fect, and found it was likewise effective in treating cluster headaches.

7       37.    After securing a patent for BOL-148, Sewell passed away. The pa-

8   tent was inherited by his wife, Nicola Sewell.

9       38.    Hurst believed the Sewell patent was critical in developing BOL-

10  148.

11      39.    As one collaborator noted in an e-mail with Freeman and Hurst,

12  "[m]y personal thoughts are his application is very well written, covers a multi-

13  tude of compounds, including BOL-148 and also mentions a variety of indica-

14  tions . . . ." (Ex. 4, 1 App. 13)

15      40.    Savant and Sewell's representatives reached a license agreement in

16  2012 but the licensing fee was $45,000, which Hurst claimed Savant Inc. could

17  not afford (Ex. 3, 1 App. 9).

18      41.    But Ms. Sewell was willing to wait because she had confidence in

19  Savant's ability as a drug-development company to develop the technology.

20      42.    Hurst did not express any urgency in raising the funds for formally

21  securing the license. Savant's dealings with Sewell and her representatives had

22  by then been ongoing for several years.

23      43.    If any other offers had come in, Sewell's representatives would have

24  alerted Savant Inc., and Savant Inc.'s timeline for formalizing the agreement

25  and paying the licensing fee would have accelerated.

26      44.    The license did not need to be executed to develop the trade-secret

27  BOL-148/LSD program because Ms. Sewell was working with Savant Inc.,

28

7

LEWIS ROCA

knowing Savant Inc. would eventually license it. The patent in question was a blocking patent, which would only be necessary when they brought their new uses of the BOL-148 drug to market.

45.    As set forth in a Savant December 2014 PowerPoint presentation, Savant's plan was to "acquir[e] Sewell IP from Sewell's estate," and to "consolidat[e] BOL-148 IP in a single entity." (Ex. 5, 1 App. 29)

46.    Hurst and Turnbull, however, in 2012, set up an entity, unbeknownst to Savant members, that jointly owned the BOL-148 intellectual property (Ex. 6).

47.    From 2012 to 2017, Savant management, including Freeman, worked on the BOL-148 program without remuneration since Savant did not have money for the program and could not pay salaries. Freeman did so only because he reasoned that if the BOL-148 project was successful he would eventually receive compensation through his officer position and equity interest in Savant.

48.    In addition to the draft license and relationship with Ms. Sewell, this program included a regulatory strategy, identification of a manufacturer, and plans for a clinical drug trial (Exs. 7–9):

   a.    Savant Inc. purchased one gram of BOL-148, which was essentially the world's entire purchasable supply and was a critical part of Savant's regulatory strategy, as it would be used for an FDA application for an investigational new drug (IND).

   b.    One gram was sufficient to conduct an early clinical trial of about twenty patients.

   c.    So Savant Inc. needed to find a manufacturer to make more.

   d.    It is difficult to find a manufacturer for BOL-148 because it is a controlled substance (manufacture requires LSD) and handling the

8

LEWIS ROCA

substance is difficult because exposure (LSD) above a few micrograms is extremely dangerous.

e.     In June 2017, Onyx, a drug manufacturer for BOL 148/LSD, was identified for Savant. This information was a trade secret held confidentially within Savant (Ex. 9).

f.     In April 2017 Savant explored the costs of conducting a clinical drug trial on BOL-148 at Yale and Hanover University (Ex. 21).

49.    In November 2014, Hurst developed an investor presentation and highlights BOL-148 for the treatment of cluster headaches as a main program. (Ex. 10, 1 App. 55)

> Savant has only recently licensed Bol-148 in October 2014 and is planning a pre-IND meeting with the FDA in 1Q:15 to discuss the regulatory path for Bol-148 approval.  Our approach will be to discuss whether Bol-148 can receive fast track and orphan drug designation since cluster headache is a low incidence disease with a high unmet medical need…. including dose finding studies for safety and efficacy, our goal is to file an IND in 2015 and to file an NDA in 2018.

50.    Moreover, the Savant Investors understood that any intellectual property previously developed relating to LSD and BOL-148 was among Savant's assets.

51.    They reasonably believed those assets were held in either Savant Holdings or Savant Inc., because they thought a separate limited liability company for BOL-148 had not been formed.

52.    But Hurst had other plans for the assets.

### 2.    2012: Hurst Enters into a Secret Partnership with Turnbull

53.    Although Savant members did not know until September 2022, Hurst and Turnbull began secretly dealing as early as 2012, with Turnbull

9

LEWIS ROCA

making an investment in Savant Inc.'s BOL-148 program as described on Ceruvia's website in September 2022 (Ex. 6):

> 2012: BOL-148 patents licensed to a new entity, Savant HWP partial ownership C Turnbull

54.     This investment was not disclosed to the Savant Inc. shareholders.

55.     Hurst fraudulently misrepresented to Savant members and in partnering presentations that BOL-148/LSD was Savant's solely owned technology. For instance, in 2014, a partnering presentation made to TEVA Pharmaceuticals with no mention of Turnbull (Ex. 11). Likewise, in management meetings and investor presentations, Turnbull's investment was never mentioned Exs. 7–9).

### 3.     2013: Savant Inc. Reorganizes: The Four Original Savant Entities

56.     To raise outside capital, the founders decided in 2013 to formalize the structure of their working arrangement.

57.     Hurst explained to Freeman that he, aided by his attorney, Evan Ng ("Ng"), formed four related entities: (i) Savant Inc. was the management company for all of the projects; (ii) Savant Holdings was a holding company for Savant's drug assets and founders shares; and (iii) two individual LLCs were formed for each drug development project so that investors could make targeted investments in the drugs of interest (Ex. 12).

58.     As Hurst explained to Freeman, Savant's corporate structure is described below (Ex. 12):

> a.     **Savant Inc.**, formed in 2009, was repurposed as the Savant management company. It provided management services for all projects, employed Savant's employees, and received a 10 percent profit share for the management services from each of the drug development LLCs. The profits were to be split among employees through stock options. Each

10

member of management was eligible for yearly stock options, salary, and bonus.

b. **Savant Holdings** obtained the intellectual property rights to the Savant Inc. drug programs, including 18-MC and BOL-148/LSD, and thus is the 100% owner of the intellectual property and trade secrets for Savant's drug assets. Savant Holdings also holds the founding members' interest in the specific drug development LLCs for targeted investment. Initially, Savant Holdings owned 100% of each drug LLC, so each founding member received a fixed ownership the drug LLC based on percentage ownership in Holdings: For instance, because Freeman was a 38.89% owner of Savant Holdings, Freeman started with 38.89% ownership in Savant Addiction Medicine (drug 18-MC) and Savant Neglected Disease (drug benznidazole). His initial equity in any other drug development LLC, such as for BOL-148/LSD, would also have been 38.89% (Ex. 13).

c. **Savant Addiction**, one of the drug development LLCs, offered investors a vehicle to purchase shares for developing 18-MC (the "18-MC Program"), a chemical with the potential to treat various mental health conditions, including anxiety, addiction, and attention deficit and hyperactivity disorder; in this way, investors could make targeted investments in the potential for this class of drugs. The purchase of ownership in Savant Addiction proportionally dilutes Savant Holdings member—for instance, Turnbull bought 2.04% ownership in Savant Addiction—but since only about a total of $1 million was raised, Savant Holdings has a 88.45% equity stake in Savant Addiction. The remaining Savant Addiction investors own 11.55%.

d. **Savant Neglected Disease**, the other known drug development LLC, offered investors a vehicle to purchase shares for developing

11

benznidazole for FDA approval; this entity was sold to Humanigen, Inc., a biotech company, and is unrelated to this litigation.

59.     Savant Holdings, Savant Inc., and Savant Addiction are collectively referred to as the "Savant Entities," and the shareholders and members of the Savant Entities are collectively referred to as the "Savant Investors."

60.     Savant Addiction and Savant Neglected Disease are subsidiaries of Savant Holdings, with Savant Holdings owning 94.23% of each, similar to Savant Inc., as summarized in the June 30, 2014 capitalization table, which omits the 2012 deal with Turnbull (Ex. 14).



61.     Savant also had plans to create a drug-development LLC dedicated to treatment of cluster headaches (BOL-148/LSD), as outlined in investor presentations—"A third LLC is being formed for Cluster Headache" (Ex. 12)—but as far as the Savant Investors knew, this entity was never formed.

62.     When Freeman asked Hurst about establishing an LLC for BOL-148/LSD, Hurst fraudulently misrepresented that it was not the right time because there were no investors, when in fact Turnbull had already invested in BOL-148 in 2012 (Ex. 6).

12

63.     Based on his ownership in Savant Holdings, Freeman's equity in this BOL-148/LSD LLC would have initially been 38.89%.

### 4.     Hurst Fraudulently Induces Freeman and Savant Investors to Sign the LLC Operating Agreements

64.     Hurst and Ng, Savant counsel and a longtime Hurst associate, acting as Savant Inc. fiduciaries, structured the Savant Entities to grant Hurst exclusive managerial control, both as CEO and chairman of Savant Inc. and managing member of Savant Holdings, which in turn is the managing member of Savant Addiction. This was done because Hurst was already dealing with Turnbull since 2012 and had future plans to siphon off Savant's trade secrets (Ex. 6).

a.     Hurst and Ng structured Savant Holdings and Savant Holdings as Delaware LLC rather than corporations to avoid the protections of annual shareholder meetings and board oversight.

b.     In addition, Hurst and Ng tailored the Savant Holdings operating agreement to grant Hurst authority to act as managing member for life and to purport to eliminate fiduciary duties, which could not be eliminated from his role in Savant Inc.

c.     Although Hurst has fiduciary obligations as CEO of Savant Inc. and because of his special relationship with Freeman, Hurst wanted to escape these obligations because he knew that he had already violated them and was going to continue.

d.     And, as managing member, the operating agreement gave Hurst unobstructed veto power over any and all corporate actions, including actions seeking Hurst's own ouster.

e.     Despite no authority or requirement in the operating agreements, Hurst also decided not to give Savant Holdings members direct membership interests in the drug-development LLCs, but only indirect

13

1Case 2:22-cv-01433-RFB-MDC   Document 190   Filed 06/19/24   Page 24 of 248

beneficial ownership through their ownership in Savant Holdings, which Hurst controlled.

f.      In this way, making Savant Holdings the managing member of Savant Addiction under a substantially identical operating agreement thus assured that Hurst would exercise effective control over both. In contrast, if the Savant Holding members had been given direct ownership of Savant Addiction, they would have constituted a majority in interest of Savant Addiction to exercise oversight over Hurst.

g.      The establishment of Savant Addiction and the transfer of 18-MC was done without member approval which was required by the Savant Holdings operating agreement, as was Hurst making Savant Holdings members beneficial owners of Savant Addiction rather than direct owners. In other words, a majority-in-interest was required to transfer the 18-MC drug asset to Savant Addiction. There was no member approval of the 18-MC transfer or the terms of the transfer, beneficial ownership in Savant Addiction.

h.      Even within Savant Inc., now a subsidiary of Savant Holdings, Hurst maintained total control by refusing to hold shareholder meetings or allow a shareholder vote to appoint a board of directors that might have exercised independent oversight.

65.    None of this was explained to Freeman or the other Savant Investors, even though Hurst and Ng, fiduciaries of Savant Inc., had a duty to.

66.    Nor did Hurst disclose his relationship with Turnbull, which had begun at least as early as 2012, and their secret plans to develop BOL-148/LSD, which would have been material to Freeman's and the other Savant Investors' decision to sign the operating agreements which gave Hurst a lot of control.

14

67.    Instead, Hurst fraudulently misrepresented that since he and Free-man were equally compensated, Hurst would be acting in both of their best interests and as fiduciaries as evidenced in Hurst's July 2020 e-mail (Ex. 15).

> Your fiduciary is the same as mine with respect to all the other members and shareholders of Savant

68.    Freeman thus signed the Savant Holdings operating agreement and agreed to let Hurst continue as CEO of Savant Inc. and to become managing member of Savant Holdings (and therefore in control of Savant Addiction) in reliance on Hurst's misrepresentations.

69.    Nevertheless, importantly, the Operating Agreements for Savant Addiction and Savant Holdings limit Hurst's discretion (Exs. 16, 17):

a.    Section 7.05 of both Operating Agreements provides that the managing member is required to advise the other members of material decisions:

> [T]he Managing Member shall keep the other Members reasonably informed on a timely basis of any material fact, information, litigation, employee relations or other matter that could reasonably be expected to have a material impact on the operations or financial position of the Company, including, but not limited to, any modification of any loan or other financing to the Company.

b.    Moreover, pursuant to the Operating Agreements, major decisions, such as the sale or transfer of assets, need a majority-in-interest approval.

c.    Specifically, Section 7.02(b) provides that the managing member may not authorize the entity to "make any material change to the nature of the Business conducted by the Company or enter into any business other than the Business" without first obtaining the "written approval of a majority-in-interest of the Members."

15

LEWIS ROCA

d.      Section 7.02(h) of each Operating Agreement requires written approval of a majority-in-interest of the members as a prerequisite to the managing member authorizing the company to "enter into or effect any transaction or series of related transactions involving the sale, lease, license, exchange or other disposition (including by merger, consolidation, sale of stock or sale of assets) by the Company of any assets, other than sales of inventory in the course of business consistent with past practice."

e.      Section 12.03 broadly prohibits the misuse of Savant's confidential information, including its affiliates:

> "[N]o Member shall, directly or indirectly, disclose or use . . . , including, without limitation, use for personal, commercial or proprietary advantage or profit, any Confidential Information of which such Member is or becomes aware. Each Member in possession of Confidential Information shall take all appropriate steps to safeguard such information and to protect it against disclosure, misuse, espionage, loss and theft."

**B.      2013-2017: Theft of Savant Trade Secrets**

70.      Hurst used the 2013 Savant Holdings operating agreement as a vehicle to further his dealing with Turnbull since the Savant Holdings gave Hurst control the board and essentially lifetime tenure as managing member.

71.      From 2014-2017, Hurst as CEO and managing member of the Savant Entities could not raise money for Savant Addiction or for the BOL-148 program in Savant Holdings.

72.      In 2017, on information and belief, Hurst decided to leave Savant since he had not been able to raise money and hired Belga for business development with a contract that if he can raise $5MM, Belga would get a 20% equity stake and become CEO (Ex. 18).

73.      Hurst then secretly established his next company Savant TAC (which would become Ceruvia) with Turnbull, by stealing Savant Inc./Savant

16

LEWIS ROCA

Holdings trade secrets for BOL-148/LSD without approval of Savant members, contrary to the operating agreement.

74.     This scheme is described below.

### 1.     *Turnbull Joins Savant Addiction and Savant Neglected Disease*

75.     Turnbull became a member of both Savant Addiction Medicine and Savant Neglected Disease and became bound by the operating agreements' confidentiality clauses:

> Each Member acknowledges that during the term of this Agreement, it will have access to and become acquainted with trade secrets, proprietary information and confidential information belonging to the Company and its Affiliates that are not generally known to the public (161B, section 12.03).

### 2.     *2013-2017: Hurst and Turnbull Secretly Form Savant TAC, Concealing Its Existence and Purpose from Savant Members*

76.     On February 17, 2017, Hurst, together with Ng and Turnbull, formed a Delaware limited liability company, Savant TAC. Its street address was listed as 1325 Airmotive Way, Suite 175A, Reno, Nevada, just like the other Savant Entities. Exhibit 19 is a true and correct copy of Savant TAC's Certificate of Formation, which Ng signed. (1 App. 218.)

77.     Hurst concealed the existence of Savant TAC from the other Savant Investors, contrary to § 7.02 and § 7.05 of the Savant Holdings operating agreement. Its name appears in neither any correspondence nor the Savant capitalization tables.

78.     Likewise, although the Savant Holdings Operating Agreement explicitly requires a majority-in-interest to approve transfers of assets and related party transactions, Hurst did not get the Savant Investors' approval to transfer the LSD and BOL-148 assets into Savant TAC.

17

LEWIS ROCA

1
2

### 3. *2017-2018: Hurst and Turnbull Secretly Divert Savant Holdings's BOL-148/LSD Assets to Ceruvia*

3      79.    In late 2017, Hurst surreptitiously transferred control of Savant

4   TAC to Turnbull. While the precise date of the transfer is unknown, its exist-

5   ence is evident because Turnbull began taking corporate actions on behalf of Sa-

6   vant TAC.

7      80.    On December 19, 2017, Turnbull, as Savant TAC's "Authorized Per-

8   son," filed a certificate of amendment changing the company's name to CH TAC,

9   LLC. Exhibit 20 is a true and correct copy of the certificate of amendment

10  signed by Turnbull.  (1 App. 220.)

11     81.    He also changed its principal place of business to an address in

12  Greenwich, Connecticut, the state where Turnbull lives.

13     82.    Both actions were unknown to Savant Investors and to Freeman,

14  who was continuing to develop the trade-secret BOL-148/LSD program for

15  "sweat equity," since there was no money invested in this program (Exs. 21, 9).

16     83.    Around this time, Hurst, acting in concert with Turnbull and Ng,

17  reached a deal with Nicola Sewell to transfer the patent rights to LSD/BOL-148

18  for use in the treatment of cluster headaches to Savant TAC.

19     84.    On February 21, 2018, Ms. Sewell executed a document assigning

20  the patent to "Savant TAC, LLC, with an address at 1325 Airmotive Way, Suite

21  175A, Reno, NV 89502" (Savant's corporate address), for $1 "and other good and

22  valuable considerations." Exhibit 22 is a true and correct copy of the assignment

23  that was submitted to the USPTO enclosing the agreement Ms. Sewell executed

24  with Savant TAC.  (1 App. 224.)

25     85.    Of course, Savant TAC had ceased to exist by that name months

26  earlier.

27
28

18

LEWIS ROCA

86. Hurst deceived Ms. Sewell to procure the patent rights for Turnbull. Hurst misrepresented to Ms. Sewell that she was assigning the patent rights to Savant—with whom Ms. Sewell had been negotiating since 2011 and in whom Ms. Sewell had confidence to develop the patented technology—when she was actually assigning the rights to CH TAC and Turnbull.

87. Ms. Sewell relied on these representations in licensing the patent on even more favorable terms than those negotiated in 2012; there was no longer a $45,000 upfront licensing fee.

88. Five days later, on February 27, 2018, CH TAC submitted an assignment to the USPTO that directed the patent to CH TAC.

89. In this submission, CH TAC included the assignment that Ms. Sewell had signed transferring the rights to Savant TAC (not CH TAC), as well as Delaware filings demonstrating that its name and place of business had changed prior to the assignment. Exhibit 23 is a true and correct copy of the submission.  (1 App. 229.)

90. On April 3, 2018, Hurst certified "micro entity" status for the Sewell patent, which, because CH TAC was the patent's assignee at that point, demonstrates that Hurst was working for CH TAC.

91. The phone number Hurst listed on the certification, his cell phone, is the same one he continued to use in Savant press releases. Exhibit 24 is a true and correct copy of the micro entity certification. (1 App. 240.)

92. In June 2021, Turnbull changed the CH TAC name to Ceruvia. Exhibit 25 is a true and correct copy of the certificate of amendment signed y Turnbull. (1 App. 242.)

93. Hurst and Turnbull both have an equity interest in Ceruvia.

94. Additionally, Hurst and Turnbull were only aware of the importance of the Sewell patent, the opportunity to license it, and other

19

LEWIS ROCA

confidential Savant information, such as the Onyx manufacturer for BOL-148 and LSD, because of their affiliations with Savant and the information that had been developed through Savant's proprietary BOL-148 program.

95.   As discussed, Section 12.03, which appears in both the Savant Holdings and the Savant Addiction Operating Agreements (the latter of which Turnbull signed as a Savant Addiction member), broadly prohibits the misuse of Savant's confidential information.

96.   Accordingly, the Sewell patent and related information constituted confidential information and trade secrets belonging to Savant, which Hurst and Turnbull were prohibited from using for their own commercial gain.

### 4.   2012-Present: Hurst and Turnbull Conceal their Theft of Savant's Trade Secrets

97.   When Freeman asked about the status of the Sewell license, Hurst fraudulently misrepresented to Freeman that since Savant did not have the $45,000 license fee, Turnbull independently licensed it.

98.   Hurst further misrepresented to Freeman that because the patent was a public document and Turnbull did not rely on any Savant confidential information, Turnbull did not violate his confidentiality obligations under the operating agreements.

99.   Rather, Hurst fraudulently misrepresented to Freeman and others, including Jamon Rahn (JR), that there was no need to worry because there was a collaboration with Turnbull, so BOL-148 was still a Savant project (Ex. 26).

> . . . . I've been developing other neuro-transformational medicines like psilocybin and BOL-148 with an eye to bringing them into Savant.

100.   Following the assignment, Hurst continued to hide that he had orchestrated the diversion of the Sewell patent and other BOL-148 trade secrets and assets to Ceruvia.

20

LEWIS ROCA

101.   At one point, Freeman asked Hurst about the status of BOL-148 and the licensing of the Sewell patent. In response, Hurst misrepresented that Savant had not paid the drug's $45,000 license fee and the license now belonged to defendant Turnbull.

102.   In other words, Hurst deceived Freeman into believing a lack of funds had prevented Savant from acquiring the patent for itself when in fact the upfront licensing fee had changed from $45,000 to $1.

103.   Freeman was surprised by this news.

104.   Hurst had never approached him about the $45,000 fee or suggested that anyone else was interested in licensing the Sewell patent. Freeman had already loaned Savant $800,000, and under the circumstances would have loaned an additional $45,000 to protect the intellectual property to BOL-148.

105.   Any discussion concerning the Sewell patent between Hurst and Turnbull, a member of Savant Addiction, should have been subject to a non-disclosure agreement.

106.   To assuage Freeman's concerns, Hurst assured him that BOL-148 was still a Savant project and the company would be working alongside Turnbull once there was any progress with the drug's development.

107.   At the time, Freeman trusted Hurst, and thus he reasonably believed Hurst's representation that BOL-148 remained a Savant project and that they were equal partners so their interests were aligned. In other words, Freeman reason that if Turnbull, a businessman was involved as a collaborator, this could help Savant develop BOL-148 because Hurst had not raised money from other investors.

108.   Nevertheless, that representation was also false which did not become apparent until Ceruvia published its website on the internet in June 2021.

21

LEWIS ROCA

1   Then Freeman knew that Turnbull was not a collaborator with Savant since Sa-

2   vant was not mentioned on it (Ex. 27).

3          109.   Armed with the Sewell patent, Ceruvia pushed forward toward

4   FDA approval for BOL-148.

5          110.   On June 22, 2022, Ceruvia announced that, based on a positive Pre-

6   IND meeting with the U.S. Food and Drug Administration, it submitted an In-

7   vestigational New Drug ("IND") application to begin a Phase 1 clinical trial of

8   BOL-148.

9          111.   Accordingly, Ceruvia is now on course for gaining FDA approval of

10   a BOL-148 treatment for migraines and other headache disorders.

11          112.   The benefits of that approval will flow solely to Ceruvia; Savant, as

12   Ceruvia's competitor, will not be able to share in those benefits.

13          113.   The Savant management team spent years working on the BOL-148

14   program without remuneration in developing its trade secrets.

15          114.   Turnbull and Hurst also caused Ceruvia to fraudulently misrepre-

16   sent on the Ceruvia website that BOL-148 was Ceruvia's property (Ex. 27).

17          115.   Hurst and Turnbull leveraged the name changes—from Savant

18   TAC to CH TAC to Ceruvia—to conceal that the theft of trade secrets from Sa-

19   vant.

20          116.   On August 18, 2022, Freeman discovered the existence of Savant

21   TAC and realized that Hurst and Turnbull are financial partners in Ceruvia.

22          117.   It was not until the emergence of this information that Turnbull

23   disclosed the truth on Ceruvia's website that Turnbull had made an investment

24   in Savant Inc. in 2012 (Ex. 6).

25   **C.    Formation of MindMed (2018-2019): Continuation of the Pat-
         tern**

26

27          118.   Hurst continued this pattern of corporate theft through control and

28   concealment. At Savant Holdings, his control arose under the operating

22

LEWIS ROCA

agreement designed for that purpose. At MindMed, he exercised control through the board of directors. At both companies, he concealed his relationship to Turnbull and his equity ownership in Ceruvia.



119.   As described below, Hurst accomplished this pattern of control and concealment in several steps: (1) a scheme to cheat an investor who would have been entitled to share control at MindMed, (2) the formation of MindMed itself, (3) the usurpation of the Savant Holdings members' voting rights in MindMed to control the board of directors, (4) leveraging Freeman's loans to maintain those voting rights, (5) forcing Freeman out of MindMed, and (5) concealing his relationship with Turnbull to steal MindMed's trade secrets for Ceruvia.

### 1.   *2018-2019: Hurst Cheats Belga Out of a Finder's Fee*

120.   In or around 2012, Savant licensed the drug 18-MC for the treatment of addiction, and in 2013 Savant Addiction was formed.

121.   Since Hurst was poor at raising money from investors, only about nine patients were treated with the 18-MC in early clinical trials.

122.   The money to develop 18-MC came from a National Institutes of Health grant to Freeman.

123.   Hurst could not raise the needed funds from investors for Savant Addiction Medicine to further develop 18-MC.

124.   By 2018, Hurst, unable to raise money for the Savant Entities, contemplated leaving Savant to work with Turnbull, with whom Hurst had already formed Savant TAC and had begun misappropriating Savant's BOL-148/LSD program to that entity.

125.   In October 2018, Hurst announced that he would outsource fundraising for Savant Addiction to a consultant who would become CEO if he could do what Hurst could not: raise $5 million.

126.   On behalf of the Savant Entities, Hurst retained Ferdinand Belga, who had worked successfully in the pharmaceutical drug industry for over two decades.

127.   Specifically, Hurst promised Belga up to 20 percent of the equity in Savant Addiction upon raising between $2 million and $5 million.

128.   As set forth in Belga's consulting agreement with Savant Inc., Hurst also promised him that, subject to board approval, "if you are successful in raising $2 million or more prior to October 1, 2019, you will be appointed [Savant Inc.'s] Chief Executive Officer and I will assume the role of Executive Chairman. You will become a salaried employee." Attached hereto as Exhibit 7 is Belga's consulting agreement with Savant Inc. (Ex. 18.)

129.   On January 8, 2019, Jamon Rahn, an investor interested in psychedelics, contacted Belga about investing money in Savant (Ex. 28).

24

LEWIS ROCA

130.   Savant Addiction's primary remaining goal was to develop 18-MC, a drug derived from a psychedelic.

131.   Belga developed a plan with Rahn to form a new Delaware corporation that would replace Savant and continue the 18-MC drug development program.

132.   A new company would be formed with 18-MC.

133.   On March 31, 2019, Rahn expressed concerns about Hurst's qualifications (Ex. 29). Hurst attempted to assuage those concerns by fraudulently misrepresenting to Rahn and Belga that he "invested in a CEO succession plan" for Belga to take over as CEO (Ex. 26).

134.   Once Belga engaged with Rahn, however, Hurst began to circumvent Belga and renege on the consulting agreement.

135.   In April 2019, an initial term sheet for the transaction with Rahn listed Belga as Chief Operating Officer, Hurst as CEO, and Freeman as Chief Medical Officer (Ex. 30, 2 App. 279).

136.   The term sheet reflected Belga's critical role in obtaining the financing, which triggered the provisions as to equity and title in his consulting agreement.

137.   Through Hurst, Savant Addiction rejected Rahn's initial offer sheet, and Belga continued to work on sourcing additional investors.

138.   In the meantime, Hurst was secretly reengaging Rahn without Belga.

139.   On May 26, 2019, Belga received an e-mail from Hurst announcing that Hurst had reached a deal with Rahn, and there was no need for him to participate in a planned trip to meet with potential investors (Ex. 31).

140.   This was a surprise to Belga, as he was unaware that Hurst was in continued discussion with Rahn.

25

141.   Shortly thereafter, the reasons for Hurst's unilateral negotiation of the terms of the transaction became clear.

142.   Hurst structured the deal with Rahn to remain in control and cut Belga out, with Rahn's funds technically being invested in MindMed instead of Savant Addiction.

143.   MindMed was by then a newly branded Delaware LLC (and later Canadian corporation) to whom the 18-MC asset was to be sold.

144.   There was no business reason for structuring the deal in this manner.

145.   Hurst merely altered the entity receiving the funds to prevent Belga from receiving what he was due under the consulting agreement.

146.   Withholding the 20 percent equity from Belga personally benefitted Hurst, who through Savant Holdings held an approximately 34 percent stake in Savant Addiction.

147.   In addition, keeping Belga from becoming CEO enabled Hurst to control MindMed because the CEO of Savant Inc. also became the CEO of MindMed, in turn enabling Hurst to steer MindMed's intellectual property to Ceruvia.

148.   On May 24, 2019, Savant members were informed that Hurst had signed a letter of intent with Rahn making Hurst CEO and Freeman CMO of MindMed. There was no position for Belga (2 App. 285).

### 2.   Further Fraud in Backdated Options

149.   In November 2019, Hurst contacted Belga and acknowledged that he had mistreated him.

150.   While this was an implicit acknowledgement that Hurst had caused Savant to breach the consulting agreement, Hurst did not offer to rectify the breach by naming Belga CEO.

26

LEWIS ROCA

151.   Nor did Hurst offer to compensate Belga by transferring to him the 20% MindMed stock he was due, which would have required disclosure to the Savant Investors.

152.   Instead, Hurst attempted to placate Belga with what he represented would be a personal gift of his own shares, but turned out to be backdated stock options issued by Savant Inc. directly.

153.   Stock options are normally issued with grant dates that substantially mirror the issue date, ensuring that the stock options are priced using the company's current fair market value. Options backdating occurs when a company issues stock options with an earlier grant date to fix a lower exercise price, which has the effect of artificially boosting the value of the options.

154.   The practice has long been considered illegal, and it was specifically targeted by the Sarbanes-Oxley Act of 2002. Further, between 2006 and 2010, the SEC and Department of Justice worked to stamp out options backdating through a series of high-profile prosecutions. *See, e.g.*, https://www.sec.gov/spotlight/optionsbackdating.htm#enf.

155.   On October 28, 2019, a paralegal at Ng's firm, Dorsey & Whitney, sent Belga a Stock Options Grant Notice granting him options for 125,000 shares of Savant Inc. stock (the "Stock Options Grant"), which was signed by Hurst on October 23, 2019. Exhibit 35 is a true and correct copy of the Stock Options Grant. (2 App. 288.)

156.   Because a reputable law firm sent Belga the Stocks Options Grant, the document raised no red flags for him at the time. Nevertheless, the Stock Options Grant has a grant date of February 26, 2019—six months earlier and well before the signing of the MindMed transaction documents—and an exercise price of five cents per share.

27

LEWIS ROCA

157.   If the option grant date had been the same as the issue date, the exercise price would have been higher because the MindMed transaction had already occurred.

158.   These backdated options were presented and executed as a personal gift from Hurst, and Belga did not execute any kind of release.

159.   The effect of granting backdated options was to dilute the shareholders of Savant Inc.

160.   The use of Savant Inc. options to fund Hurst's personal "gift" was not approved by nor disclosed to the shareholders in Savant Inc.'s financials.

161.   Nor did the shareholders elect a board to approve the transaction, even if it had been disclosed. The sole "board" was one appointed by Hurst without shareholder approval, but there is no evidence that even this "board" approved the Stock Options Grant.

162.   Freeman received no benefit from these options, as they are not part of Belga's assignment to Freeman. Freeman's assignment is for claims arising from the breach of Belga's consulting agreement.

163.   To the contrary, Freeman's shares in Savant Inc. were diluted by the Stock Options Grant. And like other shareholders, Freeman was not aware because the back-dated options do not appear in Savant Inc.'s capitalization tables (Ex. 13).

### 3.   *Hurst Moves 18-MC to Savant Addiction without Savant Holdings's Approval*

164.   Pursuant to the operating agreements for Savant Holdings and Savant Addiction, the intellectual property for Savant's 18-MC program was held by Savant Holdings, not Savant Addiction.

165.   Although the operating agreements gave Hurst substantial control, they included guardrails that Hurst ignored.

28

166.   In preparation for the deal with MindMed, Hurst did not want the equity from MindMed to reside in Savant Holdings, where he was managing member but did not hold a majority of the membership interests. Instead, he wanted the MindMed equity to flow to Savant Addiction, an entity over which Hurst had greater control through his managing-member position at Savant Holdings.

167.   Hurst therefore purported to transfer the 18-MC drug program from Savant Holdings to Savant Addiction in December 2013 without a transfer agreement or approval of the Savant Holdings membership, contrary to the operating agreement. Without the transfer agreement, Hurst made Savant Holdings members beneficial owners in Savant Addiction rather than getting direct shares.

168.   Hurst transferred the 55,000,000 shares to Savant Addiction in the MindMed Foundation Agreement, which was not approved by members and only witnessed by Nico Forte, who was not a Savant member (Ex. 34, 2 App. 301). Doing so, based only on Hurst's say-so, gave Hurst total purported control of the shares (as Savant Addiction's managing member) since Savant Holdings members were not members of Savant Addiction. This set the stage for his total control of MindMed through Savant Addiction.

### 4.   *Hurst Misrepresents His Authority in the Formation of MindMed*

169.   On or about July 23, 2019, Hurst caused Savant Addiction to enter into two agreements with MindMed—a "Foundational Agreement" and a "Contribution Agreement" (the "MindMed Agreements")—by which Savant Addiction and Savant Inc. agreed to transfer all of their assets related to the 18-MC program to MindMed. In return, Savant Addiction received 55 million Class A shares of MindMed stock "free and clear of all encumbrances." (Ex. 34, 2 App. 327.)

LEWIS ROCA

170.   Because Hurst and Turnbull had stolen the BOL-148 program for Ceruvia, 18-MC was the only asset the Savant Entities still possessed.

171.   In executing the MindMed Agreements on behalf of Savant Addiction and Savant Inc., Hurst represented that he had full authority to act. That representation was false.

172.   The counterparties to that agreement—specifically Rahn (along with his company Liquidity Holdings LLC) and his partner Leonard Latchman (along with his company LDL Corp.)—invested in MindMed and executed the MindMed Agreements on the basis of Hurst's misrepresentation about his authority.

173.   As noted, Savant Holdings is the parent company of Savant Addiction, and Hurst is Savant Holdings's managing member.

174.   Pursuant to Section 7.02(b) and (h) of the Savant Addiction Operating Agreement, Hurst was required to obtain authorization from a majority-in-interest of Savant Addiction's members and a majority-in-interest of Savant Holdings members, since Savant Addiction was its subsidiary, prior to authorizing the MindMed Transaction.

175.   Hurst did not do so.

176.   Hurst's misrepresentation was not a technical mistake or oversight.

177.   By not putting the terms of the transaction to a vote, Hurst was able to keep the structure of the transaction secret from the Savant Investors until the deal closed.

178.   The only persons associated with Savant privy to the structure were Hurst; Evan Ng, the lawyer who technically represented Savant but was personally loyal to Hurst; and Forte, who was not a Savant member, but the witness who was Hurst's longtime friend and who was rewarded with a position at MindMed and a seat on Savant Inc.'s Board of Directors.

LEWIS ROCA

179.   Hurst proceeded to structure the transaction to grant himself the same type of control over MindMed that he enjoyed with the Savant Entities by transferring the 55,000,000 MindMed shares to Savant Addiction rather than distributing them to Savant Investors.

180.   This was done without approval of the Savant Investors.

181.   In connection with the MindMed Agreements, Rahn and Latchman received 35 million MindMed shares upon the company's formation.

### 5.   *Hurst Misrepresents His Right to Maintain Control over the Savant Addiction Voting Bloc*

182.   At this point, the Savant Investors could have—and, more importantly, should have—received their 55 million shares directly because the purpose of Savant Addiction was effectively terminated.

183.   There was nothing else for Savant Addiction to do. Because Hurst had transferred the intellectual property to MindMed and Savant Addiction had no other assets, it was now a drug development corporate vehicle without a drug.

184.   Section 11.01 of the Savant Addiction Operating Agreement specifically provides that this kind of exchange warrants dissolution:

> The **Company shall be dissolved** and its affairs wound up only upon the occurrence of any of the following events:  (a) The determination of a majority in interest of the Members to dissolve the Company; (b) **The sale, exchange, involuntary conversion, or other disposition or Transfer of all or substantially all the assets** of the Company; or (c) The entry of a decree of judicial dissolution under § 18-802 of the Delaware [Limited Liability Company] Act.

(Emphasis added.)

LEWIS ROCA

185.   Instead of distributing the shares to the Savant Investors and winding down Savant Addiction—as he was required to do—Hurst contributed the 55 million MindMed shares to Savant Addiction.[2]

186.   Not only was this transfer in bad faith because it was intended to benefit Hurst at the expense of the Savant Investors, but it also contravened the Savant Addiction operating agreement.

187.   By placing the MindMed shares in Savant Addiction, Hurst changed the business from a drug-development company to a stock-management company, a new enterprise in which Hurst had no expertise.

188.   Under § 7.02(b) of the operating agreement, such a change in business could only take place if authorized by the vote of a majority-in-interest. Once again, Hurst did not call for such a vote.

189.   Instead, Hurst fraudulently misrepresented to Savant members that he did not need approval from the members of Savant Holdings to sequester the MindMed shares in Savant Addiction Medicine, as stated in shareholder letter of August 16, 2019 (Ex. 35),[3] and the Foundation Agreement (Ex. 34), which again had been witnessed only by non-Savant member Forte.

190.   The sequestering of shares in Savant Addiction also violates the operating agreement, since under § 11.01, Savant Addiction should be dissolved when "substantially all" its assets have been sold (Ex. 17, 1 App. 203).

---

[2] In fall of 2019, Hurst had the 55 million shares converted to 550,000 "multiple voting shares," each equivalent to 100 Class A common shares. The process of reconverting multiple voting shares back to common shares was a complicated and time-consuming process because plaintiff and other Savant Investors are U.S. citizens, while MindMed is a Canadian company. For simplicity, this complaint refers throughout to the equivalent number of common shares.

[3] Hurst wrote to Savant members that "your equity interest in MMED will be held by Savant for the foreseeable future." (Ex. 35, 2 App. 355.)

LEWIS ROCA

191.   By improperly sequestering the MindMed shares in Savant Addiction, which he controlled, Hurst claimed he gave himself the right to vote all 55,000,000 MindMed shares. He did so to control the voting rights of the MindMed shares and thus control the MindMed board of directors, including to continue his misappropriation of trade secrets with Turnbull, as discussed below.

192.   Hurst further cemented control by causing Savant Addiction to agree—without approval of a majority of the Savant Addiction members—to subject the 55,000,000 MindMed shares to a two year lock-up agreement with Canaccord, the investment banker involved in the transaction (Ex. 36, 2 App. 357). Accordingly, the shares could not be sold for up to two years.

193.   Hurst falsely represented that the lock-up agreement gave him control to vote the MindMed shares for two years since the MindMed shares would slowly unlock on the following schedule: 10 percent of the shares were to be released from lock-up in September 2020, 10 percent in March 2021, 10 percent in September 2021, and the remaining 70 percent in March 2022.

194.   This was untrue: Although the shares were locked up and could not be sold outright, they still had voting rights.

195.   Moreover, the 55,000,000 shares constituted a sufficiently large bloc to control the MindMed board and shareholder votes during the lock-up period. As Hurst put it in an October 19, 2020 e-mail to Freeman (Ex. 37, 2 App. 361):

> So as I understand the situation, even though the Savant block is not a majority, as votes go in Canada I've been told that a 20% block generally controls the outcome of a shareholder vote, which means that Savant likely now controls the board membership and any other issue that might require a shareholder vote in the future. . . . Once the shares are distributed, unless there is a voting rights agreement we likely give up that control.

33

LEWIS ROCA

196.   Since generally less than 40% of shareholders vote in a start-up biotechnology's annual general meeting, Hurst realized that Savant Addiction's 55-million-share voting bloc effectively controlled MindMed's board of directors.

197.   Since the shares belonged to the Savant Investors, they should have at least been given the right to vote the shares while they were held by Savant Addiction.

198.   Hurst purposefully deprived them of that right.

199.   In addition, to maintain control of the Savant voting bloc, Hurst in the fall of 2019 had the 55 million shares converted to 550,000 "multiple voting shares" (MVS), each equivalent to 100 Class A common shares (Ex. 38), which further prevented shares from being distributed to and sold by Savant members.

200.   Although Hurst claimed that MVS was done for tax reasons, this is false; there is a tax disadvantage to the conversion.

201.   Hurst also misrepresented that MindMed required conversion to MVS for U.S. citizens, but this is also untrue: Rahn, an initial MindMed investor and U.S. citizen, was not required to convert all his MindMed shares to MVS.

202.   There was only one reason Hurst converted MindMed common shares to MVS: to exert further control over the Savant voting rights. The process of reconverting multiple voting shares back to common shares was a complicated and time-consuming process because plaintiff and other Savant Investors are U.S. citizens, while MindMed is a Canadian company, and because once converted to MVS, the MindMed bylaws prevented conversion back to common

LEWIS ROCA

shares for almost a year. During that time the MindMed stock dropped precipi-
tously (Ex. 38), costing Savant members tens of millions of dollars.[4]

203.   The voting rights of shares have a monetary value (Ex. 40).

204.   These rights were especially valuable to Freeman, as the largest
MindMed shareholder, who should have had significant input into the company,
and also as an employee—including through stock options and bonuses—value
that would have been maintained had he been able to exercise the voting rights
to his shares.

205.   This value should have gone to Freeman and the Savant members,
not Hurst.

206.   Instead, with Hurst's control over the Savant Addiction voting bloc,
just 11.55% of the Savant Addiction members (i.e., the direct Savant Addiction
investors, such as Turnbull, who were not in Savant Holdings), and thus Hurst
as managing member, controlled 100% of the MindMed voting shares.

207.   Hurst conspired with Ng to mislead Freeman and the Savant Inves-
tors and enrich himself with the value of those voting rights.

### 6.   Hurst Wields his Control Over MindMed to the Company's Detriment

208.   MindMed commenced operations in the summer of 2019 with the
18-MC project, acquired from Savant Addiction.

209.   The final MindMed transaction closed with Hurst as its Executive
Chairman and Chief Executive Officer.

210.   In the fall of 2019, Hurst informed Freeman that he was working
with Turnbull's company on another psychedelic drug, psilocybin, and that he
was helping the company prepare for an FDA meeting.

---

[4] For simplicity, this complaint refers throughout to the equivalent number of
common shares.

35

LEWIS ROCA

211.   Freeman, Rahn, and Latchman confronted him to ascertain why MindMed's CEO was working with a competitor.

212.   Hurst falsely represented that it was a "collaboration" that MindMed would ultimately benefit from because MindMed would acquire the psilocybin project.

213.   He also repeated his previous claim that the BOL-148 project was a collaboration between Savant and Turnbull, and that it also would come to MindMed.

214.   Freeman asked why he was working with a competitor. Hurst responded that "Carey is my partner like you."

215.   Freeman then told Hurst that it was a conflict of interest to be CEO of both Savant and MindMed while at the same time partnering with a company developing the same drugs as MindMed. Freeman further stated that Hurst had to make a choice: either continue as CEO of Savant/MindMed or resign and officially join Ceruvia.

216.   Hurst did neither. Instead, within a few months he removed Freeman from the MindMed executive committee.

217.   Insulated by the power he possessed through the Savant voting bloc of the 55,000,000 MindMed shares, Hurst doubled down on surreptitiously assisting Ceruvia.

218.   According to public filings, in the second quarter of 2020, MindMed began its investigation of LSD for the treatment of anxiety disorder and cluster headaches, which it named "Project Lucy."

219.   In addition, as MindMed's Chief Medical Officer, Freeman developed a BOL-148 drug program that generated its own intellectual property at MindMed, independent of the Sewell patent and other BOL-148 assets stolen by Hurst and Turnbull for Savant TAC (later Ceruvia).

36

LEWIS ROCA

220.   In other words, since BOL-148 had applications other than what was developed for Savant TAC/Ceruvia based on the Sewell patent, the MindMed program was entirely new and independent of the Sewell intellectual property.

221.   Freeman agreed to work on the project for MindMed only because Freeman had an equity stake in MindMed and was part of MindMed management that would develop the BOL-148/LSD technology.

222.   The success or failure of the BOL-148/LSD program was thus directly linked to Freeman's position within the company, his influence over the direction of MindMed, and the salary, bonus, equity, and other incentives that would come with the program's success.

223.   It was a valuable MindMed program, and Hurst and Turnbull knew it. Robert Barrow, the current CEO of MindMed called it "blockbuster."(Ex. 41, 2 App. 427)

224.   In connection with Project Lucy, the BOL-148 program, and other drug-development programs, Hurst hired and placed in critical roles at MindMed persons affiliated with Ceruvia, including Kathleen Monroe (Ceruvia's COO), Jeanne Bonnelle (head of Ceruvia's quality control and CMC), Don Gelhert (a Ceruvia consultant), Judy Ashworth (in charge of clinical and regulatory strategy at Ceruvia), and Jack Henningfield (an advisor on regulatory affairs at Ceruvia) (Ex. 42).

225.   These Ceruvia consultants and employees controlled the destiny of MindMed's LSD and BOL-148 drug-development programs and had access to MindMed's intellectual property.

226.   Similarly, Hurst connected Ceruvia with Dr. Matthias Liechti, a MindMed consultant studying LSD and BOL-148 who ran MindMed's Center of

37

Excellence for psychedelics in Switzerland, so that Turnbull's company could work with Dr. Liechti on BOL-148.

### 7. Hurst and Turnbull Conspire to Force Freeman out of MindMed

227.   Freeman became MindMed CMO in July 2019, but was not a MindMed director.

228.   Hurst and Turnbull wanted to use MindMed to further their criminal enterprise and misappropriate trade secrets, and they ultimately decided that Freeman stood in the way and needed to be eliminated.

#### a. REASON 1 FOR FREEMAN'S ELIMINATION: MINDMED'S UNSAFE HUMAN TRIALS

229.    After MindMed's formation, Freeman learned that Hurst had misled MindMed investors, including co-founder Leonard Latchman, about the market readiness of the drugs they were testing.

230.   Hurst falsely claimed that one of the drugs, 18-MC, the drug sold to MindMed, was ready to enter phase 2, the efficacy evaluation phase with human test subjects. In fact, the FDA had restricted 18-MC to low doses in humans in phase 1 pending additional animal safety studies.

231.   MindMed acknowledges this in its complaint, discussing the "Full Clinical Hold" and the requirements for overcoming it; additional animal safety studies.[5]

232.   Awaiting these animal studies, Freeman as CMO initiated a low-dose phase 1 safety study in humans in March 2020, limited dosing to 16 milligrams a day or less. (Ex. 44, 2 App. 474.)

---

[5] Hurst and MindMed bought Latchman's silence (without disclosing the payment to the public shareholders). (Ex. 43.)

LEWIS ROCA

233.   In June 2020, Freeman canceled the ongoing 18-MC trials based on safety concerns raised by the FDA as the additional animal safety studies had not been done. (Ex. 45.)

b.   REASON 2 FOR FREEMAN'S ELIMINATION: LSD MANUFACTURING CRISIS

234.   Part of Hurst's and Turnbull's plan was to concoct a manufacturing crisis in obtaining LSD for MindMed's clinical trials as a pretext for MindMed to transfer trade secrets and other intellectual property to Ceruvia.

235.   But Freeman, who as MindMed's CMO was working on the drug assets, would have avoided such a crisis and prevented this theft of trade secrets.

236.   Hurst and Turnbull knew that Freeman had already located a source for pharmaceutical-grade LSD from a Swiss company, LipoMed, so Hurst actively discouraged Freeman from doing is.

237.   Freeman was working on the two MindMed drug programs, MM-120 (LSD) and BOL-148, whose trade secrets and other intellectual property Hurst planned to steal for Ceruvia, just as he had done with the BOL-148/LSD program at Savant.

238.   Finally, as an officer and member of MindMed management, but not a director, Freeman would have had substantial influence in any decision regarding MindMed's intellectual property.

c.   REASON 3 FOR FREEMAN'S ELIMINATION: FREEMAN'S WORK ON THE BOL-148 PATENTS

239.   Freeman was also working on the drug BOL-148 for MindMed, creating proprietary trade secrets for MindMed independent and separate from the Savant BOL-148 program.

240.   In the spring of 2020, Freeman was writing a MindMed BOL-148 patent. (Ex. 46.)

39

241. On May 25, 2020, Rahn told Freeman to file the BOL-148 patent, but Hurst blocked the patent filing.

242. On June 1, 2020, two weeks before Freeman's removal as CMO, Freeman asked Rahn what had changed.

243. Rahn explained that MindMed's patent counsel was conflicted because he also worked for Turnbull on BOL-148, and Rahn needed to work the conflict out with Hurst. (Ex. 46.)

244. At the time, because of Hurst's and Turnbull's misrepresentations, Freeman believed that Turnbull's work on BOL-148 did not involve Savant trade secrets.

245. Freeman's actions on the BOL-148 program, which would have resulted in a patent for MindMed, were interfering with Hurst's schemes to misappropriate MM-120 (LSD) and BOL-148 intellectual property for Ceruvia's exclusive use.

d. HURST ORCHESTRATES UNSUBSTANTIATED AND NONACTIONABLE WORKPLACE COMPLAINTS

246. For all these reasons, Hurst and Turnbull implemented a plan to eliminate Freeman from his role at MindMed by interfering with his employment agreement.

247. On May 20, 2020, Rahn revealed that Carol Nast, MindMed's COO, was spreading unsubstantiated allegations that Freeman was abusing his staff, despite her admission to Rahn that she had not spoken to Freeman or initiated any administrative protocols, and that she had no evidence.

248. Hurst also arranged for Kathleen Monroe—simultaneously the LSD project manager at MindMed and an employee at Ceruvia (Ex. 42)—claimed that Freeman had yelled at one of his staff, Jason Summa, during a clinical meeting that Monroe was attending. Although Summa lodged no complaint, Monroe did.

40

LEWIS ROCA

249.   Hurst realized, however, Monroe's complaint as it stood was not actionable, and Monroe was unwilling to escalate the complaint to something actionable, such as a false claim of sexual harassment.

e.   HURST AND TURNBULL EXTORT FREEMAN'S RESIGNATION UNDER THREAT OF "CORPORATE THEFT"

250.   Hurst and Turnbull therefore resorted to extortion. They arranged to have Hurst accuse Freeman of corporate theft on the basis that Freeman accepted a $100,000 sign-on bonus that Hurst and MindMed's CFO had personally approved.

251.   Hurst even threatened to have Freeman arrested for corporate theft, and MindMed's outside counsel supported the criminal threats.

252.   To avoid this blackmail, Freeman ultimately entered into a confidential separation agreement effective September 8, 2020, which if enforceable cost Freeman his job as MindMed CMO—along with salary, benefits, and half of his promised stock options—and subjected Freeman to the agreement's release, confidentiality, and nondisparagement provisions, which MindMed has invoked to sue Freeman for statements made during a proxy campaign.

253.   Hurst's extortive threats were pretextual, as evidenced by the timing of Freeman's administrative suspension—just hours after Freeman canceled the ongoing 18-MC trials based on safety concerns. The timing of Hurst's actions suggests that Freeman's safety concerns was one of the reasons that cost him his position.

254.   Freeman suspension lasted from June 15, 2020 until September 8, 2020, during which MindMed purportedly was investigating the claims against Freeman.

255.   Hurst falsely represented that he would "decline[] to take part in the investigation" because of his conflict of interest with the Savant Entities (Exs. 47, 48.)

41

256.   This created the false impression that when Freeman was pre-sented with a separation agreement that—to preserve his reputation and avoid criminal accusations—Freeman had no choice in accepting, Hurst was unin-volved and there was an independent investigation.

257.   In addition, at the time Freeman was unaware that both Hurst and Monroe were employees and/or equity owners at Ceruvia, MindMed's competi-tor.

258.   This fraudulent veneer of independence and impartiality created by Hurst's misrepresentations induced Freeman to sign the separation agreement.

259.   In fact, Freeman later learned that Hurst, far from recusing him-self, had personally led the effort to terminate Freeman's employment, clearing the path to transact with Ceruvia.

260.   Had Freeman been able to show that Hurst had not recused himself and personally sought Freeman's ouster to facilitate a transfer of MindMed trade secrets to Ceruvia, Freeman would have exposed Hurst's fraud and not signed the separation agreement.

261.   With Freeman now silenced, Hurst immediately restarted the hu-man trial despite the safety risks and hired Robert Barrow, his eventual succes-sor, who in February 2021 amended the study protocol to dosing *35 times higher* (325 milligrams) than what the FDA deemed safe in order to keep the 18-MC program going, avoid legal issues with Latchman, and keep selling stock. (Ex. 49, 3 App. 531.)

262.   In November 2020, as described in detail below, Hurst and Turnbull orchestrated MindMed's LSD manufacturing crisis, which resulted in a non-compete agreement with terms highly favorable to Ceruvia to eliminate MindMed as a competitor for BOL-148 and to limit MindMed's ability to use LSD.

42

LEWIS ROCA

263.   A few months after Freeman's ouster, on December 7, 2020, Rahn, MindMed's Co-CEO—who had signed the separation agreement for MindMed (107B)—acknowledged that Hurst had misled MindMed's board to vote for Freeman's suspension. (Ex. 51.)

> Rahn: Your partner should not have fired you. It was a mistake on his part
>
> Freeman: It was a mistake by the board
>
> Rahn: The board was misled by Steve

264.   Further, Rahn suggested reasons why Hurst had Freeman constructively terminated:

> But it pisses me off to learn you were filing a patent and steve shut it down. And now Carrie has a non compete with mindMed on bol 148. Steve and Carrie are bad news. They are evil. Maybe Steve pushed you out because you were working on bol-148?

(Ex. 46.)

265.   Only too late did Freeman realize that Hurst had not recused himself as he had promised, after all. (Exs. 47, 48.)

266.   Hurst also ultimately paid off Latchman, the lead MindMed investor in the Foundation agreement, who was threatening legal action based on a claimed he was told by Hurst that 18-MC was phase 2 ready (Ex. 43). This "payoff" was to keep Hurst's lies from becoming public.

**D.    2021-2021: Hurst and Turnbull Steal MindMed's LSD and BOL-148 Intellectual Property**

267.   At the time of Freeman's ouster, and signing of the Separation Agreement and after, Freeman did not know that Hurst and his associates were covering up fraudulent activity at MindMed.

268.   Today, it is clear that Freeman was standing in the way of his and Turnbull's scheme: not only was Freeman halting unsafe MM-110 (18-MC)

43

LEWIS ROCA

clinical trials until animal safety data could be performed, but he was working on two other MindMed drug programs, MM-120 (LSD) and BOL-148, whose trade secrets and other intellectual property Hurst and Turnbull planned to steal for Ceruvia, just as they had done at Savant.

269.   The theft from MindMed even followed the pattern that Hurst and Turnbull had implemented at Savant: transferring intellectual property rights of LSD (MM-120) and BOL-148 to Ceruvia while doing everything possible to keep the theft hidden from MindMed shareholders and the investing public.

270.   Freeman's termination from MindMed was central to that scheme.

### 1.   *Hurst Had Installed Ceruvia Loyalists at MindMed*

271.   After MindMed's formation in 2019, Hurst began packing it with Ceruvia hires, including Judy Ashworth, Kathleen Monroe (who accused Freeman of the workplace violation), Jeanne Bonelle, Jack Henningfield, Carol Nast, Robert Barrow, Carol Vallone, and Don Gelhert. These inside persons worked simultaneously for both Ceruvia and MindMed. (Exs. 42, 56–58.)

272.   MindMed had been infiltrated by Ceruvia at every level:

| *Name* | *Relationship with Ceruvia/Hurst* | *Role at MindMed* |
| --- | --- | --- |
| Kathleen Monroe | Ceruvia COO | LSD project manager |
| Jeanne Bonelle | Ceruvia QA/QC | QA/QC/CMC |
| Judy Ashworth | Ceruvia regulatory/clinical | Regulatory/clinical |
| Jack Henningfield | Ceruvia regulatory | Regulatory |
| Carol Nast | Hurst associate | COO |
| Robert Barrow | Hurst/Turnbull associate | CEO |
| Kenneth Krisko | Hurst associate | Outside counsel at Cooley, LLP |

| Nico Forte | Hurst associate | Chief of staff |
| Carol Vallone | Hurst recruit | Board chair |

273.   Using their insider positions, these Ceruvia loyalists were able to obtain confidential information related to two drugs BOL-148 and LSD; both programs were spearheaded by Freeman and publicly set for clinical trials.

### 2.   Hurst Dissuades Freeman from Finding an LSD Manufacturer for MindMed, Creating a Crisis

274.   The main drug development program at MindMed was LSD. Accordingly, finding a manufacturer to produce clinical grade LSD for MindMed's clinical trials was critically important.

275.   In April 2020, Hurst announced internally that MindMed should discontinue its efforts to find an independent manufacturer to produce pharmaceutical grade LSD for use in clinical trials, although Freeman had already identified a Swiss company, LipoMed.

276.   According to Hurst, MindMed could obtain access to LSD from Turnbull because it had LSD manufacturing technology but "isn't interested in LSD."

277.   He guaranteed that Onyx Pharmaceuticals, Turnbull's contract manufacturer, could produce the necessary quantities of LSD in time to maintain MindMed's clinical trial start dates.[6]

278.   As previously discussed, Savant's BOL-148/LSD program, stolen by Savant TAC/Ceruvia, had identified Onyx as the manufacturer; a trade secret (Ex. 9).

279.   Hurst knew for months about MindMed's problems sourcing the raw materials needed for Onyx to manufacture LSD.

---

[6] Recall that Onyx's identification was one of the trade secrets that Hurst and Turnbull stole for Ceruvia from Savant.

LEWIS ROCA

280.   Nevertheless, he did nothing to mitigate the risk.

281.   To the contrary, he actively discouraged efforts by others, including Freeman, to locate a source for pharmaceutical-grade LSD.

282.   Hurst knew that Onyx, which was now controlled by Turnbull, would be unable to produce clinical-grade LSD in time for the MindMed trials.

283.   Carol Nast, the MindMed chief operating offers (COO) and Hurst loyalist, was unwilling to give the board updates about an indicator of LSD pharmaceutical quality known as "chemistry, manufacturing, and controls," or CMC.

284.   Jeanne Bonelle, who was overseeing LSD manufacturing, and also a Ceruvia employee, refused to update co-CEO Rahn about the LSD manufacturing issues and problems.

285.   Rahn further indicated that even he as co-CEO he was sidelined in favor of Hurst loyalists, and was their next target for termination:

> I'm next. Kay [Monroe] and Carol [Nast] are out for me now…..He [Hurst] has installed so many yes people I don't even get cc'd on emails anymore.

(Exs. 59, 53.)

* * *

> Steve cares more about impressing Carrie than running a company.

(Ex. 54.)

286.   Shortly before the clinical trial start dates, Freeman learned that Onyx could not supply the LSD. (*Id.* at ¶ 181.)

287.   Freeman, although no longer working at MindMed, was puzzled as to why LipoMed, the manufacturer he discovered, was not being used.

288.   By November 2020, Hurst's self-created situation had become a crisis for MindMed. Hurst told the MindMed Executive Committee, and

46

1  subsequently the Board, that MindMed could not secure pharmaceutical grade
2  LSD in time for the start date for its clinical trials.

3    289.   A delay of publicly announced clinical trials would sound the death
4  knell for MindMed's development program.

5       **3.    *Hurst and Turnbull Misrepresent their***
            ***Relationship to Sabotage MindMed's Clinical***
6          ***Trials and Extract a Non-Compete for Ceruvia***

7    290.   This was also the opening for which Hurst and Turnbull had been
8  planning.

9    291.   When Hurst revealed that Onyx could not supply the LSD, Hurst
10 announced a "backup": Ceruvia (then known only as CH TAC) could provide the
11 LSD.

12   292.   Hurst pretended to "negotiate" an agreement in principle with
13 Turnbull at arm's length to acquire 50 grams of pharmaceutical-grade LSD
14 from CH TAC.

15   293.   So MindMed's Board of Directors reluctantly agreed to purchase
16 LDS on extremely lopsided terms, from CH TAC, a company that, according to
17 Hurst, was a disinterested third party with an independent BOL-148 program
18 that happened to have available clinical grade LSD, a precursor to BOL-148.
19 But that was a lie; only a year later did the Ceruvia website go public and re-
20 veal CH TAC / Ceruvia was interested, not just in BOL-148, but in LSD itself.
21 (Ex. 27.)

22   294.   On November 13, 2020, Hurst sent Turnbull an e-mail memorializ-
23 ing the terms of the transaction that Hurst and Turnbull negotiated, for the
24 purpose of forwarding to the MindMed Executive Committee for its approval.
25 Exhibit 60 is a true and correct copy of the November 13, 2020 e-mail.

26

27

28

47

LEWIS ROCA

295.   Hurst never disclosed to the MindMed Board of Directors the conflict of interest between Hurst and Turnbull through the company Savant TAC/CH TAC/Ceruvia.

296.   Nor did Hurst disclose that he had jointly formed CH TAC / Ceruvia with Turnbull, that Hurst held an equity interest in Ceruvia, and that he had been paid $500,000 as an employee of Ceruvia, some of it while also acting as MindMed's CEO.

297.   Hurst fraudulently misrepresented that he was working for Turnbull as a third-party consultant in his capacity as a Savant member when, in fact, he was working as a co-founder and co-owner of CH TAC / Ceruvia.

298.   On information and belief, Ceruvia's payments to Hurst were bribes in part to secure the misappropriation of MindMed's and Savant's trade secrets.

299.   To the contrary, Hurst and Turnbull represented that Ceruvia (then known only as CH TAC), was a disinterested third party with an independent BOL-148 program that happened to have available clinical grade LSD, a precursor to BOL-148.

300.   The e-mail's introductory statement is revealing in hindsight. Hurst thanked Turnbull for "even considering letting MindMed (MMED) purchase a portion of the LSD produced in the current manufacturing campaign at Onyx. I know it has taken [Ceruvia] about two years to get to this point . . . ." (Ex. 60, 3 App. 608.)

301.   While the recipients of the forwarded e-mail would have been unaware this fact, the reason that Hurst knew it had taken Ceruvia "about two years" to produce BOL-148 is because he had personally defrauded Nicola Sewell into assigning the patent rights to Ceruvia back in February 2018.

302.   With respect to the material terms, Hurst and Turnbull agreed that in exchange for Ceruvia providing 50 grams of pharmaceutical-grade LSD,

48

MindMed would: (1) pay $300,000 to Ceruvia; (2) agree not to manufacture BOL-148 or compete with Ceruvia as to the development of BOL-148 for regulatory approval; and (3) agree not to assert any future LSD patent intellectual property rights against Ceruvia, such that Ceruvia's rights to manufacture or sell LSD would remain unchanged. (Ex. 60.)

303.   This last provision was devastating because it would effectively grant Ceruvia a perpetual license to manufacture, develop, and sell LSD, notwithstanding MindMed's future intellectual property rights.

304.   Hurst forwarded the e-mail to MindMed's Executive Committee and gave them 24 hours to accede to the terms he negotiated with Turnbull. Hurst also told a board member, who questioned the one-sidedness of the deal, to take it as is or the "deal is off." Freeman was also forwarded a copy of the e-mail.

305.   Given the impending trial start dates, and with Hurst's and Turnbull's partnership concealed, on or around November 14, 2020, at an emergency board of directors meeting, MindMed agreed to this lopsided "gun-to-the-head" deal with Ceruvia, despite that the third condition would effectively grant Ceruvia a perpetual license to manufacture, develop, and sell LSD, notwithstanding MindMed's future intellectual property rights.

306.   The next business day, November 16, 2020, MindMed issued a press release:

> MindMed's clinical and technical operation teams are in the process of producing and preparing the GMP LSD material necessary to begin dosing for the Phase 2a commercial drug trial. (Ex. 61, 3 App. 617–18.)

307.   Rahn later summed up the deal as follows:

> He and Carrie stole BOL from Savant shareholders. And then promised it to MindMed shareholders. Now MindMed was forced to sign a non compete on bol 148 . . . Due to Steve's manipulation

49

LEWIS ROCA

* * *

> I brought it up with the board. Everyone seemed to side with
> Steve and voted to give Carey the non compete because we
> needed lsd

(Exs. 55, 60.)

308.   As a MindMed Board Member put it, this transaction "g[a]ve the house away." (Ex. 60, 3 App. 611.)

### 4.   *Hurst Arranges to Clean Up His Involvement*

309.   The MindMed-Ceruvia deal was a material event, according to MindMed counsel Peter Volk, who denied its existence—

> MindMed informs us that MindMed does not have an agree-
> ment with Ceruvia, and if they did, they would have disclosed
> it (Ex. 62).

—and co-CEO Rahn, who confirmed it:

> These are quite material decisions and one sided demands
> (Ex. 60, 3 App. 611).

310.   In February 2021, Hurst resigned as CEO/Chairman of MindMed but remained as a director, and Perry Dellelce became Chairman.

311.   On information and belief, Dellelce was aware of Hurst's relationship with Ceruvia and forced Hurst out because of his self-dealing.

312.   Hurst remained as director.

313.   By that time, however, the damage had been done. Hurst and Turnbull had effectively transferred all intellectual property rights for LSD and BOL-148 to Ceruvia—both from Savant, through Savant TAC, and now from MindMed.

314.   MindMed continues to obscure the misconduct by recruiting board members willing not to disclose the Ceruvia agreement, despite being alerted to

50

LEWIS ROCA

1    this and other elements of Hurst's misconduct between 2021 and 2023.  (Exs.

2    63–65.)



\* indicates company unknown to Savant Investors
**Bold italics** indicate stolen assets, trade secrets, and intellectual property

### 5.    *Ceruvia Goes Public in 2021*

315.   In August 2021, Freeman, for the first time, had evidence of Ceruvia's existence. He discovered Ceruvia's website: www.ceruvialifesciences.com.

316.   He found that Ceruvia was a "shadow company" to MindMed, developing the same drugs and treatments: LSD, BOL-148, and psilocybin.

317.   In addition, it appeared that at least five employees/consultants were either working for or had worked for both Ceruvia and MindMed.

318.   The manufacturer of LSD, Onyx, which MindMed was using, was also the manufacturer for Ceruvia's LSD.

319.   Freeman alerted the MindMed board of directors to this, and within months, Hurst resigned as Director of MindMed (Ex. 64).

51

320.   MindMed was spending tens of millions of dollars to develop LSD while effectively giving Ceruvia the exclusive rights to MindMed's LSD program that would prohibit MindMed from developing BOL-148.

321.   At this time, Freeman still did not know about Savant TAC or that Ceruvia was in any way connected to a Savant entity.

322.   Freeman learned only in August 2022 that Hurst was a co-founder of Ceruvia who had siphoned Savant's trade secrets and other intellectual property to Ceruvia.

323.   In fact, despite Hurst's and Turnbull's misrepresentations of independence, Ceruvia succeeded only by leeching off Savant and MindMed research.

324.   On information and belief, when Ceruvia went public in 2021, Hurst and Turnbull were trying to arrange for its sale to MindMed: With MindMed's LSD intellectual property rights, a non-compete from MindMed on BOL-148, Savant's BOL-148/LSD trade secrets, the Sewell patent, and Onyx Pharmaceuticals as the BOL-148/LSD manufacturer, Turnbull proposed to sell Ceruvia to MindMed for $100 million. (Ex. 27.)

### *6.   The Misappropriation Is a Direct Result of Freeman's Elimination*

325.   In a series of test messages from Rahm to Freeman in December 2020, JR, who signed the Separation Agreement, for the first time suggested that Freeman may have been terminated because of his efforts on BOL-148, which Hurst wanted to misappropriate for Ceruvia. (Exs. 46, 52.)

### E. 2014-Present: Hurst Uses Freeman's Loans as Leverage to Maintain Control of Savant and MindMed

326.   Hurst's control of the voting bloc (55,000,000 MindMed shares) was essential to the self-dealing described above. To accomplish this, he (1) hid

52

information from Freeman; and (2) tried to control Freeman through loans Freeman gave to Savant Entities.

327.   To prevent Freeman from exposing the fraudulent schemes Hurst was concocting, Hurst used his position as CEO of Savant Inc. and managing member of Savant Holdings (and through that position, control over Savant Addiction)—and the discretion he had in repaying corporate debt—as leverage over Freeman.

### 1.   Freeman's Loans

328.   These are the loans Freeman provided to the Savant Entities.

| | |
|---|---|
| Savant Inc. | $195,000 |
| Savant Addiction | $450,000 |
| Savant Neglected Disease[7] | $150,000 |

329.   Between 2010 and 2012, Freeman lent $195,000 to Savant Inc.

330.   In 2013, Savant Inc. received a grant from the National Institutes of Health (NIH) to perform pre-clinical studies on 18-MC that would enable the Savant Entities to submit an independent new drug (IND) application.

331.   The grant covered the period from September 30, 2012 to August 31, 2015, for a total of about $6.5 million, with the bulk of the money being distributed in 2013 and 2014.

332.   In 2014, the Savant Entities received about $3.6 million, with about $1.2 million in indirect costs from September 1, 2013 to August 31, 2014 (Ex. 66).

---

[7] Freeman's loan to Savant Neglected Disease is not part of this litigation.

LEWIS ROCA

1    333.   From April through August 2014, Freeman, through his revocable

2 Trust, lent Savant Addiction an additional $450,000 (the second of Freeman's

3 loans).[8]

4    334.   Freeman did so because, according to Hurst, the indirect costs of

5 about $600,000 from the grant period of September 1, 2013 to August 31, 2014

6 would be received between September and December 2014 (Ex. 67).

7    335.   The Savant Entities issued multiple promissory notes (the "Notes")

8 and warrants (the "Warrants") to the Trust for the second loan. According to

9 Hurst, the Notes and Warrants were a bridge loan to cover the Savant Entities'

10 operating expenses until Savant received a $620,161 grant payment from the

11 National Institutes of Health.

> The "Warrant Coverage Amount" means that amount which
> equals 100% of the principal amount of the note; provided that
> in the event the note has not yet been prepaid in whole prior
> to September 30, 2014, the "Warrant Coverage Amount"
> means that amount which equals 200% of the principal
> amount of the Note; provided further, that in the event the
> Note has not yet been prepaid in whole prior to January 1,
> 2015, the "Warrant Coverage Amount" means that amount
> which equals 300% of the principal amount of the Note.

18    336.   Since Savant was essentially guaranteed to receive the $600,000 in

19 indirect costs from the NIH by January 1, 2015, the interest was 0.28% per an-

20 num.

21    337.   Therefore, the repayment structure tiers the warrants over that

22 four-month period, September 2014 to January 2015, the timeframe when Sa-

23 vant would receive the NIH money.

24

25

26    _____

[8] At the time, Freeman also loaned $150,000 to Savant Neglected Disease (the
27 third of Freeman's loans). The third loan was extinguished when Freeman pur-
28 chased Savant Neglected Disease in May 2019.

LEWIS ROCA

### 2. Hurst Causes Savant's Default on the Notes and Warrants

338.   When Savant received the $600,000 in December 2014, however, Hurst told Freeman that the money was already spent in Savant Addiction, so he could not then repay the loan.

339.   When Freeman complained about poor company management, Hurst forced Freeman to resign as a director from Savant Inc. (Ex. 68).

340.   Hurst nonetheless reiterated his and Freeman's partnership agreement of splitting all compensation—including equity and salary—equally. (Ex. 2.)

341.   In December 2014, the Savant Entities received the grant payment.

342.   Despite this cash infusion, Hurst claimed that he was still unable to pay Freeman the balance of the Notes.

343.   In or around June 2016, Savant received approximately $3.5 million from the sale of the rights to the drug benznidazole, which were held by Savant Neglected Disease.

344.   Hurst used a portion of the money to pay off all of the Savant Entities' debts and loans (including Hurst's own loan) except for Freeman's loans. Hurst continued to string Freeman along using the outstanding loans as leverage over him.

### 3. Hurst and Freeman Reach an Accord and Satisfaction

345.   Around the time of the MindMed transaction, Freeman demanded repayment of his outstanding loans. Since MindMed had no cash, to avoid bankruptcy, Hurst used the MindMed shares to negotiate a settlement. Hurst and Freeman entered an accord and satisfaction of the outstanding debt that Savant owed to Freeman (including the $195,000 loaned to Savant Inc., plus accrued

55

LEWIS ROCA

interest, and the Savant Addiction Notes and Warrants) whereby Hurst agreed to transfer MindMed shares from Savant Addiction to Freeman.

346.   Initially, the parties agreed to 4,500,000 MindMed shares to resolve the Savant Addiction Note, but later amended that agreement to 5,000,000 shares, which also reflects the resolution of the Warrants and the $195,000 Savant Inc. loan. In other words, the $450,000 loan to Savant Addiction was to be paid based on $0.10 a share, and the additional $195,000 loan to Savant Inc. (with interest and warrants) was to be paid at a significant discount, just 500,000 shares (instead of 1.95 million).

347.   This agreement is memorialized and acknowledged by Hurst in multiple e-mails between Hurst and Freeman and other written communications.

348.   Hurst misrepresented to Freeman that the MindMed shares were valued at $0.10 USD per share. In fact, the shares were only worth $0.10 CAD, which would have been worth $0.058 USD, for a total of more than 8.62 million shares.

349.   The 5,000,000 MindMed shares to be transferred to Freeman were therefore supposed to be worth approximately $500,000, a significant discount on Savant's debt to Freeman ($450,000 + $195,000 + Warrants + interest).

350.   In addition to the discount, Freeman also assumed the risk of a loss in value of the MindMed Shares because MindMed was a start-up biotech company with a high risk of failure.

351.   Nevertheless, Freeman accepted the discount and risk of loss because he believed the MindMed Shares would appreciate and be worth more in the future.

LEWIS ROCA

352.   Freeman recognized the risk he was taking on, as memorialized in an October 3, 2019 e-mail to Hurst, where he noted this was a "final transaction": (Ex. 69)

> In other words, if for instance when the 4,500,000 MMED shares are released to me in 6-24 months, the time I can sell these shares, the value of MMED has become $0.00 per share, I am NOT entitled to anymore shares or any money to compensated for lost value.

### 4.   Hurst Delays Performance to Maintain His Power to Exercise the MindMed Shares

353.   Hurst never subsequently denied the existence of this accord and satisfaction or its essential terms.

354.   For example, in an e-mail dated June 29, 2020, Hurst acknowledged the existence of the settlement, which merely needed to be documented by Savant's outside counsel in the company's capitalization table.

355.   Nevertheless, Hurst acknowledged that he was delaying transfer of Freeman's MindMed shares to maintain his personal voting bloc:

> Note that the Cap Table does not include the additional shares to be issued to you in consideration of your loan and warrant settlement from last June. I spoke with Dorsey about this a few weeks ago and they know we still have to document this. Since there are no planned distributions in the near future I've not pressed the issue with Dorsey or you. I my mind, it's more important to hold the voting block for the next year at least.

(Ex. 70.)

356.   Hurst conceded the same point in a September 8, 2020 e-mail but linked the re-payment of the loan to maintaining the voting bloc:

> As I mentioned before, I believe that it would be a strategic mistake to break up the voting block with respect to locked up shares and will be working with counsel to address this issue. We need to document the 5 million MMED shares you'll receive for the settlement of the warrants and loans back in

57

LEWIS ROCA

June as this will impact the pro rata distribution to all the other MMED members.

(Ex. 71.)

357.   Freeman demanded that Hurst distribute the 55 million MindMed locked shares to the Savant members.

358.   On September 9, 2020, Hurst agreed, stating that with Freeman's additional 5 million shares (or 50,000 MVS), was MindMed's largest single shareholder (Ex. 37):

> Your pro rate share of SAM distribution will be approximately 155,556 multiple voting shares, plus the 50,000 additional settlement shares makes you MMED's largest single share-holder . . . . I've been told that . . . Savant likely now controls board membership . . . Once the shares are distributed, unless there is a voting rights agreement we likely give up that control.

359.   On September 18, 2020, Hurst informed Freeman that he would send the paperwork for the loan shortly: "I have the draft of the settlement agreement for your notes and warrants and should have that to you in the next few days." (Ex. 72.)

360.   But this was another misrepresentation.

361.   As Freeman had correctly foreseen, the price of MindMed's shares had skyrocketed since the June accord and satisfaction.

362.   This made honoring of the accord and satisfaction more expensive than repaying Freeman the Note and Warrants.

363.   Moreover, Hurst needed Freeman's shares to continue controlling MindMed through Savant Addiction.

364.   If Freeman received the five million shares, he would become MindMed's "largest single shareholder," which would effectively deprive Hurst of his power at MindMed.

58

LEWIS ROCA

### 5.     *Hurst Reneges on the Accord and Satisfaction*

365.   On October 14, 2020, Hurst for the first time expressed doubts about honoring the parties' accord and satisfaction.

366.   Responding to Freeman's inquiry about "the final paperwork on the 5,000,000 shares for the loan," Hurst wrote that it "[w]ill require further discussion and you will need tax advice. Share value now far exceeds loan and warrant value we agreed to last June when the share price was 10 cents." (Ex. 73.)

367.   When pressed by Freeman for clarification on when the shares would be transferred, Hurst resorted to obfuscation and delay.

368.   On July 16, 2021, after about 11,000,000 MindMed shares had been unlocked—more than twice the number of shares owed to Freeman—Freeman's counsel sent a demand to Hurst for distribution of the shares pursuant to the terms of the accord and satisfaction. (Ex. 74.)

369.   Despite the extensive paper trail documenting the accord and satisfaction, Hurst refused to honor the agreement he had reached with Freeman. At the time, MindMed stock was trading at about $4 per share.

370.   Had Hurst honored the agreement, the shares owed as part of the accord and satisfaction would have been released along with the first tranche of unlocked founders shares, and Freeman would have sold MindMed shares at that peak price.

371.   Hurst, at all times, had the ability not only to put the accord and satisfaction to a vote of the members, but to ensure that the agreement was executed as promised because Hurst and Freeman together constituted a majority of Savant Addiction and Savant Inc.

372.   Savant's counsel, Ng, responded on Hurst's behalf by denying, for the first time, the existence of the accord and satisfaction on the purported ground that the agreement had never been formally documented. (Ex. 75.)

59

LEWIS ROCA

373. Instead, Savant counsel Dorsey & Whitney sent Freeman checks for a total of $459,401.68 claiming that is what Savant owed Freeman for the 2014 loans and warrants: $450,000, plus interest. Freeman did not cash the checks. (Ex. 76.) In other words, in June 2019, when Freeman demanded repayment of his loans, since Savant Addiction did not have cash and wanted to avoid bankruptcy, Hurst agreed to 5,000,000 MindMed shares which were locked up for two years. Hurst then dragged out the loan agreement paperwork for two years, until the shares unlocked and he could sell them, and then attempted to disclaim that he had ever agreed to pay Freeman in MindMed shares, which had become more valuable shares.

374. Apart from the accord and satisfaction, Hurst and Ng have never tendered repayment of the $195,000 founder's loan to Savant Inc.

**F.    2020-2022: Hurst and Burbank Conspire to Conceal Hurst's Misappropriation and to Paper over Hurst's Self-Dealing**

**1.    *2020-2021: Hurst Delays and Breaches Agreements to Distribute the Locked-Up MindMed Shares***

375. Once MindMed became a public company in March 2020, the MindMed shares became liquid and, as noted, could have been directly distributed through Savant Addiction to the members of Savant Holdings.

376. This would have given members (1) voting rights in MindMed annual shareholders meetings, which would allow members like Freeman who owned over five percent to petition for a board seat; and (2) the ability to immediately sell their shares once they unlocked, or even sell the options to their locked shares to investment funds at discounted rates.

377. As discussed, Hurst tried to link his performance on the loan accord (distribution of 5 million shares) to Hurst's continued ability to vote those shares (Ex. 70).

60

378.   In the fall of 2020, Savant Holdings's members, tired of Hurst's an-
tics, tried to get their locked shares distributed, using two approaches: either
(1) have a majority-in-interest of the Savant Holdings's members vote to dis-
solve the company and force the distribution; or (2) get Hurst to agree to distrib-
ute the shares.

379.   First, in September 2020, the majority in interest of Savant Hold-
ings filed a resolution to dissolve Savant Holdings in order to receive their
MindMed shares. (Ex. 77.)

380.   Dissolution would have resulted in the distribution of the MindMed
shares to the Savant equity-holders, thereby allowing them to directly control
their MindMed shares.

381.   As discussed above, the Savant Holdings and Savant Addiction op-
erating agreements provide for dissolution under the very circumstances at is-
sue here.

382.   Section 18-802 of the Delaware LLC Act also provides that a mem-
ber may seek dissolution of a limited liability company "whenever it is not rea-
sonably practicable to carry on the business in conformity with a limited liabil-
ity company agreement."

383.   Hurst insisted that the exercise of the dissolution right was invalid,
and Ng supported him.

384.   In Ng's e-mail to Freeman's counsel, Ng misrepresented that "[w]e
have not reached conclusion as to the [dissolution] notice" but that the company
was "nonetheless proceeding to distribute the MindMed shares to LLC mem-
bers." (Ex. 78.)

385.   In breach of the operating agreements, Hurst refused to dissolve the
companies.

61

LEWIS ROCA

386.   Second, after Hurst refused to execute the dissolution resolution, Freeman and Hurst reached an agreement in October 2020 to transfer all locked MindMed shares to Savant Holdings members if Freeman paid $20,000 in attorney fees to Peter Volk, MindMed's outside counsel, to facilitate the transaction.

387.   Freeman promptly did so.

388.   On October 4, 2020, Volk provided the share-distribution plan (Ex. 115).

389.   According to the plan, both Canaccord and NEO Exchange, a Canadian stock exchange, agreed to allow the distribution of shares to Savant members provided the Savant members agree to same lock-up as Savant Addiction had:

> Canaccord provided their informal consent . . . . I have spoken a couple of times now with Dimitri Smidovich at NEO . . . exchange [NEO] would have no objection . . . . Therefore, it all looks achievable. . . . .

390.   On October 7, 2020 (Ex. 79), Hurst confirmed this plan to distribute the 55,000,000 shares to Savant members, noting that 10% of the MindMed shares had already been unlocked, and the other 90% of locked shares would also be distributed. Hurst thanked Freeman for agreeing to pay the $20,000 to MindMed counsel Peter Volk.

391.   Had Hurst honored this contractual agreement and timely distributed the shares, as Ng said he would, Freeman would have sold them while they still were at peak value.

392.   Ng represented to Freeman's attorney in an October e-mail that this issue was resolved because the $20,000 legal fee was paid.

> " . . . . [W]e are nonetheless proceeding to facilitate the distribution of the MindMed shares to the LLC members since, as Steve mentioned on the call, even he is interested in getting

62

LEWIS ROCA

> things resolved and ultimately wrapped up due to the heavy administrative burden. As things stand right now, we plan to follow Peter's lead as described in his email on Sunday and hopefully we can all get the distribution moving in the time-line and manner he discussed." (Ex. 78.)

393.   This was another lie. Instead of releasing the MindMed shares to Savant's members as agreed in October 2020, Hurst retained control over the MindMed shares so that he could continue his self-dealing with Turnbull and CH TAC (Ceruvia) in November 2020, as was described above.

394.   On October 14, 2020, realizing that Freeman would not agree to give Hurst the voting rights to the distributed shares, Hurst halted the release of the MindMed locked shares (Ex. 73, 4 App. 725), misrepresenting the reason for the delay:

> Still working on the Medallion Guarantee….was told another 3-5 business days…

395.   Later, when questioned about this delay, Hurst and Volk demurred that they were too busy raising money for MindMed.

396.   Eventually, Hurst falsely stated that Canaccord had not agreed to the plan—"Canaccord has not moved off the lockup and has never agreed to do anything other than entertain the idea" (Ex. 80)—even though it had already "provided approvals for the transfers as long as the lock-ups stay in place" (Ex. 116).

397.   Freeman only later learned that Hurst still needed the Savant Addiction voting block through to maintain control of the MindMed board during the LSD manufacturing crisis in November 2020, to execute his plan with Turnbull to misappropriate MindMed's trade secrets and intellectual property to Ceruvia.(Ex. 60.)

398.   This self-dealing occurred one month after Ng stated the shares would be transferred "in the timeline and manner he discussed."

63

LEWIS ROCA

399.   In October 2020, Freeman alerted Savant members by addressing the issue of Hurst's self-dealing in an e-mail to Hurst and Ng.

400.   In December 2020, Freeman requested a face-to-face meeting to try to "resolve things," referring to the broader issues involving Savant, and Hurst's inaction on distribution.

401.   In September 2021, Ng and Dorsey & Whitney, rather than investigating the allegations, wrote Freeman a cease-and-desist letter and tried to disclaim the settlement and instead tender the original loan with nominal interest. (Ex. 82.)

402.   On April 13, 2022, they began falsely claiming that this reference to "resolv[ing] things" proves that there was no meeting of the minds for the loan accord and satisfaction for 5 million MindMed shares. (Ex. 83.)

### 2.   *2021: Hurst Votes the Shares in His Personal Interest*

403.   As a result of Hurst's bait-and-switch in blocking the distribution of MindMed shares, Hurst was able to vote the Savant Addiction bloc himself at the 2021 MindMed annual general meeting.

404.   In fact, Hurst, upon his resignation in January 2021 as MindMed CEO, entered into a severance agreement with MindMed, which required him to vote the Savant Addiction bloc with MindMed management.

405.   This not only deprived Freeman and the other Savant members of their valuable voting rights, but conferred on Hurst a personal benefit—the severance package to which he would have otherwise not been entitled—at the Savant Holdings members' expense.

LEWIS ROCA

### 3.     2021-Present: Hurst Retains a Friendly Trustee to Paper Over His Self-Dealing

a.     HURST RESIGNS FROM SAVANT ADDICTION AND FALSELY PROMISES INDEPENDENCE AND ACCOUNTABILITY

406.   On October 16, 2021, Freeman e-mailed Hurst, Ng, and Savant Holdings members, questioning the potential conflict of interest between Hurst and Turnbull, and what Ng knows about it. (Ex. 81.)

> . . . the BOL-148 project was a Savant drug and Carey Turnbull was an investor, but somehow the project is now at Ceruvia Life Sciences which Carey Turnbull owns and Steve has worked for. In addition, as discussed in my last email to the Board of MindMed, there may have been some deal that Steve orchestrated with Ceruvia in November 2020 which may also have involved BOL-148 (and LSD) . . . . We also need to understand what Evan Ng knew about Carey Turnbull and Ceruvia and was Evan an enabler . . .

407.   October 25, 2021, Hurst reiterated that he would release audited financial statements when the audit is complete (Exs. 84, 85):

> I still do not have an audit date set but will let you know once that has been scheduled. All members will receive a copy of the final audit report once complete.

(Ex. 84.)

> This means that audited financials will be prepared and distributed to all members in 2022

(Ex. 85, 4 App. 778.)

408.   October 12, 2021, Hurst represents that members will have their MindMed shares to vote in the Mindmed 2022 AGM.

> Finally, while Scott has made a point of pointing out to members that I have voting control of undistributed shares, the next AGM for MindMed is not until May next year (unless there is some extraordinary event) so there is no impact on your voting rights expected prior to any distribution regardless of the timing at present.

65

(Ex. 86.)

409.   Aware of the weakness of his position with Freeman's loan, the self-dealing with Turnbull, the representations he made to Freeman and Savant members in regard to releasing audited books and records and voting rights for the 2022 MindMed AGM, in December 2021, Hurst attempted to distance himself from the dispute with Freeman and, as he had done at MindMed, resigned as managing member of Savant Addiction.

410.   Instead, Hurst devised a new scheme: bring in new counsel, Olson, to replace Ng, and a "liquidating trustee," to replace Hurst.

411.   Hurst retained a friendly trustee, Burbank, to wind down Savant Addiction, in an effort to hide the books and records which Savant members had been requesting and distribute his shares based on the fraudulent capitalization tables that do not include Savant TAC, the 2012 Turnbull deal, or Belga's back dated options.

412.   With Burbank, rather than Hurst, dissolving the company, Hurst would to all appearances receive his MindMed shares from an "independent liquidating trustee"—ostensibly limiting Hurst's own liability as well as that of the trustee, who could claim ignorance and immunity under Delaware law.

413.   In addition, having Burbank alone review the books and records enabled Hurst to exit his commitment to release the books and records to members.

414.   In March 2022, Hurst resigned from Savant Holdings.

415.   Again, Burbank was retained as a liquidating trustee to wind down the affairs of Savant Holdings (Ex. 87).

b.   BURBANK COVERS FOR HURST, HIDES BEHIND COUNSEL, AND CONCEALS THE COMPANIES' RECORDS

416.   In the engagement agreements, BPM LLP notes that Savant Holdings and Savant Addiction are retaining Burbank as "Senior Managing Director

66

of BPM LLP" and that BPM itself, through Burbank and BPM staff, are providing services to Savant Holdings and Savant Addiction.

417.   To date, members of Savant Holdings and Savant Addiction have not seen the books and records, although they have been requesting them for years.

418.   In an e-mail to a select group of Savant Investors, Hurst acknowledged that Burbank had been appointed to address the so-called "Scott [Freeman] issue."

419.   Contrary to Hurst's public announcement of Burbank's independence, Hurst explained the reason that Burbank was selected to decide Freeman's claims (Ex. 88):

> Since Scott appears to be confusing the Savant business with some personal gripe he has with me I believe the best result will be reached for all members by having the trustee resolve any outstanding issues with Scott. Given the "Scott" issue, I also believe and recommend the SAM trustee manage the windup of Holdings.

420.   Hurst and Burbank fraudulently misrepresented to the members that Burbank was working in their interest and benefit.

421.   When Freeman learned why Burbank had been retained, he brought Burbank's lack of independence to the attention of Savant Addiction's outside counsel, Ng.

422.   In correspondence, Ng's colleague, Matt Olson, the newly appointed counsel for Savant Addiction and Savant Holdings, did not deny that Hurst had sent the February 19, 2022, e-mail and that Burbank had been retained to decide Freeman's claim against Hurst.

423.   Rather, he shrugged off Burbank's compromised nature by claiming that Freeman was merely "slinging mud."

LEWIS ROCA

424.   Olson also threatened Freeman (Ex. 82) for having allegedly "disparag[ed]" Hurst, in an allusion to the MindMed's separation agreement that Freeman had signed under false pretenses:

> Dr. Freeman has stated or implied to third parties like MindMed, that Savant or Mr. Hurst have been acting dishonestly with respect to BOL-148 project and Ceruvia and how they have somehow acted in self dealing. These statements or implications are simply false and come with great consequences.

425.   Burbank has acted loyally to Hurst since his appointment, including by denying without investigation the validity of Freeman's claims.

426.   On February 14, 2022, Burbank and Olson arranged to have Olson send Freeman's counsel a letter, stating that Burbank "discovered" that Freeman had not cashed checks for the original loan amounts (instead of the issuance of the 5 million MindMed shares). Burbank and Olson feigned a lack of understanding as to why, and asked where new checks can be sent (Ex. 89).

427.   When Freeman's counsel asked for contact information to communicate directly with Burbank, Olson refused, noting that Burbank had requested that all communications go through legal counsel (Ex. 90):

> . . . [T]his firm is counsel to [Savant Addiction] and its liquidating trustee Mr. Burbank. ABA Model Rule is therefore applicable. Mr. Burbank has directed me to advise you—as I did in prior emails—that he prefers that all communication on this matter be through counsel . . . .

428.   Burbank continued this pattern in communications with other Savant Holdings members, refusing any direct communication and requiring all communications through conflicted counsel Olson.

429.   On April 13, 2022, Burbank, without conducting an independent investigation, used Olson to simply parrot Hurst's position about the loan accord and satisfaction, again fraudulently misrepresenting that Burbank was acting in the interests of the company's members that "the Liquidating Trustee is

68

LEWIS ROCA

serving the Company and all of its members by ensuring that all just obligations of the Company are paid before final distributions of its assets are made to its members," and "the Liquidating Trustee is likely to consider Dr. Freeman's claim under the Promissory Notes resolved by the Tender Payments." (Ex. 91.)

430.    Burbank's lack of independence is further evident in additional ways. Freeman has repeatedly asked to review the books and records of Savant Holdings to audit it and ensure a proper accounting.

431.    Although Hurst previously agreed to provide access to the books and records, he delayed the request for over a year because an audit supposedly needed to be completed first.

432.    The audit is apparently complete, but Hurst, Ng, and Burbank are still sequestering the books.

433.    Hurst has refused to turn over the books and records on the purported basis that Burbank's appointment will constitute an independent audit. In other words, Hurst is using Burbank as a tool to withhold evidence relating to his self-dealing.

434.    Perhaps even more telling, Burbank has refused to investigate any of the allegations set forth herein, even after instruction by the Savant Holdings members. (Ex. 97.)

435.    Freeman has written to Savant's counsel and Burbank about the Hurst/Turnbull/Ceruvia relationship discussed above and the potential for other self-dealing by Hurst at Savant Inc.

436.    An independent trustee would plainly understand the need to investigate such a serious matter.

437.    But Burbank has refused to do so. He has referred all such requests to Ng's firm, which has, in turn, declined to address the issue.

LEWIS ROCA

c.    BURBANK BLOCKS DISTRIBUTION AND REFUSES TO ISSUE PROXIES FOR THE 2022 ANNUAL GENERAL MEETING

438.   Burbank also fraudulently misrepresented his intent to distribute the bulk of the MindMed shares, 70% of which unlocked on March 3, 2022, in time for the June 2022 MindMed annual general meeting.

439.   Hurst had previously assured Savant Holdings members in October 2021—five months before the shares unlocked—that distribution would be made before the 2022 annual general meeting (Ex. 86):

> Finally, while Scott has made a point of pointing out to members that I have voting control of undistributed shares, the next AGM for MindMed is not until May next year (unless there is some extraordinary event) so there is no impact on your voting rights expected prior to any distribution regardless of the timing at present.

440.   In April 2022, however, Burbank through Olson began telling members that the date of share release is unknown, even though Burbank had known for at least four months, since December 2021, that these shares were to unlock March 3, 2022 (Ex. 93).

441.   Burbank had five months to set up the procedures and documents to release the shares.

442.   Yet Burbank did not release the shares until July 2022, over a month after the MindMed 2022 annual general meeting.

443.   Burbank continually and fraudulently misrepresented various regulatory issues as causing the delay, none of which should have taken nine months, as summarized in an e-mail after the fact (Ex. 94):

> The distribution of MindMed shares from the company to you was significantly delayed by a series of regulatory, compliance, and processing issues over which I had no control.

70

444.    Burbank purposely delayed the release of shares to protect Hurst so that members could not vote in the MindMed annual general meeting to control Hurst's misconduct.

445.    Burbank also frustrated a plan to provide proxy rights, too. In case the shares could not be directly distributed, Freeman and other members requested proxy rights to their shares in April 2022, well over a month before the meeting, so that they could vote in the MindMed 2022 AGM (Ex. 95).

> As you are aware, the MindMed annual shareholders meeting is rapidly approaching. This email is requesting my proxy rights to my shares.

446.    Burbank, again through Olson, fraudulently misrepresented that counsel would explore the issue, inducing Freeman and other Savant Holdings members to believe that Burbank would do so if possible.

447.    In fact, nothing prevented Burbank from issuing proxy rights, but on May 29, 2022, just three days before the start of the annual general meeting, Burbank through Olson announced that it could not be done (Ex. 96).

448.    Burbank thus prevented Freeman and the other the Savant Holdings members not only from getting their shares in a timely manner to sell, as the MindMed share price was plummeting because of Hurst's misconduct, but also from voting their shares through proxy to hold Hurst and the board accountable.

449.    Burbank eventually distributed some MindMed shares in July 2022, a month after the MindMed annual general meeting, but withheld 7 million shares.

450.    This distribution, which included distributions to Hurst, was based on inaccurate and fraudulent capitalization tables, including by omitting Freeman's 5 million shares.

71

LEWIS ROCA

d.   BURBANK BLOCKS PROXY RIGHTS FOR THE 2023
ANNUAL GENERAL MEETING, TORPEDOING
THE PROXY CAMPAIGN FOR FREEMAN'S ELECTION

451.   In August 2022, the members again requested their voting rights to those shares in a resolution so they could vote their shares in the 2023 MindMed annual general meeting (Ex. 97).

452.   This request was particularly important because Freeman and other Savant Holdings members had initiated a proxy campaign to replace the MindMed directors.

453.   Once again Burbank refused to issue proxy votes for the Savant Holdings members' MindMed shares, contrary to the instructions of the majority-in-interest, but rather provides a proxy to Savant Addiction (Ex. 98).

454.   This time, Burbank devised a new excuse, falsely representing that it was Hurst as managing member of Savant Holdings that had the authority to vote the shares (Ex. 99):

> I referred these inquiries to Stephen Hurst, who I understand can vote these MindMed shares in his capacity as Managing Member of Holdings, which in turn is the managing member of SAM

455.   In reality, Hurst was no longer managing member according to the operating agreement. Burbank assumed the duties of managing member upon his appointment as liquidating trustee, as represented by Hurst (Ex. 88).

> I am writing you in what I hope is my last act as managing member of Savant HWP Holdings, LLC

456.   Because the Savant Addiction shares were not voted, Burbank ensured that the voting bloc would again inure to Hurst's benefit, as it had during the 2021 annual general meeting. The absence of a vote against management (which Freeman would have cast) was tantamount to a vote for management, consistent with preserving Hurst's severance and preventing Freeman from gaining control.

72

LEWIS ROCA

457.    Freeman's slate narrowly lost. The shares sequestered in Savant Addiction and Savant Inc. could have helped Freeman win the election for Freeman and the other director candidates supported by Savant Holdings members.

458.    Burbank continues to refuse to issue proxy rights to the MindMed shares; only proxy rights to Savant Addiction. (Ex. 99.)

e.    BURBANK IGNORES THE INSTRUCTIONS OF THE MEMBERS WHOSE INTERESTS HE NOMINALLY REPRESENTS

459.    Similarly, a majority-in-interest of Savant Holdings has voted on a resolution and directed Burbank to take certain corporate actions, including the production of documents that would be relevant to this case (Exs. 97, 100).

460.    Even though he owes fiduciary duties to the Savant Holdings members and not Hurst, Burbank has refused to produce the documents and take actions to protect their assets.

461.    Burbank has never acted as an independent liquidating trustee, but instead has acted in Hurst's best interests, as prescribed by Hurst and Olson, who was conflicted because of his firm's relationship with Hurst.

462.    Burbank has acted loyally to Hurst since his appointment, including by:

a.    transferring Savant assets and MindMed stock, based on inaccurate and fraudulent capitalization tables that do not include Savant TAC, the backdated options, or misappropriated MindMed shares by Hurst at Savant Inc.;

b.    refusing to release books and records;

c.    refusing to provide proxy rights to Savant Holdings members to locked and unlocked MindMed shares sequestered in Savant Addiction so members could vote in MindMed annual and other meetings;

d.    ignoring Hurst's and Forte's violations of corporate governance at Savant Inc., such as the failure to hold annual shareholder

73

LEWIS ROCA

meetings or allow shareholders to vote for the board of directors, and re-distributing shares to themselves without shareholder approval;

e.  ignoring the interests of the Savant Inc. shareholders, including the members of Savant Holdings, who together own over 50 percent of Savant Inc.;

f.  refusing to investigate Hurst;

g.  delaying the release of MindMed shares until after the annual MindMed shareholders meeting in an effort to block Savant Holdings members from obtaining MindMed board of director seats that would allow them to learn of Hurst's activities at MindMed, a delay that cost MindMed shareholders tens of millions of dollars as the MindMed stock spiraled downward;

h.  refusing to terminate Dorsey & Whitney, who backdated options and established Savant TAC, despite the instructions from the majority-in-interest of Savant Holdings.

i.  Freeman and the Savant Holdings members have continued to press Burbank to perform his fiduciary duties, including writing to Burbank's supervisor, Weems, and Dorsey Whitney general counsel Vliestra.  (Exs. 92, 101–02.)

j.  Burbank has responded again through his lawyers requesting Freeman to send his communications to his lawyers.  (Ex. 103.)

463.  Burbank's actions have cost Savant members tens of millions of dollars, as MindMed stock has plummeted because of Hurst's self-dealing.

**G.  2021-Present: Hurst, Forte, and Burbank Enable Embezzlement at Savant Inc.**

464.  In 2019, after Savant Inc. ceased operations following the transfer of MC-18 to MindMed, Hurst, without holding the annual shareholder meeting or seeking shareholder approval, appointed Forte to the Savant Inc. board.

74

465.   Hurst and Forte compensated themselves with salary and/or stock.

466.   Hurst also compensated Brigid Makes, a decades-long associate and MindMed board member whom Hurst appointed, with stock in Savant Inc. between 2020 and March 2022 (Ex. 104).

467.   This timeframe coincides with the self-dealing between Hurst and Turnbull.

468.   In addition, Hurst and Forte as Savant Inc. board members have never released a single MindMed share to Savant Inc. shareholders—including Savant Holdings members, who own 52% of Savant Inc.

469.   Burbank as liquidating trustee of Savant Holdings has the responsibility for its asset, Savant Inc.

470.   Burbank, however, has done nothing to stop Hurst's misconduct at Savant Inc., even after Hurst told Freeman that Savant Inc. capitalization tables were unchanged when Freeman asked about distribution of the MindMed shares:

> Freeman: Is there an updated cap table?
>
> Hurst: No, it's unchanged.

(Ex. 73.)

471.   But that was a lie (Ex. 104).

472.   On June 18, 2022, Chad Boulanger, a member of Savant Holdings, asked Olson for a resolution (Ex. 105, 4 App. 870). Olson described the dissolution of the Savant entities and noted that Savant Inc. should be dissolving soon since it has no active business: "I am not aware of any new business that it is engaging in."

473.   But the capitalization tables for Savant Inc. have changed from 2020 to 2022, even though there had been no legitimate business activity and

LEWIS ROCA

no shareholder meetings—not even an annual meeting to vote for directors (Exs. 13, 104).

474.  On information and belief, only one meeting with three select share-holders—Terrance Boardman, Jeanne Bonelle, and Mathew Lo—occurred on May 27, 2022; other members asked to attend and were denied (Exs. 106, 107).

475.  The draft minutes from this meeting were never finalized by Hurst as he had promised. (Ex. 108.)

476.  The draft minutes indicate that Hurst and Forte were treating Savant Inc. as their personal piggy bank and using their positions as leverage over Freeman's claims:

> [Hurst] explained that whilst it was understood that the stock distribution from Savant HWP Inc. was overdue, unfortunately due to potential liabilities associated with a claim from Dr Scott Freeman, until that claim was settled it would not be possible to facilitate the share of distribution from this entity. It was re-emphasised that any settlement with Dr Freeman must also include Savant HWP Inc. . . .

> . . . It was also indicated that the settlement with Dr Freeman was currently in the hands of the trustee who was handling it on behalf of [Savant Addiction] & Savant HWP Holdings. [Boardman] stated that he had spoken with the trustee, who had indicated that there would be retention of circa 7 million shares that would be retained for settlement of any liabilities. . .

> . . . board of directors had been formed consisting of himself, Nico Forte, and Jeff Saling. . .

> . . . Overall, a great deal of frustration was expressed by all concerned, over the total distribution of the Mind Medicine share exercise. It was recognised that this should have occurred in early March, and even now shareholders were still waiting to receive their shares, whether it be from Savant HWP Holdings or Savant HWP Inc. . . .

> . . . expenses were currently being charged to it, which included, legal, financial, and compensation to [Hurst] (and

76

assuming other board members). [Boardman] queried what expenses were being charged to Savant HWP, and [Hurst] referred him to the retained counsel of Savant HWP Inc., who is Evan Ng, of Dorsey for a fuller explanation of these charges . . . .

477.   The three members learned from this meeting that

    a.   Hurst had appointed directors without a shareholder meeting or vote there were directors although there was no vote or meeting;

    b.   Hurst and Burbank are acting together to resolve Freeman's claim, despite their prior public claims of independence;

    c.   In addition to the 7 million MindMed shares withheld by Burbank, Hurst has withheld an additional 5.5 million shares at Savant Inc., none of which have been distributed even though all have unlocked; and

    d.   Hurst and board members have been taking salaries, although no details have ever been provided to Savant members.

## H.   Burbank Continues to Thwart the Majority-in-Interest and Evades Accountability

478.   On August 3, 2023, the majority-in-interest voted and instructed Burbank to take the following actions: (Exs. 97, 100)

    a.   Dissolve Savant Inc., since it is an asset of Savant Holdings which owns more than 50% of the shares.

    b.   Release the books and records for Savant Holdings and Savant Inc.

    c.   Terminate Dorsey & Whitney.

    d.   Appoint new legal counsel approved by the Savant Holdings majority-in-interest, since Burbank has a conflict in interest.

    e.   Appoint a new, valid board of directors for Savant Inc. by a vote of the shareholders (including Savant Holdings's majority-in-interest).

LEWIS ROCA

f.       Release all voting rights (proxy) to members who own MindMed shares in Savant Holdings and Savant Addiction.

479.   When Burbank did not respond, the majority-in-interest followed up, ultimately memorializing their vote in a resolution (Ex. 92, 100, 109).

480.   In August and September 2022, Freeman asked Burbank to investigate Dorsey & Whitney for possible fraud and misconduct. Olson, Ng, and Dorsey & Whitney general counsel Nicholas Vliestra (Ex. 102) were copied on the initial communication. John Weems, Burbank's supervisor, was added to a second communication (Ex. 109).

481.   Burbank in response deferred to counsel. (Exs. 110, 111.)

482.   On December 1, 2022, announced that he had retained new counsel based on what he called "unsubstantiated allegations" in this litigation:

> In light of various unsubstantiated allegations in the Freeman complaint, and out of an abundance of caution, in August 2022, I engaged the law firm Locke Lord LLP to replace Dorsey & Whitney LLP as my Liquidating Trustee counsel.

(Ex. 112.)

483.   Contrary to the Savant Holdings members' instructions, Burbank hired new counsel himself, without approval of a majority-in-interest.

484.   To Freeman's knowledge, new counsel have not undertaken an investigation of potential misconduct by Hurst, either.

485.   Burbank purports numerous achievements on BPM's website, yet he has not acted as an independent liquidating trustee. (Ex. 113.) BPM misrepresents that they do more than what is legally required to assure transparency and protection (Ex. 114):

> Performing this routine review can uncover unseen or unrecognized issues early and keep them from compounding into larger problems in the future. This review also instills confidence in your clients that the assets are performing well, and that no one is "dipping into the pot" for personal gain.

LEWIS ROCA

486.   Far from going beyond legal duties, Burbank and BPM have shirked the fiduciary duties that they have assumed through their stepping into the shoes of Hurst as managing member and concealing the conflicted nature of their relationship.

487.   In addition, Burbank knew about—and has been repeatedly warned about—Hurst's misconduct, yet neither Burbank nor Weems has undertaken any independent investigation, instead relying on conflicted counsel personally involved in the events.

488.   Burbank has not acted as a reasonable liquidating trustee, making decisions in the interest of—or at least at the express instruction of—the members. Instead, he has hidden behind counsel to conceal his true purpose: serving the interests of the person who hired him, Hurst.

<u>**CLAIMS**</u>

**A.**   <u>**RICO Claims**</u>

**FIRST CLAIM FOR RELIEF
CIVIL RICO (18 U.S.C. § 1961 ET SEQ.)
<u>(HURST, TURNBULL, AND BURBANK)</u>**

***Direct and Derivative for Savant Inc.,
Savant Holdings, and Savant Addiction***

489.   Plaintiff incorporates the foregoing allegations in this claim.

***1.    Direct Claim by Freeman***

a.    PARTIES AND STANDING

490.   At all relevant times, plaintiff was a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(a).

491.   At all relevant times, Hurst, Turnbull, Ceruvia, Savant Inc., Savant Holdings, Savant Addiction, and Burbank were each a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(a).

79

LEWIS ROCA

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

       b.    RICO ENTERPRISE AND ITS EFFECT ON INTERSTATE COMMERCE

492.   From its formation in or around 2017 and continuing to present, the Savant Entities (Savant Inc., Savant Holdings, and Savant Addiction) together with Ceruvia (renamed from Savant TAC) are an enterprise engaged in and whose activities affect interstate commerce (the "Savant Enterprise") within the meaning of 18 U.S.C. § 1961.

493.   The Savant Enterprise is distinct from the Savant Entities, MindMed, and Ceruvia Lifesciences because the Enterprise was formed by Hurst and Turnbull for the purpose of facilitating, committing, perpetuating, and concealing the fraudulent conduct and other criminal conduct alleged herein with the purpose of unlawfully depriving private and public companies of trade secrets and intellectual property, including misappropriating Savant's and MindMed's intellectual property related to, but not limited to, BOL-148 and LSD (the "Pattern"). The Savant Enterprise allowed them to conduct the illegal scheme by using the corporate form, Ceruvia Lifesciences and the Savant Entities, to conceal their misconduct from the Savant and MindMed Investors. Cloaking their scheme in the guise of drug development companies also added a veneer of legitimacy to the operation.

494.   Hurst (through his management positions, CEO/managing member of the Savant Entities and MindMed, and through his ownership interest in Ceruvia), Turnbull (through his position as CEO of Ceruvia and through ownership in Ceruvia and Savant Addiction and agreements with Hurst), and Burbank (as trustee of Savant Addiction and Savant Holdings) are associated with the Savant Enterprise.

495.   Hurst, Turnbull, and Burbank agreed to and did conduct and participate in the conduct of the Savant Enterprise's affairs through a pattern of racketeering activity. Others who conducted and participated in the conduct of

LEWIS ROCA

the Savant Enterprise included Ceruvia employees and other associates of Hurst and Turnbull, who, even if they did not know every detail of the Pattern, knew they were participating in wrongdoing.

496.   Specifically, Hurst, Turnbull, and Burbank each committed and aided and abetted multiple, related acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343, as detailed more fully in the Eighth Claim for Relief and incorporated here; in theft of trade secrets in violation of 18 U.S.C. § 1832, as detailed more fully in the Fourth Claim for Relief and incorporated here.

497.   These predicate acts constitute a continuing pattern of racketeering activity since it occurred over more than two years, beginning in 2012, and is ongoing as summarized below:

498.   Hurst aided and abetted the predicate acts described below in his role as CEO/Chair of Savant HWP Inc., Savant HWP Holdings, Savant Addiction Medicine, and MindMed.

499.   Turnbull aided and abetted the predicate acts described below as CEO of Ceruvia Lifesciences and as a member of Savant Addiction Medicine.

500.   Burbank aided and abetted the predicate acts described below in his position as liquidating trustee of Savant HWP Holdings and Savant Addiction Medicine.

c.   HURST'S MAIL AND WIRE FRAUD IN FORMATION OF SAVANT HOLDINGS AND SAVANT ADDICTION

501.   In 2012, Hurst/Savant HWP Inc. entered into an arrangement with Carey Turnbull involving Savant's BOL-148/LSD drug-development project but never disclosed it to Savant Inc. shareholders. This was disclosed on the Ceruvia website for the first time around September 2022 (¶¶ 53, 116-117).

502.   In October and December 2013, Hurst together with Ng restructured Savant Inc. and presented operating agreements for the creation of Savant Holdings and Savant Addiction.

81

LEWIS ROCA

503.   Hurst—in communications over mail or e-mail using computers connected to the Internet across state lines—fraudulently induced Freeman to sign these agreements by misrepresenting their scope and Hurst's intent with respect to Turnbull. While the agreements concentrated extraordinary power in Hurst as managing member of Savant Holdings (and by extension, of Savant Addiction through Savant Holdings), to the point that Hurst could veto a majority vote for his removal and Hurst could appoint and remove the directors, Hurst did not disclose that he had already breached his fiduciary duties at Savant Inc. when he had begun dealing with Turnbull in 2012 and intended to continue to siphon intellectual property developed by the Savant Entities to his separate company with Turnbull (¶¶ 56-88).

504.   Instead, Hurst misrepresented over e-mail that he and Freeman were working in the best interest of the company and members, particularly since some of Savant members were Hurst's longtime friends. Hurst also represented that he and Freeman would each be equally compensated in salary, stock, stock options, and bonus, so that their interests were aligned.

505.   Freeman relied to his detriment on the misrepresentations, signing the operating agreements that gave Hurst control over the Savant Entities. As a consequence, when Freeman developed trade-secret BOL-148/LSD drug programs for Savant without compensation (i.e., just sweat equity)—and later, MindMed—Hurst was able to use his position as managing member to misappropriate the programs to Ceruvia without sharing the benefits with Freeman.

506.   Hurst, conspiring with Turnbull and Ng, initially transferred the BOL-148/LSD trade secrets to Savant TAC.

507.   Hurst was aided and abetted by Turnbull, who was the authorized person to transfer Savant's BOL-148/LSD trade secrets to CH TAC.

82

LEWIS ROCA

508. Hurst and Turnbull continually changed the company's name—in communications over telephone or e-mail using computers connected to the Internet across state lines—to willfully conceal the existence of Savant TAC/CH TAC/Ceruvia from Savant members (¶¶ 76-117).

509. Freeman's direct benefits would have been as an employee of Savant Inc., which would have had a service agreement with a drug development LLC, like Savant TAC, developing BOL-148/LSD, and he would have received stock options in Savant Inc., salary, and bonus.

510. Freeman would also have been entitled to shares in the drug development LLC.

511. Had Freeman known about Hurst's intent, Freeman would not have signed the operating agreements as written.

512. Hurst's mail and wire fraud described above proximately caused direct injury to Freeman:

     a.    Freeman was fraudulently induced to sign the Savant Holdings operating agreement, which gave Hurst extreme power as managing member and control over Savant's BOL-148/LSD trade secrets and other intellectual property.

     b.    As a result, because he has no stake in Ceruvia and is not Ceruvia's CMO, Freeman lost all of the salary, bonus, stock options, and other incentives that he would have received had the projects remained with Savant (or MindMed), where Freeman was CMO.

     c.    Freeman also lost the 38.89% of initial ownership in the Savant drug-development entity, such as Savant TAC, to which he would have been entitled because of membership in Savant Holdings.

83

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

    d.    Freeman received nothing, while Hurst received equity and salary from Ceruvia. Thus, they did not equally share in the BOL-148/LSD project as Hurst had promised.

        d.    HURST'S MAIL AND WIRE FRAUD IN THE FORMATION OF CERUVIA

513.  After Hurst and Turnbull secretly formed Savant TAC, with assistance from Ng, Hurst fraudulently promulgated—in communications over mail or e-mail using computers connected to the Internet across state lines—capitalization tables for the Savant entities that omitted Savant TAC's existence. (¶¶ 64-117.)

514.  When Freeman asked Hurst about the Sewell patent, Hurst—in telephone communications across state lines—falsely represented to Freeman that Savant did not have the $45,000 upfront license fee, and since the patent was public, Turnbull licensed it. Hurst falsely assured Freeman not to worry because Savant was collaborating with Turnbull.

515.  In fact, Turnbull did not license the Sewell patent independently but through the secret entity Savant TAC, in which Turnbull and Hurst shared ownership and which had misappropriated Savant's trade-secret BOL-148/LSD program.

516.  Freeman's salary, bonus, equity share in Savant Inc., the management company, and other incentives would have made it extremely lucrative for Freeman to develop the BOL-148/LSD program within Savant. But by misappropriating the program to Savant TAC (later Ceruvia), Freeman lost all of the personal benefits of the drug's development. This was particularly devastating to Freeman because the BOL-148/LSD program was not at a stage where Freeman was being paid a salary, at all—he expended his sweat equity in expectation of eventually obtaining those benefits.

84

517.   Freeman relied to his detriment on Hurst's misrepresentations, believing that there was no reason to doubt Hurst's account regarding the patent and that Turnbull's license would not impede what Freeman believed would be a collaboration within Savant since Hurst had represented they were equal partners and their interests were aligned.

518.   In relying on these misrepresentations, Hurst and Turnbull were able to steal Savant's proprietary BOL-148/LSD program without interference to develop Ceruvia, which—culminating the in November 2020—has eliminated both Savant and MindMed as competitors.

519.   And because Freeman has no stake in Ceruvia and is not Ceruvia's CMO, Freeman lost all of the lost all of the salary, bonus, stock options, membership interests, and other incentives that he would have received had the project remained with Savant or MindMed, where Freeman was CMO.

e.   TURNBULL'S FRAUD IN THE FORMATION OF CERUVIA

520.   Upon information and belief, Turnbull knew about Hurst's misrepresentations regarding the licensing of the Sewell patent and the concealment of Savant TAC's existence. Turnbull had an independent duty under the Savant Addiction operating agreement not to use Savant's proprietary confidential information (including the BOL-148/LSD program) in a competing company and also to correct Hurst's misrepresentations. He did not, instead aiding and abetting Hurst with his silence and his own false statements—in communications over telephone, mail or e-mail using computers connected to the Internet across state lines—regarding Ceruvia's independence. (¶¶ 64-117.)

521.   Further, Turnbull knew from the operating agreements that he needed member approval to transfer assets from Savant Inc. or Savant Holdings to another entity. Turnbull was the authorized person for Savant TAC who changed the name to CH TAC and then Ceruvia. Turnbull was the authorized

LEWIS ROCA

person who accepted the Sewell patent license agreement, which misappropri-
ated Savant's draft license agreement, to CH TAC.

522.    Turnbull defrauded Freeman in publishing the Ceruvia website
around June 2021, in which Turnbull falsely represented Ceruvia's BOL-
148/LSD program as independently developed, omitting mention of Savant's
BOL-148/LSD program.

523.    In publishing these statements over the Internet, Turnbull and Ce-
ruvia intended that Freeman would see this misrepresentation.

524.    But in September 2022, Turnbull changed the story: after Turnbull
learned that Freeman discovered Savant TAC, Turnbull updated the Ceruvia
website to detail the relationship with Savant Inc. dating back to 2012.

525.    Freeman relied to his detriment on Turnbull's misrepresentations,
believing that there was no reason to doubt Turnbull's account of Ceruvia's in-
dependence from Savant.

526.    Because Freeman relied on Turnbull's misrepresentations about Ce-
ruvia's independence, Turnbull was able to steal Savant's proprietary BOL-
148/LSD program without interference to develop Ceruvia, which—culminating
with the November 2020 MindMed agreement—has eliminated both Savant
and MindMed as competitors.

527.    And because Freeman has no stake in Ceruvia and is not Ceruvia's
CMO, Freeman lost all of the salary, bonus, stock options, membership inter-
ests, and other incentives that he would have received had the project remained
with Savant or MindMed, where Freeman was CMO.

f.    HURST'S AND TURNBULL'S THEFT OF TRADE SECRETS
      FROM SAVANT

528.    The Savant BOL-148/LSD program developed by Freeman included
confidential scientific and technical information about the development of BOL-
148/LSD for therapeutic use; financial, business, and economic information

86

LEWIS ROCA

about regulatory strategy, a clinical drug trial, and a manufacturer; and the purchase of one gram of BOL-148/LSD. These constituted trade secrets within the meaning of 18 U.S.C. § 1839(3). (¶¶ 64-117.)

529.   The purpose of the BOL-148/LSD program was to develop BOL-148 and LSD for use in interstate and/or foreign commerce within the meaning of 18 U.S.C. § 1836(b)(1).

530.   The BOL-148/LSD program belonged to Savant Inc. and/or Savant Holdings and was protected as a trade secret through confidentiality and member-disclosure and member-approval provisions in the Operating Agreements of Savant Holdings and Savant Addiction. Each of the elements of this program were confidential and were the sole right of Savant Inc. and/or Savant Holdings to develop for the benefit of the Savant Investors.

531.   Hurst and Turnbull, through Savant TAC/CH TAC/Ceruvia, stole or otherwise misappropriated these trade secrets, which allowed Ceruvia to progress toward FDA approval.

532.   Hurst and Turnbull targeted Freeman in this theft, knowing that Freeman as CMO of Savant and MindMed would have been entitled to substantial salary, bonus, stock options, membership interests, and other incentives for developing a drug such as BOL-148 and LSD for FDA approval. By misappropriating the trade secret BOL-148/LSD program to Ceruvia, in which Freeman has no stake, Hurst and Turnbull were able to keep these benefits from Freeman.

g.   HURST'S AND TURNBULL'S THEFT OF TRADE SECRETS FROM MINDMED

533.   The MindMed drug programs for BOL-148, 18-MC, and LSD were developed by Freeman as CMO and included confidential scientific and technical information about the development of these drugs for therapeutic use independent of the Savant/Ceruvia BOL-148/LSD program; financial, business,

87

and economic information about regulatory strategy, a clinical drug trial, and a manufacturer. These constituted trade secrets within the meaning of 18 U.S.C. § 1839(3). (¶¶ 271-325.)

534.   The purpose of the BOL-148, 18-MC, and LSD programs was to develop these drugs for use in interstate and/or foreign commerce within the meaning of 18 U.S.C. § 1836(b)(1).

535.   The BOL-148, 18-MC, and LSD programs belonged to MindMed and were distinct from the Savant BOL-148/LSD program. MindMed's programs were separately protected as trade secrets and intellectual property through confidentiality and a proprietary information and inventions agreement. Each of the elements of these programs were confidential and were the sole right of MindMed to develop for the benefit of MindMed, in which Savant Investors had a significant amount of shares. In other words, the trade secrets/intellectual property for the MindMed BOL-148/LSD program were different than those of the Savant BOL-148/LSD program, which was stolen for Ceruvia.

536.   Hurst and Turnbull, through Savant TAC/CH TAC/Ceruvia, stole or otherwise misappropriated these trade secrets/intellectual property/confidential information, which has allowed Ceruvia to develop the programs without Freeman receiving benefit as an officer and CMO of Savant Inc.:

a.   Hurst, as CEO, hired Ceruvia employees and other loyalists to work at MindMed. These employees were working simultaneously at both Ceruvia and MindMed.

b.   Hurst orchestrated a series of crises in the MindMed BOL-148/LSD program and then went to Turnbull/Ceruvia for assistance.

c.   Hurst and Turnbull misrepresented themselves to be unrelated third parties while they negotiated a MindMed/Ceruvia deal, with terms highly favorable to Ceruvia. They hid the fact that Hurst was a co-founder and

LEWIS ROCA

1   equity owner of Ceruvia and was paid $500,000 by Turnbull/Ceruvia between
2   2017 and 2021.

3          d.      In order to accomplish the theft, they needed Freeman out of
4   the way because he, as CMO was involved in development, and had become sus-
5   picious of Hurst and Turnbull and Freeman was working on MindMed's BOL-
6   148/LSD program. They used Monroe, a CH TAC/Ceruvia employee embedded
7   in MindMed, to manufacture an unsubstantiated workplace complaint, on
8   which Freeman relied in signing a Separation Agreement.

9          537.   This theft of MindMed's trade secrets was predicated on Freeman's
10   termination from MindMed and thus directly injured Freeman's own business
11   and property:

12          a.      Since Freeman was a paid consultant to, and then employee
13   of, MindMed, his compensation was based on his clinical development perfor-
14   mance for drugs like LSD and BOL-148.

15          b.      As CMO of MindMed, Freeman would have been entitled to
16   substantial salary, bonus, stock options, membership interests, and other incen-
17   tives for developing one or more of these drugs, BOL-148 and LSD, for FDA ap-
18   proval.

19          c.      But by arranging for Freeman's termination and by misappro-
20   priating the MindMed trade secrets and intellectual property of the BOL-
21   148/LSD drug programs to Ceruvia, in which Freeman has no stake, Hurst and
22   Turnbull were able to keep these benefits from Freeman.

23          h.    HURST'S MAIL AND WIRE FRAUD IN THE CONTRACT
                  WITH BELGA

24          538.   On October 2, 2018, Hurst fraudulently misrepresented to Belga—
25   in communications over telephone, mail or e-mail using computers connected to
26   the Internet across state lines—that if Belga were able to raise $5 million for
27   Savant Addiction, Belga would become CEO and receive a 20% equity interest
28

89

in Savant Addiction. In these communications, Hurst also fraudulently misrepresented that for raising $2 million before October 1, 2019, Belga would be CEO and Hurst would become executive chairman. (¶¶ 120-163.)

539.    Hurst did not intend to give Belga the equity or the position, but instead intended to usurp any fundraising opportunity Belga identified so that it would close formally under Hurst's name, not Belga's.

540.    Belga relied to his detriment, immediately proceeding to work to identify investors that—had he known Hurst would usurp—Belga would not have done.

541.    After Belga identified JR Rahn as a potential investor and created a term sheet, with a plan for Belga to begin as COO and transition to CEO, Hurst rejected it on Savant Addiction Medicine's behalf and instead secretly re-engaged Rahn himself.

542.    Doing so allowed Hurst to cut Belga out of the final deal, the MindMed Foundation Agreement, and to withhold the equity, salary, and title to which Belga would have been entitled.

543.    Belga's injury is not simply the loss of the title, but given the size of the anticipated investment from Rahn, the full 20% equity-interest bounty of the 55,000,000 MindMed shares, totaling 11,000,000 shares. These shares, along with their voting rights, would have gone to Belga. Instead, Hurst through his mail and wire fraud induced Belga to raise the $5 million that Hurst could not, allowing Hurst to usurp the monetary value and voting rights of those 11,000,000 shares so he could control the MindMed board and remain as CEO of Savant Inc., which gave Hurst further control over the 55 million MindMed shares.

LEWIS ROCA

i.    H<small>URST'S MAIL AND WIRE FRAUD IN THE LOAN ACCORD</small>
TO MAINTAIN CONTROL OF S<small>AVANT</small> A<small>DDICTION'S</small>
V<small>OTING</small> B<small>LOC</small>

544.    Around the time of MindMed's formation, Hurst defrauded Free-man by falsely representing—in communications over telephone, mail or e-mail using computers connected to the Internet across state lines—that he would cause Savant Addiction to distribute 5 million MindMed common shares to Freeman to settle Freeman's claims for nonpayment of notes and warrants to-taling $645,000, plus interest (¶¶ 326-405):

a.    Freeman demanded payment of his loans in June 2019, but Hurst knew that Savant Addiction did not have cash assets to repay the loans.

b.    Instead, to avoid bankruptcy, Hurst fraudulently offered as a settlement MindMed shares, which were locked up and could not be sold for two years, but he intended to string Freeman along by not distributing the shares during this lock-up period until Savant Addiction obtained funds by selling the unlocked shares. After two years, once Savant Addiction had the funds to repay the original loans, Hurst would then decide whether it was in his interest to dis-tribute shares (if they were worth less than the face value of the original loans) or to disclaim the accord and satisfaction and offer cash (if the shares were worth more than the face value of the loans and nominal interest).

c.    Thus, in reality, Hurst intended only to expose Freeman to the downside risk that the shares would become less valuable; or, if the shares became more valuable, Freeman would have to agree to give Hurst something in return: let Hurst vote the Savant bloc.

545.    In calculating how many shares to give Freeman, Hurst knowingly misrepresented to Freeman the value of MindMed shares, stating that each was worth $0.10 (U.S.) instead of their true value, $0.10 (Canadian) or about 0.058 USD. Had Hurst correctly represented the actual value of MindMed shares,

91

Freeman would have been entitled to more than 7.75 million MindMed shares for the $450,000 in Savant Addiction loans (in addition to the 500,000 shares in settlement of the $195,000 in Savant Inc. loans).

546.   In fact, Hurst's intent in making these representations was not to distribute MindMed shares to Freeman but to maintain control of the voting rights for the 55 million shares that Savant Addiction received at MindMed's formation. This control was critical because, through it, Hurst exercised the voting rights as though he personally owned a controlling stake in MindMed and could thereby control the MindMed board. This in turn enabled Hurst and Turnbull to perpetuate the Enterprise's racketeering acts, including the theft of MindMed's trade secrets.

547.   Hurst continued to fraudulently represent in e-mails throughout 2020 that Hurst intended to distribute the 5 million shares to Freeman.

    a.      On June 29, 2020, when Freeman asked about the status of his 5 million shares, Hurst falsely represented that Freeman would be issued these shares but tried to forestall Freeman's attempt to enforce the accord by falsely suggesting that the sole cause of delay was a need to "document" the settlement.

    b.      On September 8, 2020, Hurst again sought to delay Freeman by arguing that immediate distribution "would be a strategic mistake" until a voting-rights agreement was in place to maintain Hurst's full control of the bloc.

    c.      In the meantime, Hurst planned to amend the operating agreements of Savant Addiction and Savant Holdings so that he could continue to exercise the voting rights of the members' shares, even if Hurst was unable to extract a voting-rights agreement from Freeman.

    d.      After the Savant Holdings members voted on September 23, 2020 to dissolve the company, however, Hurst realized that Freeman and the

92

LEWIS ROCA

1    other Savant Holdings members would not accede to a voting-rights agreement

2    or amendment to the operating agreement.

3            e.      Shortly thereafter, on October 14, 2020, Hurst suggested a

4    new, but equally false, rationale for delaying distribution of shares pursuant to

5    the accord:

6            We require further discussion and you will need tax advice.
             Share value now far exceeds loans and warrant value we
7            agreed to last June when share price was 10 cents.

8
9    548.   Freeman detrimentally relied on the misrepresentations, allowing

     Hurst to maintain control over Savant Addiction's 55 million shares in
10
     MindMed as a bloc, which constituted a controlling interest in MindMed, since
11
     it was not until June 2021—after the shares began to unlock—that Hurst at-
12
     tempted to renege on the loan accord. Had Freeman known that Hurst would
13
     not authorize the distribution, Freeman would have taken action to enforce the
14
     agreement earlier, when the price of MindMed shares was at its peak, and in
15
     time to vote his 5,000,000 shares in the 2021 MindMed Annual General Meet-
16
     ing.
17
     549.   As a result of the mail and wire fraud, however, Hurst was able to
18
     control MindMed unimpeded, including to transfer MindMed's BOL-148 and
19
     LSD programs ("Transaction")—unimpeded by Freeman, who (together with his
20
     other shares in MindMed) would have been MindMed's largest shareholder.[9]
21

22

23   _____

24   [9] Freeman should also have received about 18,000,000 of the 55,000,000
     MindMed shares Savant had received; up to 20% ownership in MindMed at cer-
25   tain times. Had Freeman received those shares he could have, as the company's
     largest individual shareholder, negotiated a better salary, equity, and severance
26   package, as well as a director position during the time he worked at MindMed.
     Freeman would also have been in a unique position to be able to call a general
27   company meeting and put initiatives on the MindMed ballot for voting at gen-
     eral meetings. Alternatively, Freeman could have sold his shares on the public
28
                                      93

That transaction, once publicized in this litigation, caused a 27% drop in the price of MindMed stock.

550.    Freeman was thus directly injured by this mail and wire fraud. Not only was he deprived of his 5 million shares that Hurst represented Freeman would receive, but he was deprived of an additional 2.75 million shares that Freeman should have received had Hurst not misrepresented the MindMed share price.

551.    In addition, the consequential damages of that fraud include the loss of the voting rights of MindMed's largest shareholder at a time when he could have safeguarded the value of those voting rights.

j.    BURBANK'S MAIL AND WIRE FRAUD IN AIDING AND ABETTING HURST'S FRAUD IN THE LOAN ACCORD

552.    To conceal and legitimize Hurst's misconduct, including the fraudulent misrepresentations described in paragraphs 375-488, Hurst caused Savant Addiction and Savant Holdings to retain Burbank as a liquidating trustee.

553.    Burbank aided and abetted Hurst's acts of mail and wire fraud, including by fraudulently misrepresenting—over mail or e-mail using computers connected to the Internet across state lines, including in his engagement letters—that he was acting as an independent liquidating trustee, serving the companies' interests rather than Hurst's personal interests.

554.    BPM likewise represented on its public website that it provides transparency when its partners act as fiduciary trustees.

555.    Burbank's affirmative statements, along with his omission to correct Hurst's misstatements—created the impression that Burbank would independently investigate Freeman's claim to the 5 million MindMed shares, which

---

or private equity markets. Further, the voting rights of shares have a monetary value which Freeman lost.

LEWIS ROCA

1    Burbank had the authority to execute in Hurst's stead. Hurst stated that Bur-

2    bank was hired to deal with the "Scott issue."

3        556.   In reality, Burbank was hired to provide cover to Hurst and Sa-

4    vant's counsel, Olson and Ng.

5        557.   Burbank fraudulently misrepresented that he did not have the au-

6    thority to investigate Hurst, Olson, or Ng and consequently deferred to Olson

7    and Ng—who were conflicted and not independent—in evaluating Freeman's

8    claim to the 5 million MindMed shares. In reality, Burbank had the authority to

9    independently investigate and substantiate Freeman's claim.

10       558.   Burbank would only communicate to Freeman and his attorney,

11   and also Savant Holdings members, through Olson, thus further shielding Bur-

12   bank.

13       559.   In deference to Olson's conclusion, Burbank falsely stated that

14   Freeman's settlement for the 5 million shares was invalid.

15       560.   But this statement was neither independent nor the result of an in-

16   vestigation, but was simply fulfilling Hurst's scheme.

17       561.   Freeman detrimentally relied on the misrepresentations by seeking

18   to present his claim to Burbank and work with him on securing distribution of

19   the promised 5 million MindMed shares. This delay allowed Hurst—now

20   through Burbank, Ng, and Olson—to receive his MindMed shares from Savant

21   Addiction based on fraudulent capitalization tables, while also maintaining con-

22   trol over Savant Addiction's 55 million shares in MindMed as a bloc, which con-

23   stituted a controlling interest in MindMed.

24       562.   Had Freeman known that Burbank would not independently inves-

25   tigate Hurst but instead would adopt wholesale Hurst's preferred conclusion to

26   deprive Scott of the 5 million promised shares, Freeman would have taken

27

28

LEWIS ROCA

95

1  action to protest Burbank's appointment and enforce the agreement earlier, be-

2  fore the price of MindMed shares fell yet further.

3          k.    HURST'S WIRE FRAUD IN FREEMAN'S SEPARATION
                 FROM MINDMED

4

5      563.   Part of the Savant Enterprise's purpose was to concoct a manufac-

6  turing crisis as a pretext for MindMed to transfer trade secrets and other intel-

   lectual property to Ceruvia in the Transaction. (¶¶ 250-308.)

7
       564.   Because Freeman, who was MindMed's CMO and working on the
8
   drug assets, would have avoided such a crisis and prevented this theft of trade
9
   secrets, Hurst needed Freeman to leave MindMed. Not only was Freeman halt-
10
   ing unsafe 18-MC clinical trials until animal safety data could be performed,
11
   but he was working on two other MindMed drug programs, MM-120 (LSD) and
12
   BOL-148, whose trade secrets and other intellectual property Hurst planned to
13
   steal for Ceruvia in the Transaction, as he had done at Savant to further the
14
   Enterprise.
15
       565.   In coordination with Ceruvia employee and Enterprise associate,
16
   Kathleen Monroe, Hurst arranged for Monroe to falsely accuse Freeman of a
17
   workplace violation.
18
       566.   Hurst then defrauded Freeman by falsely representing—in commu-
19
   nications over telephone or e-mail using computers connected to the Internet
20
   across state lines—that he would recuse himself from the subsequent investiga-
21
   tion.
22
       567.   This created the false impression that when Freeman was pre-
23
   sented with a separation agreement that—to preserve his reputation—Freeman
24
   had no choice in accepting, Hurst was uninvolved and there was an independ-
25
   ent investigation.
26

27

28

LEWIS ROCA

568.   This veneer of independence and impartiality created by Hurst's misrepresentations fraudulently induced Freeman to sign the separation agreement.

569.   In fact, Freeman later learned that Hurst, far from recusing himself, had personally led the effort to terminate Freeman's employment, clearing the path to transact with Ceruvia.

570.   Monroe's workplace complaint was that Freeman had yelled at one of his staff, Mr. Jason Summa, who did not support the complaint, and thus was not actionable. Monroe refused to elevate her complaint to sexual harassment.

571.   So Hurst turned to extortion and accused Freeman of corporate theft on the basis that Freeman accepted a $100,000 sign-on bonus that Hurst and MindMed's CFO had personally approved. Hurst even threatened to have Freeman arrested by the Las Vegas district attorney, and MindMed's outside counsel supported the criminal threats.

572.   Had Freeman been able to show that Hurst had not recused himself and personally sought Freeman's ouster to facilitate the Ceruvia transaction, Freeman would have exposed Hurst's fraud and not signed the separation agreement. Had he not signed the separation agreement, Freeman would not have lost his job as MindMed CMO—along with salary, benefits, and half of his promised stock options—or been subject to the agreement's release, confidentiality, and non-disparagement provisions, which MindMed has invoked to sue Freeman for statements made during a proxy campaign.

         1.   HURST'S AND TURNBULL'S WIRE FRAUD IN THE NOVEMBER 2020 CERUVIA DEAL

573.   To avoid scrutiny of their relationship and conflicts of interest, Hurst and Turnbull performatively negotiated Ceruvia's sale of LSD for use in MindMed's clinical trials, fraudulently portraying—in communications over mail or e-mail using computers connected to the Internet across state lines—

97

1  that the November 2020 agreement transferring trade secrets and other intel-

2  lectual property from MindMed to Ceruvia was an arm's-length transaction,

3  prompted by a genuine emergency in sourcing LSD. (¶¶ 271-308.)

4      574.  In fact, Hurst orchestrated the LSD emergency using Ceruvia em-

5  ployees hired by MindMed. Nor were Hurst and Turnbull independent: Hurst

6  was an equity owner of Ceruvia and had been paid $500,000 by Turnbull, both

7  in connection with the theft of a similar drug-development program from Sa-

8  vant Inc. and/or Savant Holdings.

9      575.  Both Hurst and Turnbull were aware that third-party related

10  transactions needed to be disclosed to MindMed shareholders, but they did not

11  because disclosure would have unraveled the Savant Enterprise and its scheme

12  to steal MindMed's BOL-148/LSD program, as anyone who read the disclosure

13  and would be injured by the program's theft would have taken immediate action

14  to stop it.

15      576.  The misrepresentation of independence was thus made specifically

16  to dissuade recipients of the communication from taking action.

17      577.  Here, although Freeman was not initially included on the communi-

18  cations, Hurst's and Turnbull's e-mails were forwarded to Freeman. At the

19  time, Freeman was unaware of the existence of CH-TAC, which later became

20  Ceruvia, and Freeman had been led to believe through Hurst's misrepresenta-

21  tions that any Turnbull work with Savant on the BOL-148/LSD program that

22  Freeman had developed would come to MindMed.

23      578.  In appearing to make the Ceruvia deal seem legitimate with an un-

24  known entity, CH TAC, and arm's length, the misrepresentations dissuaded

25  Freeman from challenging the loss of his employment at MindMed, which had

26  been orchestrated specifically to make way for the Ceruvia deal. Freeman rea-

27  sonably relied on the misrepresentations in accepting that—although the deal

28

LEWIS ROCA

1  was detrimental to MindMed—he could not prove that Hurst and Turnbull

2  shared a financial interest in CH TAC/Cervia so as doubt the reasons for which

3  Freeman had been terminated or to invalidate the separation agreement.

4    579.   Hurst's and Turnbull's fraudulent misrepresentations thus directly

5  injured Freeman in keeping him subject to the separation agreement: But for

6  the misrepresentation, and with a proper disclosure of Hurst's and Turnbull's

7  relationship, Freeman would have taken action to invalidate the separation

8  agreement, restore his job as MindMed CMO—along with salary, benefits, and

9  half of his promised stock options—and invalidated the agreement's release,

10  confidentiality, and non disparagement provisions, which MindMed has invoked

11  to sue Freeman for statements made during a proxy campaign.

12        m.    HURST'S WIRE FRAUD IN THE DELAY OF DISTRIBUTING
              SHARES TO MAINTAIN CONTROL OF SAVANT
13            ADDICTION'S VOTING BLOC

14    580.   Around the time of MindMed's formation, Hurst defrauded Free-

15  man by falsely representing—in communications over mail or e-mail using com-

16  puters connected to the Internet across state lines—that Hurst had the author-

17  ity to sign the MindMed foundation agreement without member approval with

18  only Forte as a witness, which transferred 55,000,000 MindMed shares to Sa-

19  vant Addiction, which Hurst claimed he could vote as managing member.

20  (¶¶ 164-226, 326-405.)

21    581.   He also entered into a two-year lockup period and fraudulently mis-

22  represented that for tax purposes and because of a provision in the MindMed

23  bylaws, the 55 million MindMed common shares belonging to Savant Addiction

24  had to be converted to 550,000 multiple voting shares (MVS) (at a ratio of 100

25  common shares to 1 MVS) which further gave Hurst control of the shares.

26    582.   Hurst falsely represented that, while the shares were locked up in

27  an agreement between Savant Addiction and Canaccord, the beneficial owners

28

99

of those shares could not vote the shares—only Hurst, as managing member of Savant Holdings (and with Savant Holdings as managing member of Savant Addiction) could. This was supported by Ng, Savant's counsel.

583.   The Savant structure indicated that if Savant Holdings were dissolved, Freeman could obtain a distribution of the MindMed shares since Savant Addiction was a subsidiary of Savant Holdings. Yet when a majority-in-interest of Savant Holdings filed a dissolution resolution, Hurst and Ng ignored the resolution.

584.   Instead, Hurst and Ng falsely represented that Savant Addiction would proceed to "distribute the MindMed shares to LLC members," under an agreement between Freeman and Hurst.

585.   On October 7, 2020, Hurst falsely represented in an e-mail to Freeman that, by paying MindMed's counsel to perform administrative work to release the locked shares to individual Savant members, Freeman could vote (but not sell or transfer on the public market) his share of the 55 million shares, about 20,000,000 MindMed shares.

586.   Freeman relied on these misrepresentations to pay $20,000 to MindMed's counsel, Peter Volk, in October 2020.

587.   Canaccord was willing to allow the distribution of shares to Savant members, provided that the Savant members agreed to same lock-up terms as Savant Addiction. Yet Hurst halted the distribution of these shares, contrary to his agreement, first claiming that he and Volk were too busy, and then that Canaccord had not agreed to the distribution.  In reality, Hurst blocked the share distribution in October 2020 because he needed to maintain control of the voting bloc in order to execute the Ceruvia transaction in November 2020.

588.   Thus, Freeman as a result of these misrepresentations not only suffered delay in the distribution of shares—a delay that cost him a potential

100

1  controlling stake in MindMed which could have prevented the Transaction and
2  the associated destruction of shareholder value—but Freeman also lost $20,000
3  for the attorney's fee to MindMed and Volk. In addition, Freeman lost the value
4  of the shares' voting rights.

n.  BURBANK'S FRAUD—IN THE DELAY OF DISTRIBUTING
SHARES AND FAILURE TO ISSUE PROXIES—TO
MAINTAIN CONTROL OF SAVANT ADDICTION'S VOTING
BLOC

589.  To conceal and legitimize Hurst's misconduct, including the fraudu-
lent misrepresentations described in paragraphs 406-463, Hurst caused Savant
Addiction and Savant Holdings to retain Burbank as a liquidating trustee.

590.  Burbank aided and abetted Hurst's acts of mail and wire fraud, in-
cluding by fraudulently misrepresenting—over mail or e-mail using computers
connected to the Internet across state lines, including in his engagement let-
ters—that he was acting as an independent liquidating trustee, serving the
companies' interests rather than Hurst's personal interests.

591.  Hurst had represented to Savant members that shares which un-
locked in March 3, 2022 would be available for members to vote in the 2022
MindMed annual general meeting.

592.  Burbank, to protect Hurst, then fraudulently represented in tele-
phone conversations and e-mail that, although he became liquidating trustee of
Savant Addiction in December 2021, regulatory issues caused a delay in distrib-
uting shares until July 2022, more than a month after the MindMed 2022 an-
nual general meeting.

593.  Burbank further misrepresented that, as liquidating trustee, he
does not have the authority of the managing member, and that that authority
remains with Hurst.

594.  About two months before the MindMed 2022 annual general meet-
ing on June 1, 2022, Burbank was asked to provide proxy rights for the

LEWIS ROCA

MindMed shares he was distributing, in the event that regulatory issues prevented the timely release of MindMed shares to members.

595.   Burbank said he would present the issue to Savant counsel, Olson. Burbank falsely represented that Olson, the conflicted Dorsey Whitney attorney, would appropriately review the request. Burbank knew, however, that Olson would deny distributing proxies to protect Hurst.

596.   Two days before the meeting, on May 29, 2020, Burbank also fraudulently represented that Savant Addiction was empowered to vote the entire bloc of the 55 million MindMed shares, that transferring proxy authority to the Savant members was not possible since it was too close to the meeting, and that Burbank could not provide proxy instructions to MindMed on the Savant members' behalf.

597.   Either Burbank never intended to distribute the undisputed shares before the 2022 general meeting, or Burbank was incompetent to handle the regulatory issues and create the proxies necessary to allow Savant members to vote their shares.

598.   Either would be a fraudulent misrepresentation, as Burbank represented that he had the qualifications to fulfill his duties as liquidating trustee, including to proxy Savant Addiction's shares.

599.   In addition, although Freeman did not know it at the time, Burbank did in fact have the authority to proxy Savant Addiction's shares.

600.   Freeman detrimentally relied on these misrepresentations. Had Freeman known that Burbank would not distribute the undisputed shares, Freeman would have taken action to protest Burbank's appointment and enforce the distribution plan secured by Feeman's $20,000 payment to Volk.

601.   And had Freeman known that Burbank's putting the proxy request to Olson was just a ruse to delay so that Burbank could announce his decision

102

only when it was too late for Freeman to do anything, Freeman would have taken action, including seeking an injunction, to force Burbank to issue those proxies.

### 2. Derivative Claims and Predicate Acts Harming Nonparties

602.   Plaintiff incorporates here the definition and purpose of the Savant Enterprise, its associates, and the pattern of racketeering described above.

603.   In addition to racketeering acts causing direct harm to Freeman, Hurst, Turnbull, and Burbank each committed and aided and abetted further acts of mail and wire fraud in violation of 18 U.S.C. §§ 1341 and 1343 and theft of trade secrets in violation of 18 U.S.C. § 1832, causing harm to Savant Inc., Savant Holdings, and Savant Addiction (derivative claims), or to nonparties (for which Freeman does not seek relief but which underscore the continuity and pattern of the Savant Enterprise).

604.   These predicate acts constitute a continuing pattern of racketeering activity summarized below:

a.   HURST'S FRAUD IN THE DELAY OF DISTRIBUTING SHARES TO MAINTAIN CONTROL OF SAVANT ADDICTION'S VOTING BLOC

605.   Hurst represented that the MindMed shares needed to be seques-tered in Savant Addiction but (1) that needed member approval, which Hurst did not receive, (2) which should have been dissolved according to the operating agreement because substantially all assets had been sold, (3) those shares should have been distributed according to the Freeman/Hurst agreement which Freeman paid $20,000 and the Savant Holdings majority-in-interest dissolution agreement. In reality, Hurst sequestered the shares so he could control the MindMed board of directors and continue to self-deal with Turnbull.

606.   As discussed in paragraphs 164-226 and 326-405, Hurst falsely rep-resented that Savant Addiction's 55 million MindMed common shares were

103

LEWIS ROCA

transferred to SAM without member approval and then he entered into a 2 year lockup agreement.

607.    He then had the shares converted to 550,000 multiple voting shares (MVS) for tax purposes and bylaw compliance. In reality, the conversion to MVS merely created an additional hurdle to prevent individual Savant members from exercising their voting rights and leave control of the voting bloc to Hurst.

608.    Hurst also falsely represented the nature of the lock-up agreement with Canaccord and the potential for obtaining a distribution to the individual members in agreement with Freeman.

609.    Savant Addiction members (including Savant Holdings members) relied on these misrepresentations to their detriment, delaying action that would have otherwise allowed them to more quickly gain access to their shares and exercise the valuable voting rights.

610.    While Freeman suffered a direct injury from the $20,000 payment to facilitate the re-conversion to common shares and the monetary value of his voting rights and the loss of value of his shares, Savant Addiction members (including Savant Holdings members) suffered the monetary loss of the value of the shares' voting rights and the delay in distribution. While the shares were locked up in an agreement between Savant Addiction and Canaccord, the beneficial owners of those shares could not vote the shares; Hurst claimed that he alone could vote those shares as managing member of Savant Holdings (and with Savant Holdings as managing member of Savant Addiction), although this is not supported by the operating agreements.

611.    Hurst's statements indicated that if Savant Holdings were dissolved, Freeman could obtain a distribution of the MindMed shares. Yet when a majority-in-interest of Savant Holdings filed a dissolution resolution, Hurst and Ng ignored the resolution.

LEWIS ROCA

612.   Instead, Hurst and Ng falsely represented that Savant Addiction would proceed to "distribute the MindMed shares to LLC members."

613.   On October 7, 2020, Hurst falsely represented in an e-mail to Freeman that, by paying MindMed's counsel to perform administrative work to release the locked shares to individual Savant members, Freeman could vote (but not sell or transfer on public markets) his share of the 55 million shares, about 20,000,000 shares.

614.   Freeman and Savant members relied on these misrepresentations to pay $20,000 to MindMed's counsel, Peter Volk. Canaccord was willing to allow the distribution of shares to Savant members, provided that the Savant members agreed to same lock-up terms as Savant Addiction. Yet Hurst halted the distribution of these shares to maintain control of the voting bloc.

615.   Thus, the Savant members as a result of these misrepresentations suffered delay in the distribution of shares—a delay that cost them a controlling stake in MindMed—Savant members (Savant Addiction, Savant Holdings, Savant Inc.) lost the right to vote their shares and the value of the share vote. Further, the delay in distributing the shares cost them share value as share price plummeted because of Hurst's misconduct.

> b.   BURBANK'S FRAUD IN THE DELAY OF DISTRIBUTING SHARES TO MAINTAIN CONTROL OF SAVANT ADDICTION'S VOTING BLOC

616.   As discussed in paragraphs 406-488, Burbank aided and abetted Hurst's acts of mail and wire fraud, misrepresented his own independence, and falsely blamed on regulatory issues a purposeful delay in distributing unlocked shares until after the May 2022 MindMed annual meeting.

617.   Hurst represented that shares would be distributed prior to the 2022 MindMed AGM.

LEWIS ROCA

618.   Savant Addiction members (including Savant Holdings members) detrimentally relied on these misrepresentations. Had they known that Burbank would not distribute the undisputed shares, they would have taken action to protest Burbank's appointment and enforce the distribution plan secured by Feeman's $20,000 payment to Volk.

619.   Had they known that Burbank would not provide proxy rights to their undisputed and unlocked MindMed shares, as Hurst represented would happen, and have Olson, a conflicted attorney, as Savant counsel decide, they would have taken action against Burbank's appointment.

620.   Savant Addiction members (including Savant Holdings members) suffered the monetary loss of the value of the shares' voting rights and monetary loss from the delay in share distribution.

   c.   HURST'S AND BURBANK'S FRAUD IN THE DISTRIBUTION OF MINDMED SHARES TO HURST.

621.   In e-mails, Hurst and Burbank have provided Savant Investors inaccurate and fraudulent capitalization tables. (¶¶ 406-488.)

622.   In addition to entirely omitting the existence of Savant TAC (now Ceruvia), these tables omit the illegally backdated Savant Inc. options that Hurst issued to Belga as a personal "gift" and the fact Hurst as CEO had already misappropriated MindMed shares to himself.

623.   Burbank, aware of the misrepresentations in the capitalization tables, nonetheless released to Hurst MindMed shares from Savant Addiction according to the inaccurate ownership percentages in the fraudulent capitalization table.

624.   Hurst told Savant members through e-mail that books and records would be released, after the years long audit. But instead of releasing the audited books in 2022 as Hurst committed, he hired Burbank instead to continue to hide the books and records.

106

LEWIS ROCA

625.   Without access to the books and records, the Savant Investors re-lied to their detriment on these misrepresentations. Had they known, Hurst and Burbank would not distribute audited books and records and distribute MindMed shares based on fraudulent capitalization tables they would not have signed operating agreements and not voted for for Burbank as liquidating trus-tee s. As a consequence, Burbank has given Hurst MindMed shares to which he was not entitled, injuring Savant Addiction and accordingly diluting the re-maining Savant Investors.

> d.   HURST'S AND FORTE'S FRAUD IN THE DISTRIBUTION OF SAVANT INC. SHARES AND MONEY

626.   Savant Inc. has never held a shareholder meeting. (464-488.)

627.   Hurst had fraudulently represented to Freeman in e-mail that Sa-vant Inc. capitalization tables were unchanged, which was relied upon by Free-man. This appeared reasonable since, with the sale of 18-MC to MindMed, Free-man knew that Savant Inc., the management company, had no other drugs in development.

628.   Nevertheless, without a shareholder meeting or vote of the share-holders, Hurst as CEO of Savant Inc. unilaterally appointed a so-called "board," including himself, Nico Forte, and Jeff Saling.

629.   Despite that Savant Inc. has no drug-development or other business activity since the sale of 18-MC to MindMed in 2019, Hurst and Forte between 2020 and 2022 have distributed Savant Inc. stock and salaries to enrich them-selves and other members of the Savant Enterprise, including Brigid Makes. Hurst and Forte have taken the 5.5 million MindMed shares that were distrib-uted to Savant Inc. (its 10% cut of the 55 million) for their personal use.

630.   In 2020, Hurst in e-mails fraudulently misrepresented that nothing was going on in Savant Inc. and that Freeman would receive a full accounting after the competition of an audit.

LEWIS ROCA

631.   Hurst also promulgated fraudulent capitalization tables that do not reflect the secretly issued shares or the backdated options to Belga.

632.   Instead of providing accurate capitalization tables or the promised accounting, as soon as the audit concluded Hurst appointed Burbank to his trustee roles at Savant Holdings and Savant Addiction to aid and abet the embezzlement and fraud at Savant Inc., which is 52% owned by Savant Holdings. Burbank should have overseen Savant Inc. as trustee of Savant Holdings, since Savant Inc. is a subsidiary of Savant Holdings, but Burbank did not, even after the majority-in-interest voted to have him do so.

633.   Savant Inc. shareholders detrimentally relied on Hurst's misrepresentations and fraudulent capitalization tables. Had they known, they could have petitioned for an injunction to prohibit the distribution of shares and salaries that dilute the other shareholders.

e.   BURBANK'S AND BPM'S PROMULGATION OF FRAUDULENT CAPITALIZATION TABLES

634.   Burbank, in e-mail communications to Savant Holdings members, and BPM through its website, have misrepresented Burbank as independent and transparent, but he has acted to the contrary. He has refused to independently address members, and has turned over investigations to Olson, who is conflicted, and he has ignored instructions from the Savant Holdings majority-in-interest. (¶¶ 416-488.)

635.   As the 52% owner of Savant Inc., Savant Holdings could enforce a request for accounting or investigate the accuracy of Hurst's representations. And Savant Holdings members did so in an e-mail to Burbank based on their vote and resolution.

636.   Burbank instead promulgated through e-mail fraudulent capitalization tables and never investigated or corrected Hurst's misrepresentations

108

regarding the absence of activity within Savant Inc. Doing so aided and abetted Hurst and Forte and helped conceal their misdeeds and delay an accounting.

637.   Members of Savant Holdings and Savant Inc. detrimentally relied on Burbank's fraudulent capitalization tables and continued to await access to the audited books and records. Had they known that Burbank was providing fraudulent capitalization tables, members of Savant Addiction and/or Savant Holdings could have petitioned for his removal and and injunction to prohibit the distribution of shares to Hurst and salaries that diluted the other shareholders.

f.   Hurst's and Turnbull's Fraud in the Sewell Patent Assignment

638.   Hurst and Turnbull defrauded Nicola Sewell and later the USPTO by falsely representing—in communications over mail or e-mail using computers connected to the Internet across state lines—that the entity seeking to license the Sewell patent was associated with Savant, specifically "Savant TAC, LLC, with an address at 1325 Airmotive Way, Suite 175A, Reno, NV 89502" (Savant's corporate address). (¶¶ 70-117.)

639.   In fact, Savant TAC had already been renamed as CH TAC, with its headquarters in Connecticut, and the company was neither a Savant drug-development LLC nor even disclosed to the Savant Investors.

640.   Because of the misrepresentation, Nicola Sewell understood that the company receiving the patent would be the same company with which the draft license agreement had been negotiated and with which she had dealt over the years and had confidence to develop the patent technology.

641.   If Nicola Sewell had understood that Hurst and Turnbull were diverting the BOL-148 program away from Savant without informing the Savant Investors, she would have alerted the Savant Entities before executing the assignment.

109

LEWIS ROCA

642.   Hurst and Turnbull intended for Nicola to rely on this misrepresentation, and she in fact relied on it in executing the assignment to Savant TAC, rather than to Savant Inc., in which she had confidence to develop her late husband's patented technology.

643.   In addition, rather than paying her a $45,000 upfront license agreement, Hurst and Turnbull induced Niocla to accept less upfront money based on the good-will relationship she had with Savant Inc.

644.   Hurst and Turnbull made the same misrepresentation to the USPTO in submitting—over mail and/or e-mail using computers connected to the Internet across state lines—their patent assignment, which the USPTO accepted.

645.   Only after "Savant TAC" had the patent rights did Hurst and Turnbull disclose CH TAC's true name and location to the USPTO.

646.   Ms. Sewell lost the $45,000 upfront license fee, and the company, Savant Inc., that she had wanted to develop the patented technology.

g.   HURST'S AND FORTE'S FRAUD IN THE FORMATION OF MINDMED

647.   Hurst defrauded Rahn (along with his company Liquidity Holdings LLC) and Latchman (along with his company LDL Corp.) by falsely representing—in communications over mail or e-mail using computers connected to the Internet across state lines—that Hurst had authority to enter into the MindMed agreements. (¶¶ 118-148, 164-207.)

648.   In fact, Hurst had not obtained the required authorization from a majority-in-interest of Savant Addiction's.

649.   Instead, Hurst kept the structure of the transaction secret from the Savant Investors until the deal closed since only Hurst and Forte were signatories to the agreement, and Ng as Savant counsel had seen it.

LEWIS ROCA

650.   Ng and Forte were aware of Hurst's misrepresentation but abetted it rather than alert the Savant Addiction members.

651.   Hurst intended for Rahn, Latchman, and their respective companies to rely on the misrepresentation in order to structure the transaction in a way that gave voting power to Hurst personally to control the direction of MindMed by transferring the 55,000,000 MindMed shares to Savant Addiction Medicine, rather than allowing the Savant Investors to vote MindMed shares proportionate to their interest.

652.   Rahn, Latchman, and their respective companies in fact relied on the misrepresentation in investing in MindMed and executing the MindMed Agreements.

653.   Similarly, Hurst fraudulently represented to Rahn and Latchman that 18-MC was a "phase 2 ready" drug to induce their investment in exchange for just 35 million MindMed shares. Hurst then again fraudulently promised Rahn and Latchman a $1 million bonus for raising more funds than their initial commitment, and again promised the Savant BOL-148 program would become a MindMed program. Although Hurst eventually settled the claims relating to the "phase 2 ready" misrepresented, he ignored the requirements of membership approval in doing so.

654.   The Savant Holdings and Savant Addiction members, who never voted on the agreement as required by the operating agreement, became beneficial owners and lost voting rights to 55,000,000 shares, lost the ability to sell their shares on the private market, and were never made aware of the Latchman agreement, which would have alerted them to Hurst's fraudulent behavior.

LEWIS □ ROCA

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

h.   ADEQUACY OF REPRESENTATION
AND DEMAND FUTILITY

655.   At all relevant times, Freeman has been a shareholder of Savant Inc. and a member of Savant Holdings, which in turn is a 52% owner of Savant Addiction.

656.   This claim is not collusive or brought to confer jurisdiction that this Court would otherwise lack.

657.   Freeman fairly and adequately represents the interests of the Savant Inc. shareholder and Savant Holdings and Savant Addiction members:

a.   Freeman is a major shareholder of Savant Inc., as indicated in the chart at paragraph 11, holding 27.7% of the shares.

b.   Freeman is a major owner of Savant Holdings, as indicated in the chart at paragraph 11, holding 38.89% of the shares.

c.   Freeman is a major owner of Savant Addiction through his 38.89% ownership in Savant Holdings, as indicated in the chart at paragraph 11, which makes him a 34.4% beneficial owner Savant Addiction.

d.   Freeman is well-positioned to represent the interests of similarly situated shareholders and members because he has extensive knowledge of the misconduct that gives rise to the Savant Entities' claims, as detailed in the e-mails and other communications described above and attached to this complaint.

e.   In particular, Freeman obtained the consent of a majority-in-interest of the members of Savant Holdings to vote to dissolve the company to force distributions, as detailed in paragraphs 378-385, which Hurst and Savant counsel refused to do.

f.   Freeman also obtained the consent of a majority-in-interest of the members of Savant Holdings to issue instructions to Burbank, as detailed in paragraphs 459-463, which he ignored.

112

LEWIS ROCA

g.      Because Savant Holdings is the parent company of both Savant Inc. and Savant Addiction, a majority-in-interest of Savant Holdings could—had Hurst and Burbank not disregarded their instructions—have controlled the direction of all three companies.

h.      In a private meeting with just three Savant Inc. shareholders, those shareholders also expressed frustration over the delay in distribution of MindMed shares, "whether it be from Savant HWP Holdings or Savant HWP Inc."

i.      The only shareholders and members whose interests diverge from Freeman's are Hurst and Turnbull, who are committing the misconduct that gives rise to the Savant Entities' claims.

658.   Freeman has repeatedly made efforts to obtain action from those with the authority of directors, and otherwise demand is excused as futile:

a.      *Savant Inc.* has never held any annual or other shareholder meetings to elect a valid board of directors. Although Hurst purported to appoint a board unilaterally, as described in paragraph 636, that action is void, so there is no validly elected board on whom to make a demand. The identities of the so-called "directors" was not even shared with shareholders until recently, and the board has prevented Savant Inc. from holding shareholder meetings. Alternatively, two of the three directors—Hurst and Forte—are not independent, as they are implicated in the RICO conspiracy and cannot be expected to take action against their own misconduct. Burbank, who as liquidating trustee of Savant Holdings has stewardship over its subsidiaries, Savant Inc. and Savant Addiction, has also refused to investigate Freeman's claims and has instead deferred to Savant's conflicted counsel, who have assisted Hurst, Turnbull, and Burbank in the RICO conspiracy as described above.

113

b.      *Savant Holdings* does not have a board of directors on whom demand could be made, and under provisions of the operating agreement that are challenged in this complaint, Hurst as managing member holds veto power over his own removal or investigation into his misconduct. Moreover, although Burbank now disclaims that he is the managing member of Savant Holdings and lacks authority to investigate Hurst, Burbank also specifically refused the demand of the majority-in-interest to investigate this claim. Neither is independent because they are implicated in the RICO conspiracy and cannot be expected to take action against their own misconduct.

c.      *Savant Addiction* is likewise under the sole control of Hurst as managing member or Burbank as liquidating trustee and acting managing member. Like the Savant Holdings operating agreement, the Savant Addiction operating agreement gives the managing member veto power over removal or other action to investigate the managing member's misconduct.

d.      Freeman brought his concerns about Hurst's mismanagement of all three Savant Entities to the attention of Hurst, Savant's counsel, and Burbank.

e.      This includes Freeman's October 2021 e-mail to Hurst and Ng addressing Hurst's self-dealing.

f.      As discussed, Ng and Dorsey & Whitney, rather than investigating the allegations, wrote Freeman a cease-and-desist letter.

g.      Likewise, since Burbank's appointment as trustee to address the so-called "Scott issue," Burbank has refused to turn over the books and records and refused to investigate any of the allegations in this

114

1    complaint, and has instead deferred to Hurst and Savant's counsel, which

2    have declined to address the issues.

3        h.    John Weems, BPM's Director of Business Development and

4    Partnerships, was copied on Freeman's communications with Burbank,

5    Ng, and Olson informing him of the issues that Burbank was unwilling to

6    address.

7        i.    No one at BPM has responded to address these issues.

8        j.    Freeman and a majority-in-interest of the Savant Holdings

9    members also instructed Burbank, in the August 3, 2023 e-mail and sub-

10   sequent resolution, described in paragraphs 478-484, to take specific ac-

11   tions relevant to this claim, but Burbank and BPM have refused.

12   659.   Under these circumstances, making a separate demand on the Sa-

13   vant Entities, who remain under the effective control of Hurst, either directly or

14   with Burbank and Forte, would be futile.

### 3.    Pattern of Racketeering in Interstate Commerce

16   660.   Acts in furtherance of the purpose of the Savant Enterprise take

17   place across state lines. For instance, the sham promises in the accord and sat-

18   isfaction with Freeman, and the extortive scheme to transfer intellectual prop-

19   erty from both Savant TAC and MindMed to Ceruvia—were communicated over

20   e-mail using computers connected to the Internet across state lines.[10] The origi-

21   nal offer of MindMed shares for the accord and satisfaction was initially com-

22   municated over the telephone, including telephone conversations across state

23   lines. The agreement with Nicola Sewell and the filings with the USPTO were

24   likewise communicated through computers connected to the Internet across

25   state lines.

---

27   [10] Timestamps on e-mails memorializing the conversations indicate that the
28   parties were in different time zones.

115

LEWIS ROCA

661. The acts set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5) because they are aimed at a single goal. The tortious, fraudulent schemes described above are part of the Savant Enterprise's regular way of conducting its ongoing business—Turnbull and Hurst founded Ceruvia for the very purpose of operating as a shadow of the Savant Entities and MindMed, capitalizing on their medical advancements and relationships for personal gain through the theft and misuse of confidential information, trade secrets, and intellectual property, particularly in regard to the drugs BOL-148 and LSD.

662. That is, the Savant Enterprise's predicate acts are all in furtherance its greater purpose, making money off trade secrets and intellectual property of psychedelic medicines stolen from competitors, and hiding that misconduct.

### 4.    *Management of the Enterprise*

663. Hurst, Turnbull, and Burbank have directly and indirectly conducted and participated in the management of the Savant Enterprise's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c), and have conspired to do so in violation of 18 U.S.C. § 1962(d).

664. Hurst and Turnbull hired on Ceruvia employees and/or recruited longtime associates or loyalists at MindMed to be the Savant Enterprise's foot soldiers and other Hurst/Turnbull loyalists to extend Hurst and Turnbull's improper control even further.

| *Name* | *Relationship with Ceruvia/Hurst* | *Role at MindMed* |
|---|---|---|
| Kathleen Monroe (Kay) | Ceruvia COO | MindMed LSD project manager |
| Jeanne Bonelle | Ceruvia QA/QC | MindMed QA/QC/CMC |

116

LEWIS ROCA

| Judy Ashworth | Ceruvia regulatory/clinical | MindMed regulatory/clinical |
|---|---|---|
| Jack Henningfield | Ceruvia regulatory | MindMed regulatory |
| Carol Nast | Hurst associate | MindMed COO |
| Robert Barrow | Hurst/Turnbull associate | MindMed CEO |
| Kenneth Krisko | Hurst associate | MindMed outside counsel at Cooley, LLP |
| Nico Forte | Hurst associate/Savant Inc. director | MindMed chief of staff |
| Carol Vallone | Hurst recruit | MindMed board chair |
| Brigid Makes | Savant Addiction member | MindMed director |

These lower rung co-conspirators are all seasoned pharmaceutical industry professionals working on identical drugs for Ceruvia, a competitor shadow company to the Savant Entities and MindMed, while working for the Savant Enterprise. If they were not outright aware of the criminality of their conduct they certainly knew about the general theft and misuse of confidential information from the Savant Entities, MindMed, and Freeman by the Savant Enterprise.

665.   Forte and Burbank serve the Savant Enterprise by covering up its wrongdoing.  As Hurst and Turnbull's foot-soldiers, Forte and Burbank may not know every detail of the enterprise's criminality, but they have sufficient knowledge to know that their real job has always been to prevent discovery of the Savant Enterprise's collective involvement in the theft and misuse by concealing the theft and misrepresentations in an effort to forestall timely claims.

666.   Because Forte simultaneously served as both a Director of Savant Inc. and a Vice President of MindMed and oversaw contracts and intellectual property, he was privy to and able to block the release of information which

117

LEWIS ROCA

1   would have revealed Hurst and Turnbull's misappropriation to Savant mem-
2   bers and MindMed investors.

3      667.   Burbank knew an independent trustee with fiduciary responsibili-
4   ties to members would not ask a conflicted Dorsey Whitney attorney like Olson
5   to investigate misconduct by Dorsey Whitney attorneys who had issued back-
6   dated options and filed the certificate of formation for Savant TAC.

7      668.   Burbank also knew, when he blocked distribution of MindMed vot-
8   ing rights to members, that he was protecting Hurst; there was no reason a
9   proxy could not be given to members who were awaiting distribution of their
10  shares.

11     669.   Burbank also knew that Savant Inc. was a subsidiary of Savant
12  Holdings and that, as liquidating trustee of Savant Holdings, he was responsi-
13  ble for all assets. He also knew that if his retention agreement had removed any
14  authority to investigate, which it did not, it would be invalid as induced by the
15  individual accused of fraud and subject to investigation. And even if Burbank
16  did not have investigative authority, he should have raised alarm bells to some-
17  one who does, like State and Federal officials.

18          *5.   Ongoing Enterprise*

19     670.   The predicate acts occurred over a period of more than two years,
20  since it began in 2012, making the Enterprise ongoing.

21     671.   Moreover, the Savant Enterprise continues to operate; left un-
22  checked, it poses a real threat of concocting similar schemes against the Savant
23  Entities and MindMed (and other competitors).

24     672.   The Savant Enterprise needs to continue to block the public disclo-
25  sure of its prior misconduct. And looking forward, the enterprise has its sights
26  on intellectual property that has not yet been fully developed, specifically the
27  drug uses Freeman himself envisioned and cultivated. The enterprise will seek

28

118

to misappropriate these trade secrets to Ceruvia and then provide the benefits of these drugs' development solely to the members of Ceruvia—Hurst and Turnbull, and their employees.

673.  Hurst and Turnbull's misappropriation of Savant's trade secrets further reflects their intention that the Savant Enterprise be ongoing, not an isolated incident.  Indeed, rather than offloading the stolen trade secrets to the highest bidder, Hurst and Turnbull instead established a competing entity, Ceruvia, to develop BOL-148 and LSD for treatment of alcohol use disorder and opioid addiction.  Ceruvia, led by Turnbull as CEO and Hurst as a Director (as of October 2022) began directly competing with Savant Addiction even while Hurst remained Savant Addiction's managing member and remains CEO of Savant Inc., and Turnbull remains a Savant Addiction member.

674.  They have also through a pattern of racketeering activity directly or indirectly maintained an interest in or control of the Savant Enterprise, in violation of 18 U.S.C. § 1962(b).

675.  Defendants have also conspired under 18 U.S.C. § 1962(d) to violate the provisions of 18 U.S.C. § 1962(b).

676.  As a direct and proximate result of defendants' racketeering activities and violations of 18 U.S.C. § 1962, plaintiff has been injured in his business and property in that:

a.  Plaintiff has been totally deprived of the 5,000,000 MindMed Class A common shares of MindMed related to the loan accord and satisfaction after not agreeing to allow Hurst to vote his MindMed shares and an additional 2.75 million shares based on accurate valuation of MindMed shares at the time of the loan accord.

b.  Plaintiff has been deprived of the voting rights of about 20,000,000 Class A common shares, his beneficial interest of the

119

55,000,000 MindMed shares in SAM, after paying $20,000 to have his locked shares released.

      c.    Plaintiff would have received lost all of the salary, bonus, stock options, and other incentives from Savant Inc. as part of the management of a BOL-148/LSD drug LLC formed with the trade secrets.

      d.    Plantiff's MindMed job as CMO would have received salary, bonus, stock options, and other benefits had his MindMed contract not been tortuously interfered with to get him out of the way so Hurst and Turnbull could effectuate the Transaction.

      e.    Plaintiff would have received $250,000 of the $500,000 Turnbull paid to Hurst since the payment was for Savant project, BOL-148/LSD; Hurst and Freeman agreed to be equally compensated for Savant work.

      f.    Plaintiff would have received the voting rights to his MindMed shares to vote in the 2021, 2022, 2023 MindMed AGM. Plaintiff was the largest MindMed shareholder and thus his MindMed shares had significant monetary voting value since share votes have a monetary value.

      g.    Defendants Ceruvia, Hurst, and Turnbull extorted MindMed into relinquishing property rights in BOL-148/LSD, in which plaintiff has a beneficial interest and which plaintiff had personally developed, causing a decline in the value of plaintiff's shares. Freeman also lost salary, bonus, stock, stock options, and other benefits at MindMed because of Hurst and Turnbull's schemes.

      h.    Plaintiff could have sold his MindMed shares on the private equity market before the stock plummeted had the locked shares been released in October 2020, after paying the $20,000 fee as Hurst requested.

LEWIS ROCA

677.   As a direct and proximate result of defendants' breach, plaintiff has suffered general and special damages in excess of $15,000. Plaintiff is entitled to treble damages under 18 U.S.C. § 1964(c) and punitive damages.

678.   Plaintiff has also been forced to retain counsel to pursue this action and has incurred attorney's fees as a result of defendants' breach.

**SECOND CLAIM FOR RELIEF**
**CIVIL RICO (NRS 207.470) (HURST, TURNBULL, AND BURBANK)**
***Direct and Derivative for Savant Inc.,***
***Savant Holdings, and Savant Addiction***

679.   Plaintiff incorporates the foregoing allegations in this claim.

680.   Each of the elements of federal RICO claim—including standing, the description of the Savant Enterprise, the predicate acts under federal mail and wire fraud and trade-secrets statutes, the pattern of racketeering, the description of the ongoing nature of the enterprise, and the Freeman's direct injuries and the derivative injuries to the Savant Entities—are analogous to Nevada's state-law counterpart and are incorporated here.

681.   The description of Freeman's adequacy as a shareholder/member representative and his satisfaction of the requirement to make a demand from each of the Savant Entities is also described in the federal RICO claim and incorporated here.

682.   Below are additional allegations specifically relevant to the state RICO claim.

683.   Under NRS 207.360, a "crime related to racketeering" means the commission of, attempt to commit or conspiracy to commit any of the following crimes:

> . . .

> 9. Taking property from another under circumstances not amounting to robbery;

121

LEWIS ROCA

10. Extortion;

. . .

27.   Embezzlement of money or property valued at $650 or more;

28.   Obtaining possession of money or property valued at $650 or more, or obtaining a signature by means of false pretenses; . . .

684.   In turn, under NRS 207.390, "racketeering activity" means "engaging in at least two crimes related to racketeering that have the same or similar pattern, intents, results, accomplices, victims or methods of commission, or are otherwise interrelated by distinguishing characteristics and are not isolated incidents, if at least one of the incidents occurred after July 1, 1983, and the last of the incidents occurred within 5 years after a prior commission of a crime related to racketeering."

685.   A defendant commits a racketeering offense under NRS 207.400(1)(a) when it,

with criminal intent receive[s] any proceeds derived, directly or indirectly, from racketeering activity to use or invest, whether directly or indirectly, any part of the proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of:

(1) Any title to or any right, interest or equity in real property; or

(2) Any interest in or the establishment or operation of any enterprise.

686.   A defendant commits a racketeering offense under NRS 207.400(1)(b) when it "acquire[s] or maintain[s], directly or indirectly, any interest in or control of any enterprise" through racketeering activity.

687.   A defendant commits a racketeering offense under NRS 207.400(1)(c) when it

122

is employed by or associated with any enterprise to conduct or participate, directly or indirectly, in:

(1)  The affairs of the enterprise through racketeering activity; or

(2)  Racketeering activity through the affairs of the enterprise.

688.   As described above, the Savant Enterprise was formed by Hurst and Turnbull for the purpose of perpetuating the extortionate acts and other criminal conduct alleged herein with the purpose of unlawfully misappropriating Savant's and MindMed's intellectual property related to BOL-148/LSD and LSD. The Savant Enterprise allowed them to conduct the illegal scheme by using the corporate form to conceal their misconduct from the Savant Investors. Cloaking their scheme in the guise of drug development companies also added a veneer of legitimacy to the operation.

689.   Hurst (through his management positions and ownership interest), Turnbull (through ownership in Savant Addiction, agreements with Hurst, and ownership of Ceruvia), and Burbank (as trustee of Savant Addiction and Savant Holdings) are associated with the Savant Enterprise.

690.   Here, as described above, Hurst, Turnbull, and Burbank engaged in a pattern of racketeering activity through the Savant Enterprise. The examples below focus on the most salient racketeering crime, but many of the acts constitute multiple racketeering crimes.

*Embezzlement and Extortion.*

a.      Hurst and Turnbull embezzled and otherwise misappropriated Savant's BOL-148 program—along with the trade secrets and other intellectual property and assets belonging to Savant Inc. and Savant Holdings—and transferred it to their secret entity, Savant TAC.

b.      Hurst and Turnbull also achieved an extortionate scheme

123

LEWIS ROCA

through manipulating Hurst's voting bloc of the MindMed shares locked in Savant Addiction. Hurst induced Freeman to settle his claims for non-payment of his loans for 5 million MindMed shares rather than pursuing those loans, avoiding litigation at a time when Hurst needed to consolidate his control (voting bloc) over Savant and steer MindMed toward his self-dealing with Ceruvia. Hurst then in bad faith disavowed their accord and tried to extort Freeman into accepting fewer shares, commensurate with the shares' increased value. Hurst continued to hold this leverage over Freeman because Hurst had refused to distribute the shares even after Canaccord permitted the distribution and after Freeman paid Volk the legal fees for completing the distribution and reconversion to common shares.

c.     Ultimately, the voting bloc—maintained by depriving the Savant Holdings members of their voting rights in MindMed—was necessary to accomplish Hurst's and Turnbull's acts of extortion and embezzlement from MindMed to Ceruvia. Turnbull and Hurst conspired to defraud MindMed by commingling employees, sabotaging MindMed's manufacturing process and slowing the clinical development programs, and ultimately holding MindMed's board of directors hostage to approve Hurst's self-dealing transactions with Ceruvia, including transactions in which MindMed ceded valuable property rights to Ceruvia.

d.     As a result of this self-dealing and crisis-making, Hurst and Turnbull were able to force MindMed to forfeit its intellectual property to BOL-148, and likely to LSD, to Ceruvia.

e.     In effect, Turnbull and Hurst, while *at MindMed*, were able to embezzle MindMed's intellectual property to Ceruvia, unencumbered by having to share in the equity with Freeman and the other shareholders of

Savant or MindMed.

f.      In addition, Hurst and Burbank have provided Savant Investors fraudulent capitalization that omit the illegally backdated Savant Inc. options issued to Belga as a personal "gift" and do not account for MindMed shares Hurst gave to himself.

g.      On the basis of these inaccurate tables, Burbank has conspired with Hurst to embezzle MindMed shares that, under an accurate accounting, would belong to the Savant Investors.

h.      Hurst also used extortion by accusing Freeman of corporate theft on the basis that Freeman accepted a $100,000 sign-on bonus that Hurst and MindMed's CFO had personally approved. Hurst even threatened to have Freeman arrested by the Las Vegas district attorney, and MindMed's outside counsel supported the criminal threats. As a result of these extortive threats, Freeman signed the separation agreement with MindMed, losing his position and influence as CMO of MindMed, along with salary, bonus, stock options, and other benefits.

*False Pretenses.*

i.      Hurst under false pretenses induced Freeman and the other Savant Investors to sign the operating agreement for Savant Holdings, which gave Hurst exclusive control, even as Hurst and Turnbull had already decided to divert BOL-148 trade secrets and other contributions from Freeman and the other Savant Investors to Savant TAC (later Ceruvia). Had Hurst and Turnbull disclosed their intentions, Hurst would not have received the signatures and investments necessary to carry out their schemes.

j.      Hurst and Turnbull also induced Nicola Sewell to transfer the Sewell patent to "Savant TAC" under the false pretense that it would be

125

developed within the Savant Entities, even as Savant TAC had already been renamed CH TAC and had stolen the Savant BOL-148 program for what would ultimately become Ceruvia.

k.     Hurst, who ultimately obtained control over Savant Addiction and did not share in the equity or executive role with Belga, obtained Belga's services—as well as the beneficial interest in the financing that Belga initiated—under false pretenses. Although Belga was entitled to the equity interest and the role of CEO for his fundraising efforts, Hurst took those benefits for himself.

l.     Hurst under false pretenses represented to Rahm, Latchman, and their respective companies that Hurst had authority to enter into the MindMed Agreements, and that MC-18 was "phase 2 ready," so as to procure their investment and execution of the MindMed Agreements and solidify his control over MindMed for the benefit of the Savant Enterprise.

*Theft.*

m.     Hurst issued backdated Savant Inc. stock options without shareholder approval and misrepresented the issuance as an ordinary business transaction rather than a personal "gift" funded by a fraud on the Savant Inc. shareholders.

n.     Because the backdated option agreement and its purpose as a personal gift were concealed, this had the effect of depriving the Savant Inc. shareholders of their property—the undiluted value of their shares—in circumstances where they would not realize they had been improperly diluted.

o.     Burbank, aware of this unlawful activity, has aided and abetted Hurst rather than investigate, rectify this conduct, or even allow access to the books and records so that plaintiff or the other Savant

126

1    Investors could investigate.

2       691.   Burbank has provided active and critical assistance to the Savant

3    Enterprise by covering up or preventing an investigation into Hurst and Turn-

4    bull's acts of extortion, embezzlement, and acquisition of property under false

5    pretenses.

6           a.      Burbank delayed the release of MindMed shares until after

7       the MindMed annual meeting, thus preventing the Savant members from

8       obtaining a board seat and finding out about Hurst's and Turnbull's self-

9       dealing with respect to the BOL-148 and LSD embezzlement and extor-

10      tion through the Savant Enterprise.

11          b.      Burbank not only refuses to investigate the allegations of

12      Hurst and Turnbull's self-dealing but continues to actively block Savant

13      members' voting rights to sequestered MindMed shares, refuses to release

14      books and records, and rejects the instructions of the majority-in-interest

15      with respect to producing documents and terminate Dorsey & Whitney.

16      692.   Hurst and Turnbull committed their acts of extortion, embezzle-

17   ment, and acquisition of property under false pretenses and for which Burbank

18   provided critical assistance in covering up the criminal enterprise.

19      693.   This enterprise, through Hurst's control of Savant and MindMed,

20   and Hurst and Turnbull's control of Ceruvia, commingled employees, sabotaged

21   MindMed's manufacturing process, and ultimately held MindMed's board of di-

22   rectors hostage to approve Hurst's self-dealing transactions with Ceruvia, in-

23   cluding transactions (such as commingling Savant asset BOL-148 and LSD with

24   Ceruvia) in which MindMed ceded valuable property rights to Ceruvia.

25      694.   Hurst and Turnbull, with criminal intent, have used the proceeds of

26   their racketeering activities—especially the intellectual property from

27   MindMed and the BOL-148 program stolen from Savant—to invest in the

28

127

LEWIS ROCA

1   Savant Enterprise, in violation of NRS 207.400(a).

2       695.   Hurst, Turnbull, and Burbank have directly and indirectly con-

3   ducted and participated in the conduct of the Savant Enterprise's affairs

4   through the pattern of racketeering and activity described above, in violation of

5   NRS 207.400(c).

6       696.   They have also through a pattern of racketeering activity directly or

7   indirectly maintained an interest in or control of the Savant Enterprise, in vio-

8   lation of NRS 207.400(b).

9       697.   As a direct and proximate result of defendants' racketeering activi-

10  ties and violations of NRS 207.400, plaintiff has been injured in his business

11  and property in that:

12      a.   Plaintiff has been totally deprived of the 5,000,000 Class A

13  common shares of MindMed related to the accord and satisfaction.

14      b.   Plaintiff has been deprived of the voting rights of the Class A

15  MindMed common shares, with the result that defendants Ceruvia,

16  Hurst, and Turnbull were able to extort MindMed into relinquishing

17  property rights in BOL-148/LSD in which plaintiff has a beneficial inter-

18  est and which plaintiff had personally developed.

19      c.   Plaintiff has been denied salary, bonus, stock options, and

20  other benefits as a management member of Savant Inc. for the misappro-

21  priated BOL-148/LSD program.

22      d.   Plaintiff has been denied salary, bonus, stock options, and

23  other benefits as a CMO of MindMed because he was fraudulently termi-

24  nated for getting in the way of the Savant Enterprise.

25      e.   Plaintiff as assignee of Belga has been deprived of equity in-

26  terest in Savant Addiction and was denied the 20% equity in Savant Ad-

27  diction Medicine, the title and salary of CEO.

28

128

LEWIS ROCA

f.     Plaintiff also asserts the derivative injury of the loss to Savant Inc. and Savant Holdings from the misappropriation of trade secrets and intellectual property.

g.     Plaintiff also asserts the derivative injury of the loss to Savant Inc. and Savant Holdings from misappropriation of voting rights and loss of stock value, since members could not sell their shares on the private equity market.

698.  As a direct and proximate result of defendants' breach, plaintiff has suffered general and special damages to his business and property in excess of $15,000. Plaintiff is entitled to treble damages under NRS 207.470(1) and punitive damages.

699.  Plaintiff has also been forced to retain counsel to pursue this action and has incurred attorney's fees as a result of defendants' breach. Plaintiff is entitled to "attorney's fees in the trial and appellate courts and costs of investigation and litigation reasonably incurred" under NRS 207.470(1).

700.  Under NRS 207.470(4), this remedy is not exclusive of any other remedy or penalty.

**B.**    **Misappropriation of the BOL-148/LSD Program and <u>Other Abuses of Power through Savant and Ceruvia</u>**

**THIRD CLAIM FOR RELIEF**
**BREACH OF OPERATING AGREEMENTS**
**(HURST, BURBANK, BPM, TURNBULL)**

***Derivative for Savant Addiction and Savant Holdings***

701.  Plaintiff incorporates the foregoing allegations in this claim.

702.  Defendants Hurst and Turnbull are bound by the operating agreements of Savant Addiction and Savant Holdings as signatories, members, or managing members.

703.  Hurst and Turnbull violated, among other provisions, Sections 7.05, 7.02(b), 7.02(h), and 12.03 of the operating agreements in creating Savant TAC

LEWIS ROCA

1   as a secret entity, not informing the members of Savant Addiction or Savant

2   Holdings, and then failing to safeguard and actively misappropriating for Sa-

3   vant TAC the proprietary BOL-148 program, including confidential infor-

4   mation, trade secrets, and business opportunities belonging to Savant Inc. and

5   Savant Holding.

6       704.   Hurst and Turnbull also violated these provisions of the operating

7   agreements in licensing the Sewell patent for CH TAC (falsely represented to

8   Nicola Sewell as "Savant TAC"), even though that opportunity belonged to Sa-

9   vant Inc. and Savant Holdings, with whom Dr. Sewell and his representatives

10   had previously drafted a license agreement, which also constituted confidential

11   information within the meaning of the operating agreements.

12       705.   The theft of Savant's BOL-148 program was never approved by a

13   majority-in-interest of the members.

14       706.   In authorizing Savant Addiction to enter into the MindMed Agree-

15   ments, Hurst was acting in his capacity as managing member of Savant Hold-

16   ings and was therefore constrained by that entity's operating agreement. The

17   Savant Holdings Operating Agreement makes clear that its managing member

18   may not make any material change to the nature of the "Business"—i.e., Savant

19   Holdings's operating subsidiaries Savant Addiction and Savant Inc.—absent the

20   written consent of at least 51 percent of Savant Holdings's members.

21       707.   The MindMed Transaction made material changes to the "Busi-

22   ness," as it transferred the 18-MC Assets to MindMed.

23       708.   Indeed, while the operating subsidiaries had once been responsible

24   for developing the 18-MC Program, following the MindMed Transaction, Savant

25   Inc. serves no function whatsoever, and Savant Addiction merely holds 55 mil-

26   lion shares of MindMed stock, to be voted as a bloc by Hurst.

27

28

LEWIS ROCA

709.    Hurst was therefore required by Section 7.02(b) of the Operating Agreement to obtain written approval of a majority-in-interest of Savant Holdings's members prior to executing the Agreements. Hurst, however, breached the Savant Holdings Operating Agreement by proceeding without the required member consent.

710.    Hurst likewise breached the Operating Agreement in transferring the 18-MC assets held directly or indirectly by Savant Holdings without authorization from a majority-in-interest of Savant Holdings.

711.    Furthermore, Savant shareholders could not vote their MindMed shares and remove Hurst as Chairman/CEO of MindMed to prevent his mismanagement. Nor could Savant members vote their shares to install a board that represented their interests.

712.    In particular, plaintiff could not vote his shares, as the largest MindMed shareholder, to appoint or assume a board seat and protect his interests.

713.    Hurst, as managing member of Savant Holdings and Savant Inc., had the power and obligation to ensure a proper accounting of the books and records and an accurate total of a member's membership interests or other assets in relation to the overall equity.

714.    Burbank as trustee also has this power now.

715.    Pursuant to Savant Holdings and Savant Addiction's engagement with BPM and Burbank, BPM and Burbank assume the duties of the managing member under the Operating Agreements, including the obligation to investigate or remedy the breaches of Hurst while he was managing member.

716.    Yet BPM and Burbank have failed to do so, breaching both their engagement agreements and their assumed obligations under the Operating Agreements.

131

LEWIS ROCA

717.   Hurst's control of Savant's MindMed shares (voting bloc) and commingling of assets with Ceruvia caused MindMed's stock price to drop and cost Savant members tens of millions of dollars, including the inability to

    a.   sell MindMed shares on primary and secondary markets while the stock price was high;

    b.   vote their MindMed shares to remove Hurst as Chairman and CEO of MindMed and prevent his mismanagement;

    c.   vote for MindMed board members that represented their interests; and

    d.   allow Freeman, MindMed's largest shareholder, to obtain a board seat to represent his own interests.

718.   In addition, Hurst's action in converting the MindMed common shares to multiple voting shares also delayed Savant Investors from selling on public exchanges because when shares unlocked, they still needed to be converted back to common shares, a complicated process that often added several months' delay and exacerbated the harm from the rapid drop in stock price.

719.   For example, shares that unlocked in September 2020 and March 2021 were not conveyed to plaintiff until July 2021.

720.   Hurst's breaches caused significant damages.

721.   But for Hurst's delays and breaches of the operating agreements, plaintiff would have sold his shares before MindMed's stock dropped.

722.   If Savant members had been permitted to exercise the rights associated with their beneficial ownership of their shares, they could have prevented the substantial harm caused by Hurst's mismanagement and commingling of Ceruvia and MindMed assets.

LEWIS ROCA

723.   Each of the preceding actions also constitutes a breach of the covenant of good faith and fair dealing, whether or not the action violates the express terms of the operating agreements.

724.   As a direct and proximate result of defendants' breach, plaintiff and the Savant Entities on whose behalf plaintiff is derivatively suing have suffered general and special damages in excess of $15,000, and are entitled to punitive damages.

725.   Plaintiff has also been forced to retain counsel to pursue this action and has incurred attorney's fees as a result of defendants' breach.

726.   At all relevant times, Freeman has been a member of Savant Holdings, which in turn is a 52% owner of Savant Addiction.

727.   This claim is not collusive or brought to confer jurisdiction that this Court would otherwise lack.

728.   Freeman fairly and adequately represents the interests of the Savant Holdings and Savant Addiction members:

a.   Freeman is a major owner of Savant Holdings, as indicated in the chart at paragraph 11, holding 38.89% of the shares.

b.   Freeman is a major owner of Savant Addiction through his 38.89% ownership in Savant Holdings, as indicated in the chart at paragraph 11, which makes him a 34.4% beneficial owner Savant Addiction.

c.   Freeman is well-positioned to represent the interests of similarly situated members because he has extensive knowledge of the breaches that give rise to the Savant Entities' claims, as detailed in the e-mails and other communications described above and attached to this complaint.

d.   In particular, Freeman obtained the consent of a majority-in-interest of the members of Savant Holdings to vote to dissolve the

133

LEWIS ROCA

company to force distributions, as detailed in paragraphs 378-385, which Hurst and Savant counsel refused to do.

e.      Freeman also obtained the consent of a majority-in-interest of the members of Savant Holdings to issue instructions to Burbank, as detailed in paragraphs 459-463, which he ignored.

f.      Because Savant Holdings is the parent company of Savant Addiction, a majority-in-interest of Savant Holdings could—had Hurst and Burbank not disregarded their instructions—have controlled the direction of both companies.

g.      The only members whose interests diverge from Freeman's are Hurst and Turnbull, who are committing the misconduct that gives rise to the Savant Entities' claims.

729.    Freeman has repeatedly made efforts to obtain action from those with the authority of directors, and otherwise demand is excused as futile:

a.      *Savant Holdings* does not have a board of directors on whom demand could be made, and under provisions of the operating agreement that are challenged in this complaint, Hurst as managing member holds veto power over his own removal or investigation into his misconduct. Moreover, although Burbank now disclaims that he is the managing member of Savant Holdings and lacks authority to investigate Hurst, Burbank also specifically refused the demand of the majority-in-interest to investigate this claim. Neither is independent because they are implicated in the breach of the operating agreements and cannot be expected to take action against their own misconduct.

b.      *Savant Addiction* is likewise under the sole control of Hurst as managing member or Burbank as liquidating trustee and acting managing member. Like the Savant Holdings operating agreement, the

134

LEWIS ROCA

Savant Addiction operating agreement gives the managing member veto power over removal or other action to investigate the managing member's misconduct.

c.    Freeman brought his concerns about Hurst's mismanagement of all three Savant Entities to the attention of Hurst, Savant's counsel, and Burbank.

d.    This includes Freeman's October 2021 e-mail to Hurst and Ng addressing Hurst's self-dealing.

e.    As discussed, Ng and Dorsey & Whitney, rather than investigating the allegations, wrote Freeman a cease-and-desist letter.

f.    Likewise, since Burbank's appointment as trustee to address the so-called "Scott issue," Burbank has refused to turn over the books and records and refused to investigate any of the allegations in this complaint, and has instead deferred to Hurst and Savant's counsel, which have declined to address the issues.

g.    John Weems, BPM's Director of Business Development and Partnerships, was copied on Freeman's communications with Burbank, Ng, and Olson informing him of the issues that Burbank was unwilling to address.

h.    No one at BPM has responded to address these issues.

i.    Freeman and a majority-in-interest of the Savant Holdings members also instructed Burbank, in the August 3, 2023 e-mail and subsequent resolution, described in paragraphs 478-484, to take specific actions relevant to this claim, but Burbank and BPM have refused.

730.    Under these circumstances, making a separate demand on the Savant Entities, who remain under the effective control of Hurst, either directly or with Burbank and Forte, would be futile.

LEWIS ROCA

1
2

**FOURTH CLAIM FOR RELIEF**
**DEFENSE OF TRADE SECRETS ACT (18 U.S.C. § 1836)**
**(HURST, TURNBULL, AND CERUVIA)**

3

### *Direct and Derivative for Savant Inc. and Savant Holdings*

4   731.   Plaintiff incorporates the foregoing allegations in this claim.

5   732.   Savant Inc. and/or Savant Holdings is an owner with respect to

6   trade secrets within the meaning of 18 U.S.C. § 1839(3) and (4).

7   733.   Plaintiff is also an owner of trade secrets through his membership

8   in Savant Holdings, his shares of Savant Inc., and equitably through his per-

9   sonal efforts to develop the intellectual property and proprietary BOL-148 pro-

10  gram for Savant Inc. and Savant Holdings.

11  734.   This proprietary program included

12          a.   Scientific and technical information, including information re-

13  garding the development of BOL-148 for therapeutic use through plaintiff's per-

14  sonal medical knowledge and study;

15          b.   Financial, business, and economic information, including a

16  comprehensive regulatory strategy, a study of the costs of conducting a clinical

17  drug trial on BOL-148 at Yale and Hanover University, the identification of a

18  manufacturer for producing BOL 148/LSD, and the draft license agreement for

19  the Sewell patent;

20          c.   Program devices, formulas, designs, and prototypes, including

21  through the purchase of one gram of BOL-148.

22  735.   Each of the elements of this program were confidential and were

23  the sole right of Savant Inc. and/or Savant Holdings to develop for the benefit of

24  the Savant Investors.

25  736.   Savant Inc. and/or Savant Holdings took reasonable measures to

26  keep the Savant BOL-148 program secret, including by requiring in both the

27
28

136

LEWIS ☐ ROCA

Savant Holdings and the Savant Addiction Operating Agreements (the latter of which Turnbull signed as a Savant Addiction member)

       a.     A broad prohibition against the misuse of Savant's confidential information (Section 12.03);

       b.     A requirement that members be informed about any matters reasonably expected to have a material impact on the company (Section 7.05); and

       c.     A requirement of a majority-in-interest approval for major decisions, such as changing the nature of the business or selling assets.

737.   Plaintiff likewise took reasonable measures to keep the Savant BOL-148 program secret by not sharing it outside the company.

738.   The trade secrets belonging to Savant Inc. and/or Savant Holdings are related to the development of BOL-148, a drug intended for use in interstate and/or foreign commerce within the meaning of 18 U.S.C. § 1836(b)(1).

739.   Hurst and Turnbull, through Savant TAC/CH TAC/Ceruvia, stole or otherwise misappropriated trade secrets belonging to Savant Inc. and/or Savant Holdings.

740.   After secretly forming Savant TAC, Hurst and Turnbull used the proprietary knowledge and intellectual property developed from the Savant BOL-148 program to continue the program in their secret company.

741.   They then defrauded Dr. Sewell's widow with misrepresentations about the name and affiliation of the entity to which she was assigning the Sewell patent.

742.   Hurst also defrauded plaintiff and the Savant Entities in misrepresenting that Turnbull was collaborating with Savant to develop the BOL-148 program.

137

LEWIS ROCA

743.   These misrepresentations enabled CH TAC (later Ceruvia) to obtain the patent without the knowledge of the Savant Investors.

744.   Ceruvia has since used the Savant BOL-148 program and the Sewell patent to race toward FDA approval, including the submission of an IND application for a Phase 1 clinical trial of BOL-148.

745.   Ceruvia would not have been able to achieve this progress at this speed without these stolen trade secrets.

746.   As a direct and proximate result of defendants' misappropriation, plaintiff and the Savant Entities on whose behalf plaintiff is derivatively suing are entitled to all of the remedies under 18 U.S.C. § 1836(3), including injunctive relief, damages both for actual loss and for unjust enrichment caused by the misappropriation, and exemplary damages.

747.   Plaintiff's direct injuries include the loss of all of the salary, bonus, and equity incentives that he would have received as Savant's CMO had the BOL-148/LSD program remained at Savant, rather than being stolen to Ceruvia.

748.   Savant Inc. and Savant Holdings were injured by the loss of the BOL-148/LSD trade secrets and intellectual property.

749.   Plaintiff has also been forced to retain counsel to pursue this action and has incurred attorney's fees as a result of defendants' breach.

750.   Because the trade secret was willfully and maliciously misappropriated, plaintiff is entitled to an award of attorney's fees under 18 U.S.C. § 1836(b)(3)(D).

751.   At all relevant times, Freeman has been a shareholder of Savant Inc. and a member of Savant Holdings.

752.   This claim is not collusive or brought to confer jurisdiction that this Court would otherwise lack.

138

LEWIS ROCA

753.   Freeman fairly and adequately represents the interests of the Savant Inc. shareholder and Savant Holdings members:

a.   Freeman is a major shareholder of Savant Inc., as indicated in the chart at paragraph 11, holding 27.7% of the shares.

b.   Freeman is a major owner of Savant Holdings, as indicated in the chart at paragraph 11, holding 38.89% of the shares.

c.   Freeman is well-positioned to represent the interests of similarly situated shareholders and members because he has extensive knowledge of BOL-148/LSD program that was stolen and the misconduct by Hurst, Turnbull, and Ceruvia that gives rise to this claim, as detailed in the e-mails and other communications described above and attached to this complaint.

d.   Freeman's personal claim does not create a conflict because his personal claim is predicated on salary and other benefits that would flow from the BOL-148/LSD program returning to Savant Holdings and/or Savant Inc. Those benefits are not different or above the status quo before the misappropriation to Ceruvia.

e.   The only shareholders and members whose interests diverge from Freeman's are Hurst and Turnbull, who are committing the misconduct that gives rise to the Savant Entities' claims.

754.   Freeman has repeatedly made efforts to obtain action from those with the authority of directors, and otherwise demand is excused as futile:

a.   *Savant Inc.* has never held any annual or other shareholder meetings to elect a valid board of directors. Although Hurst purported to appoint a board unilaterally, as described in paragraph 636, that action is void, so there is no validly elected board on whom to make a demand. The identities of the so-called "directors" was not even shared with shareholders until recently, and the board has prevented Savant Inc. from holding

139

LEWIS ROCA

1    shareholder meetings. Alternatively, two of the three directors—Hurst

2    and Forte—are not independent, as they are implicated in the theft of

3    trade secrets (Hurst orchestrated it, and Forte while having access to Sa-

4    vant Inc.'s books and records has not corrected the capitalization tables to

5    reflect Turnbull's 2012 investment into the BOL-148/LSD program). Bur-

6    bank, who as liquidating trustee of Savant Holdings has stewardship over

7    its subsidiaries, Savant Inc. and Savant Addiction, has also refused to in-

8    vestigate Freeman's claims or correct the capitalization tables that would

9    have revealed Savant TAC's existence and revealed the theft of trade se-

10   crets.

11        b.    *Savant Holdings* does not have a board of directors on whom

12   demand could be made, and under provisions of the operating agreement

13   that are challenged in this complaint, Hurst as managing member holds

14   veto power over his own removal or investigation into his misconduct.

15   Moreover, although Burbank now disclaims that he is the managing

16   member of Savant Holdings and lacks authority to investigate Hurst,

17   Burbank also specifically refused the demand of the majority-in-interest

18   to investigate this claim. Neither is independent because they are impli-

19   cated in the theft of the BOL-148/LSD program or its coverup and cannot

20   be expected to take action against their own misconduct.

21        c.    Freeman brought his concerns about Hurst's mismanagement

22   of all three Savant Entities to the attention of Hurst, Savant's counsel,

23   and Burbank.

24        d.    This includes Freeman's October 2021 e-mail to Hurst and Ng

25   addressing Hurst's self-dealing.

26        e.    As discussed, Ng and Dorsey & Whitney, rather than investi-

27   gating the allegations, wrote Freeman a cease-and-desist letter.

28

LEWIS ROCA

f.      Likewise, since Burbank's appointment as trustee to address the so-called "Scott issue," Burbank has refused to turn over the books and records and refused to investigate any of the allegations in this complaint, and has instead deferred to Hurst and Savant's counsel, which have declined to address the issues.

g.      John Weems, BPM's Director of Business Development and Partnerships, was copied on Freeman's communications with Burbank, Ng, and Olson informing him of the issues that Burbank was unwilling to address.

h.      No one at BPM has responded to address these issues.

i.      Freeman and a majority-in-interest of the Savant Holdings members also instructed Burbank, in the August 3, 2023 e-mail and subsequent resolution, described in paragraphs 478-484, to take specific actions relevant to this claim, but Burbank and BPM have refused.

755.   Under these circumstances, making a separate demand on the Savant Entities, who remain under the effective control of Hurst, either directly or with Burbank and Forte, would be futile.

**FIFTH CLAIM FOR RELIEF**
**UNIFORM TRADE SECRETS ACT (NRS CHAPTER 600A)**
**(HURST, TURNBULL, AND CERUVIA)**

***Direct and Derivative for Savant Inc. and Savant Holdings***

756.   Plaintiff incorporates the foregoing allegations in this claim.

757.   Savant Inc. and/or Savant Holdings is an owner with respect to trade secrets within the meaning of NRS 600A.030(3) and (5).

758.   Plaintiff is also an owner of trade secrets through his membership in Savant Holdings, his shares of Savant Inc., and equitably through his personal efforts to develop the intellectual property and proprietary BOL-148 program for Savant Inc. and Savant Holdings.

141

LEWIS ROCA

759.   Hurst and Turnbull, through Savant TAC/CH TAC/Ceruvia, stole or otherwise misappropriated trade secrets belonging to Savant Inc. and/or Savant Holdings.

760.   As a direct and proximate result of defendants' misappropriation, plaintiff and the Savant Entities on whose behalf plaintiff is derivatively suing are entitled to all of the remedies under NRS 600A.040-.060, including injunctive relief, damages in excess of $15,000, and exemplary damages.

761.   Plaintiff's direct injuries include the loss of all of the salary, bonus, and equity incentives that he would have received as Savant's CMO had the BOL-148/LSD program remained at Savant, rather than being stolen to Ceruvia.

762.   Savant Inc. and Savant Holdings were injured by the loss of the BOL-148/LSD trade secrets and intellectual property.

763.   Plaintiff has also been forced to retain counsel to pursue this action and has incurred attorney's fees as a result of defendants' breach.

764.   Because the trade secret was willfully and maliciously misappropriated, plaintiff is entitled to an award of attorney's fees under NRS 600A.060(3).

765.   At all relevant times, Freeman has been a shareholder of Savant Inc. and a member of Savant Holdings.

766.   This claim is not collusive or brought to confer jurisdiction that this Court would otherwise lack.

767.   Freeman fairly and adequately represents the interests of the Savant Inc. shareholder and Savant Holdings members:

a.   Freeman is a major shareholder of Savant Inc., as indicated in the chart at paragraph 11, holding 27.7% of the shares.

b.   Freeman is a major owner of Savant Holdings, as indicated in the chart at paragraph 11, holding 38.89% of the shares.

142

LEWIS ROCA

c.      Freeman is well-positioned to represent the interests of simi-larly situated shareholders and members because he has extensive knowledge of BOL-148/LSD program that was stolen and the misconduct by Hurst, Turnbull, and Ceruvia that gives rise to this claim, as detailed in the e-mails and other communications described above and attached to this complaint.

d.      Freeman's personal claim does not create a conflict because his personal claim is predicated on salary and other benefits that would flow from the BOL-148/LSD program returning to Savant Holdings and/or Savant Inc. Those benefits are not different or above the status quo before the misappropriation to Ceruvia.

e.      The only shareholders and members whose interests diverge from Freeman's are Hurst and Turnbull, who are committing the miscon-duct that gives rise to the Savant Entities' claims.

768.   Freeman has repeatedly made efforts to obtain action from those with the authority of directors, and otherwise demand is excused as futile:

a.      *Savant Inc.* has never held any annual or other shareholder meetings to elect a valid board of directors. Although Hurst purported to appoint a board unilaterally, as described in paragraph 636, that action is void, so there is no validly elected board on whom to make a demand. The identities of the so-called "directors" was not even shared with sharehold-ers until recently, and the board has prevented Savant Inc. from holding shareholder meetings. Alternatively, two of the three directors—Hurst and Forte—are not independent, as they are implicated in the theft of trade secrets (Hurst orchestrated it, and Forte while having access to Sa-vant Inc.'s books and records has not corrected the capitalization tables to reflect Turnbull's 2012 investment into the BOL-148/LSD program).

LEWIS ROCA

Burbank, who as liquidating trustee of Savant Holdings has stewardship over its subsidiaries, Savant Inc. and Savant Addiction, has also refused to investigate Freeman's claims or correct the capitalization tables that would have revealed Savant TAC's existence and revealed the theft of trade secrets.

b. *Savant Holdings* does not have a board of directors on whom demand could be made, and under provisions of the operating agreement that are challenged in this complaint, Hurst as managing member holds veto power over his own removal or investigation into his misconduct. Moreover, although Burbank now disclaims that he is the managing member of Savant Holdings and lacks authority to investigate Hurst, Burbank also specifically refused the demand of the majority-in-interest to investigate this claim. Neither is independent because they are implicated in the theft of the BOL-148/LSD program or its coverup and cannot be expected to take action against their own misconduct.

c. Freeman brought his concerns about Hurst's mismanagement of all three Savant Entities to the attention of Hurst, Savant's counsel, and Burbank.

d. This includes Freeman's October 2021 e-mail to Hurst and Ng addressing Hurst's self-dealing.

e. As discussed, Ng and Dorsey & Whitney, rather than investigating the allegations, wrote Freeman a cease-and-desist letter.

f. Likewise, since Burbank's appointment as trustee to address the so-called "Scott issue," Burbank has refused to turn over the books and records and refused to investigate any of the allegations in this complaint, and has instead deferred to Hurst and Savant's counsel, which have declined to address the issues.

144

g.      John Weems, BPM's Director of Business Development and Partnerships, was copied on Freeman's communications with Burbank, Ng, and Olson informing him of the issues that Burbank was unwilling to address.

h.      No one at BPM has responded to address these issues.

i.      Freeman and a majority-in-interest of the Savant Holdings members also instructed Burbank, in the August 3, 2023 e-mail and subsequent resolution, described in paragraphs 478-484, to take specific actions relevant to this claim, but Burbank and BPM have refused.

**SIXTH CLAIM FOR RELIEF**
**USURPATION OF BUSINESS OPPORTUNITY AND WRONGFUL**
**INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
**(HURST, TURNBULL, AND CERUVIA)**

***Direct and Derivative for Savant Inc. and Savant Holdings***

769.   Plaintiff incorporates the foregoing allegations in this claim.

770.   As plaintiff has just learned, Hurst and Turnbull diverted to themselves and Ceruvia economic opportunities.

771.   These opportunities included, for instance, the opportunity to acquire the Sewell patent and develop BOL-148/LSD. Plaintiff had pursued this opportunity on behalf of Savant, including to the point of negotiating and drafting a license agreement for the Sewell patent.

772.   But for Hurst and Turnbull's interference, Savant could have acquired the patent, including if necessary with assistance from plaintiff.

773.   Hurst and Turnbull instead leveraged the Savant name by creating Savant TAC, inducing Sewell's widow to transfer the patent to that entity (even though Savant TAC had already become CH TAC), and only afterwards correcting the name to CH TAC and later to Ceruvia.

145

LEWIS ROCA

774.   While Hurst and Turnbull were secretly engaged in usurping Savant's opportunity to develop BOL-148/LSD, Hurst continued to reassure Freeman that Savant would continue to have a BOL-148/LSD program in partnership with Ceruvia.

775.   The loss of this opportunity to Savant (and later MindMed) culminated in the LSD manufacturing "crisis" described above, in which Hurst and Turnbull negotiated to subordinate and sacrifice to Ceruvia MindMed's exclusive rights to LSD and to develop drugs based on BOL-148.

776.   Hurst and Turnbull also interfered with Freeman's employment as MindMed CMO for the purpose of orchestrating this crisis and misappropriation, as without Freeman's ouster he would have prevented it.

777.   Hurst, Turnbull, and Ceruvia benefitted from the usurpation of these and other business opportunities and this interference with economic advantage belonging to plaintiff and Savant.

778.   Plaintiff's direct injuries include the loss of all of the salary, bonus, and equity incentives that he would have received as Savant's CMO had the BOL-148/LSD program remained at Savant, rather than being stolen to Ceruvia, as well as the loss of Freeman's position and influence as MindMed's CMO, along with accompanying salary, equity, and other benefits that he lost with his termination. Plaintiff has also been injured by MindMed's suit against him on the basis of the separation agreement which was the result of Hurst's and Turnbull's interference.

779.   Savant Inc. and Savant Holdings were injured by the loss of the BOL-148/LSD trade secrets and intellectual property.

780.   As a sole, direct and proximate result of the foregoing, plaintiff has been damaged in a sum in excess of $15,000 and is entitled to general, special, and punitive damages.

146

LEWIS ROCA

781.   In the event that plaintiff is not entitled to full relief under NRS chapter 600A, this action is alternative to any remedies available under that chapter.

782.   Plaintiff has also been forced to retain counsel to pursue this action and has incurred attorney's fees as a result of defendants' breach.

783.   At all relevant times, Freeman has been a shareholder of Savant Inc. and a member of Savant Holdings.

784.   This claim is not collusive or brought to confer jurisdiction that this Court would otherwise lack.

785.   Freeman fairly and adequately represents the interests of the Savant Inc. shareholder and Savant Holdings members:

a.   Freeman is a major shareholder of Savant Inc., as indicated in the chart at paragraph 11, holding 27.7% of the shares.

b.   Freeman is a major owner of Savant Holdings, as indicated in the chart at paragraph 11, holding 38.89% of the shares.

c.   Freeman is well-positioned to represent the interests of similarly situated shareholders and members because he has extensive knowledge of BOL-148/LSD program and other corporate opportunities stolen by Hurst, Turnbull, and Ceruvia that gives rise to this claim, as detailed in the e-mails and other communications described above and attached to this complaint.

d.   Freeman's personal claim does not create a conflict because his personal claim is predicated on salary and other benefits that would flow from the BOL-148/LSD program returning to Savant Holdings and/or Savant Inc. Those benefits are not different or above the status quo before the misappropriation to Ceruvia.

147

LEWIS ROCA

e.     The only shareholders and members whose interests diverge from Freeman's are Hurst and Turnbull, who are committing the misconduct that gives rise to the Savant Entities' claims.

786.   Freeman has repeatedly made efforts to obtain action from those with the authority of directors, and otherwise demand is excused as futile:

a.     *Savant Inc.* has never held any annual or other shareholder meetings to elect a valid board of directors. Although Hurst purported to appoint a board unilaterally, as described in paragraph 636, that action is void, so there is no validly elected board on whom to make a demand. The identities of the so-called "directors" was not even shared with shareholders until recently, and the board has prevented Savant Inc. from holding shareholder meetings. Alternatively, two of the three directors—Hurst and Forte—are not independent, as they are implicated in the theft of trade secrets (Hurst orchestrated it, and Forte while having access to Savant Inc.'s books and records has not corrected the capitalization tables to reflect Turnbull's 2012 investment into the BOL-148/LSD program). Burbank, who as liquidating trustee of Savant Holdings has stewardship over its subsidiaries, Savant Inc. and Savant Addiction, has also refused to investigate Freeman's claims or correct the capitalization tables that would have revealed Savant TAC's existence and revealed the theft of trade secrets.

b.     *Savant Holdings* does not have a board of directors on whom demand could be made, and under provisions of the operating agreement that are challenged in this complaint, Hurst as managing member holds veto power over his own removal or investigation into his misconduct. Moreover, although Burbank now disclaims that he is the managing member of Savant Holdings and lacks authority to investigate Hurst,

148

Burbank also specifically refused the demand of the majority-in-interest to investigate this claim. Neither is independent because they are implicated in the theft of the BOL-148/LSD program or its coverup and cannot be expected to take action against their own misconduct.

c.      Freeman brought his concerns about Hurst's mismanagement of all three Savant Entities to the attention of Hurst, Savant's counsel, and Burbank.

d.      This includes Freeman's October 2021 e-mail to Hurst and Ng addressing Hurst's self-dealing.

e.      As discussed, Ng and Dorsey & Whitney, rather than investigating the allegations, wrote Freeman a cease-and-desist letter.

f.      Likewise, since Burbank's appointment as trustee to address the so-called "Scott issue," Burbank has refused to turn over the books and records and refused to investigate any of the allegations in this complaint, and has instead deferred to Hurst and Savant's counsel, which have declined to address the issues.

g.      John Weems, BPM's Director of Business Development and Partnerships, was copied on Freeman's communications with Burbank, Ng, and Olson informing him of the issues that Burbank was unwilling to address.

h.      No one at BPM has responded to address these issues.

i.      Freeman and a majority-in-interest of the Savant Holdings members also instructed Burbank, in the August 3, 2023 e-mail and subsequent resolution, described in paragraphs 478-484, to take specific actions relevant to this claim, but Burbank and BPM have refused.

149

**SEVENTH CLAIM FOR RELIEF**
**BREACH OF FIDUCIARY DUTY AND**
**DUTY OF LOYALTY (HURST, BURBANK, BPM, AND FORTE)**

*Direct and Derivative for Savant Inc.,*
*Savant Holdings, and Savant Addiction*

787.   Plaintiff incorporates the foregoing allegations in this claim.

788.   Hurst owes a fiduciary duty and duty of loyalty to Savant Inc. in his capacity as CEO.

789.   Hurst also owes fiduciary duties to Savant Holdings and Savant Addiction because his attempt to limit his fiduciary duties in the operating agreements of Savant Holdings and Savant Addiction was invalid. Those operating agreements entered into force only on the basis of Hurst's fraudulent misrepresentations and concealment of his collaboration with Turnbull dating back to 2012.

790.   In addition, Hurst stands in a special relationship of trust to the Savant members because his Hurst's total control over the Savant Entities give him superior information about the companies, forcing members to rely on and place their trust in his representations.

791.   Hurst owes a fiduciary duty and duty of loyalty to plaintiff. These duties arise not just from Hurst's service as a corporate officer and director of Savant Inc. and the parties' mutual service on the MindMed board of directors,[11] but also from the parties' longstanding partnership that predates even the formation of Savant Addiction and Savant Holdings. Over the course of more than a decade, Freeman had come to trust Hurst and rely on his

---

[11] Under Canadian law, any "provision in a contract, the articles, the by-laws or a resolution [that] relieves a director or officer from the duty to act in accordance with this Act or the regulations or relieves them from liability for a breach thereof" is prohibited. Can. Bus. Corp. Act § 122(3). Directors are absolutely required to "act honestly and in good faith with a view to the best interests of the corporation," *id.* § 122(1)(a).

150

1  judgment, expecting that Hurst would act in Freeman's best interest and those
2  of Savant and MindMed.

3      792.  In fact, Freeman entered into an agreement with Hurst that they
4  would each be equally compensated in salary, stock, stock options, and bonus,
5  so that their interests were aligned. It was under this agreement that Freeman
6  acquiesced to allowing Hurst to be CEO/Chairman.

7      793.  Hurst breached that trust by repeatedly placing his own interests
8  and those of Turnbull and Ceruvia—a company in which Freeman, and the
9  other Savant Investors have no stake—above those of Freeman.

10      794.  Hurst, as CEO, failed to protect the interests of Savant Inc. share-
11  holders but instead created operating agreements that gave him permanent and
12  unchecked power over the disclosed LLCs, Savant Holdings and Savant Addic-
13  tion, while concealing his self-dealing in the creation of the undisclosed Savant
14  TAC.

15      795.  Hurst, as CEO of Savant Inc., also breached his fiduciary duties in
16  conspiring with Turnbull and Ng to misappropriate the BOL-148 program to
17  Savant TAC, later Ceruvia, in which Hurst had an undisclosed interest.

18      796.  Hurst has also breached his fiduciary duties in preventing share-
19  holders from getting their shares from Savant Inc.

20      797.  Hurst has also breached his fiduciary duties in issuing backdated
21  Savant Inc. options to Belga as a personal gift—an act that had the effect of di-
22  luting the other Savant Investors—without shareholder approval or informing
23  the shareholders of the improper "gift."

24      798.  Worse, Hurst obtained his own shares of MindMed stock on the ba-
25  sis of fraudulent capitalization tables that omit the backdated options, thereby
26  inflating the share that he received compared to what he would be entitled to
27  under an accurate accounting.

28

LEWIS ROCA

799.   In doing so, he has conspired with Burbank and Forte: Savant Inc. is 52 percent owned by Savant Holdings, for which Burbank is the trustee and has a duty to Savant Holdings members.

800.   Pursuant to Savant Holdings and Savant Addiction's engagement with BPM and Burbank, BPM and Burbank are to act in the members' interest—including their interest in obtaining a proper accounting from Savant Inc. and Hurst as its fiduciary.

801.   Notwithstanding any attempted contractual disclaimer, these duties are fiduciary in nature:

a.   As liquidating trustee of Savant Holdings, Burbank bears the responsibility to oversee its subsidiary, Savant Inc., whose officers (including Hurst) owe fiduciary duties to their shareholders.

b.   Burbank and BPM misrepresented their independence from Hurst in their appointment, with the purpose of covering up Hurst's misconduct, and so cannot disclaim fiduciary duties on the basis of an arm's-length transaction.

c.   Burbank steps into the shoes of Hurst as managing member. Hurst's own attempt to limit his fiduciary duties in the operating agreements of Savant Holdings and Savant Addiction was invalid because those operating agreements entered into force only on the basis of Hurst's fraudulent misrepresentations and concealment of his collaboration with Turnbull dating back to 2012.

d.   Burbank and BPM, like Hurst, stand in a special relationship of trust with the members of Savant Holdings and Savant Addiction, particularly because Burbank has superior information about the companies and has refused to turn over the companies' books and records, thus forcing members to rely on and place their trust in Burbank's

152

1    representations.

2    802.   Yet BPM and Burbank have failed to do so, breaching their obliga-

3    tions to the members of Savant Holdings and Savant Addiction.

4    803.   Burbank has never acted as an independent liquidating trustee, but

5    instead has acted in Hurst's best interests, as prescribed by Hurst and Olson,

6    who was conflicted because of his firm's relationship with Hurst.

7    804.   Burbank has breached his fiduciary duties and duties of loyalty by

8    acting loyally to Hurst—not the Savant members—since his appointment, in-

9    cluding by:

10        a.    transferring Savant assets and MindMed stock, based on in-

11       accurate and fraudulent capitalization tables that do not include Savant

12       TAC, the backdated options, or misappropriated MindMed shares by

13       Hurst at Savant Inc.;

14        b.    refusing to release books and records;

15        c.    refusing to provide proxy rights to Savant Holdings members

16       to locked and unlocked MindMed shares sequestered in Savant Addiction

17       so members could vote in MindMed annual and other meetings;

18        d.    ignoring Hurst's and Forte's violations of corporate govern-

19       ance at Savant Inc., such as the failure to hold annual shareholder meet-

20       ings or allow shareholders to vote for the board of directors, and redistrib-

21       uting shares to themselves without shareholder approval;

22        e.    ignoring the interests of the Savant Inc. shareholders, includ-

23       ing the members of Savant Holdings, who together own over 50 percent of

24       Savant Inc.;

25        f.    refusing to investigate Hurst;

26        g.    delaying the release of MindMed shares until after the annual

27       MindMed shareholders meeting in an effort to block Savant Holdings

28

153

LEWIS ROCA

members from obtaining MindMed board of director seats that would allow them to learn of Hurst's activities at MindMed, a delay that cost MindMed shareholders tens of millions of dollars as the MindMed stock spiraled downward;

h.      refusing to terminate Dorsey & Whitney, who backdated options and established Savant TAC, despite the instructions from the majority-in-interest of Savant Holdings.

805.   Under Delaware law, a corporation must hold annual shareholders meetings, and shareholder must elect the board of directors.

806.   Hurst has done none of this; there has never been an annual shareholder meeting, and Hurst has appointed the board—including Forte—unilaterally.

807.   In doing so, Hurst has installed Forte on the board of Savant Inc.

808.   Forte, as a member of the board, likewise owes fiduciary duties to Savant Inc. and its shareholders.

809.   Despite the conflict of interest, Forte has executed Hurst's wishes in breach of Forte's fiduciary duties to the corporation.

810.   Hurst and Forte have taken salaries and given themselves stock grants, despite the absence of a business reason for doing so.

811.   Freeman's direct damages include the loss of compensation, including salary, stock, stock options, and bonus—at both the Savant Inc. and MindMed—that resulted when the BOL-148/LSD programs was stolen from Savant Inc. and Savant Holdings, and when Freeman was terminated from MindMed.

812.   Savant Inc. is damaged by the dilution caused by unauthorized distribution of salary and stock and stock options, including the backdated stock options.

154

813.   Savant Holdings and Savant Inc. are damaged by the loss of the BOL-148/LSD program.

814.   Savant Holdings and Savant Addiction are damaged by the loss of voting rights from the refusal to distribute shares.

815.   As a sole, direct, and proximate result of the foregoing, plaintiff has been damaged in a sum in excess of $15,000 and is entitled to general, special, and punitive damages.

816.   Plaintiff has also been forced to retain counsel to pursue this action and has incurred attorney's fees as a result of defendants' breach.

817.   At all relevant times, Freeman has been a shareholder of Savant Inc. and a member of Savant Holdings, which in turn is a 52% owner of Savant Addiction.

818.   This claim is not collusive or brought to confer jurisdiction that this Court would otherwise lack.

819.   Freeman fairly and adequately represents the interests of the Savant Inc. shareholder and Savant Holdings and Savant Addiction members:

a.      Freeman is a major shareholder of Savant Inc., as indicated in the chart at paragraph 11, holding 27.7% of the shares.

b.      Freeman is a major owner of Savant Holdings, as indicated in the chart at paragraph 11, holding 38.89% of the shares.

c.      Freeman is a major owner of Savant Addiction through his 38.89% ownership in Savant Holdings, as indicated in the chart at paragraph 11, which makes him a 34.4% beneficial owner Savant Addiction.

d.      Freeman is well-positioned to represent the interests of similarly situated shareholders and members because he has extensive knowledge of the misconduct that gives rise to the Savant Entities' claims, as detailed in the e-mails and other communications described above and attached to this complaint.

155

e.     In particular, Freeman obtained the consent of a majority-in-interest of the members of Savant Holdings to vote to dissolve the company to force distributions, as detailed in paragraphs 378-385, which Hurst and Savant counsel refused to do.

f.     Freeman also obtained the consent of a majority-in-interest of the members of Savant Holdings to issue instructions to Burbank, as detailed in paragraphs 459-463, which he ignored.

g.     Because Savant Holdings is the parent company of both Savant Inc. and Savant Addiction, a majority-in-interest of Savant Holdings could—had Hurst and Burbank not disregarded their instructions—have controlled the direction of all three companies.

h.     In a private meeting with just three Savant Inc. shareholders, those shareholders also expressed frustration over the delay in distribution of MindMed shares, "whether it be from Savant HWP Holdings or Savant HWP Inc."

i.     The only shareholders and members whose interests diverge from Freeman's are Hurst and Turnbull, who are committing the misconduct that gives rise to the Savant Entities' claims.

820.   Freeman has repeatedly made efforts to obtain action from those with the authority of directors, and otherwise demand is excused as futile:

a.     *Savant Inc.* has never held any annual or other shareholder meetings to elect a valid board of directors. Although Hurst purported to appoint a board unilaterally, as described in paragraph 636, that action is void, so there is no validly elected board on whom to make a demand. The identities of the so-called "directors" was not even shared with shareholders until recently, and the board has prevented Savant Inc. from holding shareholder meetings. Alternatively, two of the three directors—Hurst

156

and Forte—are not independent, as they are implicated in the RICO conspiracy and cannot be expected to take action against their own misconduct. Burbank, who as liquidating trustee of Savant Holdings has stewardship over its subsidiaries, Savant Inc. and Savant Addiction, has also refused to investigate Freeman's claims and has instead deferred to Savant's conflicted counsel, who have assisted Hurst, Turnbull, and Burbank in the RICO conspiracy as described above.

     b.    *Savant Holdings* does not have a board of directors on whom demand could be made, and under provisions of the operating agreement that are challenged in this complaint, Hurst as managing member holds veto power over his own removal or investigation into his misconduct. Moreover, although Burbank now disclaims that he is the managing member of Savant Holdings and lacks authority to investigate Hurst, Burbank also specifically refused the demand of the majority-in-interest to investigate this claim. Neither is independent because they are implicated in the RICO conspiracy and cannot be expected to take action against their own misconduct.

     c.    *Savant Addiction* is likewise under the sole control of Hurst as managing member or Burbank as liquidating trustee and acting managing member. Like the Savant Holdings operating agreement, the Savant Addiction operating agreement gives the managing member veto power over removal or other action to investigate the managing member's misconduct.

     d.    Freeman brought his concerns about Hurst's mismanagement of all three Savant Entities to the attention of Hurst, Savant's counsel, and Burbank.

157

1    e.    This includes Freeman's October 2021 e-mail to Hurst and Ng

2    addressing Hurst's self-dealing.

3    f.    As discussed, Ng and Dorsey & Whitney, rather than investi-

4    gating the allegations, wrote Freeman a cease-and-desist letter.

5    g.    Likewise, since Burbank's appointment as trustee to address

6    the so-called "Scott issue," Burbank has refused to turn over the books

7    and records and refused to investigate any of the allegations in this com-

8    plaint, and has instead deferred to Hurst and Savant's counsel, which

9    have declined to address the issues.

10    h.    John Weems, BPM's Director of Business Development and

11    Partnerships, was copied on Freeman's communications with Burbank,

12    Ng, and Olson informing him of the issues that Burbank was unwilling to

13    address.

14    i.    No one at BPM has responded to address these issues.

15    j.    Freeman and a majority-in-interest of the Savant Holdings

16    members also instructed Burbank, in the August 3, 2023 e-mail and sub-

17    sequent resolution, described in paragraphs 478-484, to take specific ac-

18    tions relevant to this claim, but Burbank and BPM have refused.

19    821.   Under these circumstances, making a separate demand on the Sa-

20    vant Entities, who remain under the effective control of Hurst, either directly or

21    with Burbank and Forte, would be futile.

**EIGHTH CLAIM FOR RELIEF**
**FRAUDULENT MISREPRESENTATION**
**(HURST, TURNBULL, CERUVIA, AND BURBANK, BPM)**

***Direct and Derivative for Savant Inc.,***
***Savant Holdings, and Savant Addiction***

26    822.   Plaintiff incorporates the foregoing allegations in this claim.

LEWIS ROCA

823.   In addition to the foregoing specific acts of fraud, defendants made the following misrepresentations:

### 1.   *Direct Claim by Freeman*

a.   HURST'S FRAUD IN FORMATION OF SAVANT HOLDINGS AND SAVANT ADDICTION

824.   As detailed in paragraphs 53-78, in October and December 2013, Hurst together with Ng presented operating agreements for the creation of Savant Holdings.

825.   Hurst made material misrepresentations or omissions of fact regarding his intent with the operating agreements. Specifically, he represented to Freeman that as partners they would equally split equity, salary, and other benefits, so that their interests were aligned.

826.   Hurst represented that Hurst needed to handle the business affairs while Freman would be Chief Medical Officer and be responsible for the medical and technical issues.

827.   Hurst also misrepresented that his longtime associate and legal counsel, Evan Ng, would be working in Savant's interest. Hurst used Ng for his own personal interest as Savant counsel to cement his role as managing member even though Ng knew Hurst was defrauding members.

828.   Hurst made those misrepresentations and omissions of fact directly to Freeman and through e-mail and telephone conversations.

829.   Those statements were false because, in fact, Hurst had no intention of equally splitting equity and salary with Freeman. This is demonstrated by Hurst in 2012, when he started dealing with Turnbull on BOL-148/LSD, which was not disclosed to Freeman or the Savant Holdings members before they signed the operating agreement. Freeman only found out about this in August 2022, when Turnbull published this transaction on the Ceruvia website.

159

1   Moreover, Hurst continued his dealing with Turnbull for a decade without dis-
2   closing to Freeman or members (¶¶ 46, 116-117).

3        830.   Hurst did not disclose that he intended to start a separate company
4   with Turnbull, which became Savant TAC/Ceruvia, to which he could siphon in-
5   tellectual property developed by Savant (¶¶ 76-117).

6        831.   Hurst knew that those statements were false when he made them
7   directly to Freeman.

8        832.   Hurst knew that his secret dealings with Turnbull violated the pro-
9   posed operating agreements for Savant Holdings and Savant Addiction, and his
10  fiduciary duties to Freeman and Savant Inc., so he made special exceptions in
11  the operating agreement, which included protecting himself from removal as
12  managing member.

13       833.   Freeman relied on these false statements when he signed the Sa-
14  vant Holdings operating agreement in 2013, including its provision that Hurst
15  could not be removed as managing member without his approval, and other pro-
16  visions that entrenched Hurst's power.

17       834.   Freeman relied to his detriment on the misrepresentations, signing
18  the agreements that gave Hurst control over the Savant Entities since he be-
19  lieved his interests were aligned with Hurst. As a consequence, when Freeman
20  developed trade-secret drug programs for Savant without compensation (i.e.,
21  just sweat equity)—and later, MindMed—Hurst was able to use his position as
22  managing member to misappropriate the programs (BOL-148/LSD) to Ceruvia
23  by signing agreements and or instructing Ng to do so, without sharing the bene-
24  fits with Freeman or sell the program (18-MC) for equity (MindMed shares)
25  that were sequestered.

26       835.   Freeman could not remove Hurst as managing member because it
27  required Hurst's approval. Had Freeman known about Hurst's intent, Freeman

28

160

would not have signed the operating agreements as written, including to make Hurst managing member.

836.   Freeman was fraudulently induced to sign believing that Freeman and Hurst were equal partners.

837.   Because Freeman has no stake in Ceruvia and is not Ceruvia's CMO, Freeman lost all of the salary, bonus, and equity incentives that he would have received as CMO of Savant Inc.

        b.     HURST'S FRAUD IN THE TRANSFER OF 18-MC TO SAVANT ADDICTION

838.   As detailed in paragraphs 53-117, Hurst defrauded Freeman by falsely representing that Hurst had the authority to transfer the Savant 18-MC program to Savant Addiction without the approval of the members of Savant Holdings, who owned the program.

839.   Hurst made material misrepresentations or omissions of fact regarding his intent with the transfer of 18-MC to form Savant Addiction Medicine, including the terms of that transfer.

840.   Specifically, he represented to Freeman that as CEO of Savant Inc. and managing member of Savant Holdings, he could make the 18-MC transfer from Savant Holdings to Savant Addiction Medicine.

841.   Hurst also misrepresented that Ng, Savant counsel, was working in the Savant Holdings members' best interests and agreed that the transfer was permissible without Savant Holdings member approval.

842.   But according to the Savant Holdings operating agreement signed in October 2013, Hurst needed member approval to transfer 18-MC and form Savant Addiction Medicine in December 2013. Hurst used Ng as Savant counsel to cement this misrepresentation.

843.   Under the terms of the transfer, to which the Savant Holdings members did not agree, Savant Holdings members did not become direct equity

LEWIS ROCA

owners in Savant Addiction but were rather beneficial owners through their ownership of Savant Holdings. This gave Hurst control of Savant Addiction Medicine, since the managing member of Savant Holdings was also the managing member of Savant Addiction.

844.   Hurst induced Freeman not to object to the transfer or question its legality because, as state, Hurst had assured Freeman that their interests were aligned, with Freeman and Hurst equally splitting equity, salary, and othe benefits (¶8).

845.   Had Freeman known that Hurst was secretly dealing with Turnbull by 2012, Freeman would have taken action to prevent the illegal transfer of 18-MC, undo it, or alter its terms to make the Savant Holdings members direct equity owners in Savant Addiction to be able to exercise control.

846.   Hurst knew that these statements were false because, in fact, Hurst had no intention of equally splitting equity and salary with Freeman to further the business in both their interests.

847.   Instead, Hurst was using 18-MC for his personal gain. Having established this structure where Hurst alone could direct the actions of Savant Addiction, Hurst could personally control the use of the 18-MC program without Savant Holdings membership approval.

848.   Hurst ultimately caused Savant Addiction to sell 18-MC to MindMed in 2019. Because the Savant Holdings members did not directly own Savant Addiction membership interest, Hurst was able to maintain control of the proceeds, 55,000,000 MindMed shares, to personally vote as a bloc, thus maintaining sole control over the MindMed board of directors.

849.   Hurst made those misrepresentations and omissions of fact directly to Freeman and through e-mail and telephone conversations.

850.   Freeman reasonably relied on Hurst's misrepresentation because of

162

LEWIS ROCA

Hurst's superior legal knowledge about corporate proceedings and because of Hurst's and Ng's duties as fiduciaries of Savant Inc. and Hurst's fiduciary duties to Freeman based on their special relationship of trust.

851.   Freeman also reasonably relied on Hurst's misrepresentation because of Hurst's prior misrepresentation that he and Freeman would each be equally compensated in salary, stock, stock options, and bonus, so that their interests were aligned.

852.   Freeman's reliance was detrimental, as the transfer of the 18-MC program to Savant Addiction meant that Freeman and the other members of Savant Holdings lost direct control over the asset as beneficial owners, enabling Hurst to structure the MindMed transaction to give Hurst direct control over the 55 million MindMed shares as a bloc within Savant Addiction (rather than distributed to the Savant Holdings members).

853.   Freeman was uniquely damaged compared to the other members since he was the largest MindMed shareholder, about 20,000,000 MindMed shares, with which he could have had a major influence on the company (¶180, 335).

854.   Instead, when Hurst used the voting bloc, including Freeman's shares, Freeman was damaged by the other schemes described in this complaint, including the transfer of intellectual property to Ceruvia, the delay in the distribution of MindMed shares.

855.   Freeman's damages include the lost opportunities for salary, stock options, bonuses, and ultimately, his job as CMO associated with development of the 18-MC program.

c.   HURST'S FRAUD IN THE DELAY OF DISTRIBUTING SHARES TO MAINTAIN CONTROL OF SAVANT ADDICTION'S VOTING BLOC

856.   As detailed in paragraphs 178-217 and 353-364, around the time of

163

MindMed's formation, Hurst defrauded Freeman by falsely representing that Hurst could sign the MindMed foundation agreement without shareholder approval, which transferred the 55,000,000 shares received from MindMed to Savant Addiction.

857.   Further, he falsely represented that the MindMed shares could be sequestered in Savant Addiction even though, because substantially all assets were sold, the operating agreement stated that Savant Addiction should be dissolved.

858.   Hurst falsely represented that he had sole authority to enter into a two-year lockup period with Canaccord.

859.   Further, Hurst falsely represented that for tax purposes and because of a provision in the MindMed bylaws, the 55 million MindMed common shares belonging to Savant Addiction had to be converted to 550,000 multiple voting shares (MVS) (at a ratio of 100 common shares to 1 MVS)

860.   In fact, Jamon Rahn, another U.S. did not have to convert all his shares to MVS.

861.   Hurst falsely represented that, while the shares were locked up in an agreement between Savant Addiction and Canaccord, the beneficial owners of those shares could not vote the shares—only Hurst, as managing member of Savant Holdings (and with Savant Holdings as managing member of Savant Addiction) could and without any input from Savant Holdings members.

862.   Hurst's statements through the operating agreements which he wrote, also indicated that if Savant Holdings were dissolved, Freeman could obtain a distribution of the MindMed shares since Savant Addiction is a subsidiary of Savant Holdings. Yet when a majority-in-interest of Savant Holdings filed a dissolution resolution, Hurst and Ng ignored the resolution.

863.   Instead, Hurst and Ng falsely represented that Savant Addiction

164

1  would proceed to "distribute the MindMed shares to LLC members."

2      864.   On October 7, 2020, Hurst falsely represented in an e-mail to Free-

3  man that, by paying MindMed's counsel to perform administrative work to re-

4  convert the MVS to common stock and to release the locked shares to individual

5  Savant members, Freeman could vote (but not sell or transfer on the public

6  markets) his share of the 55 million shares.

7      865.   Freeman relied on these misrepresentations to pay $20,000 to

8  MindMed's counsel, Peter Volk. Canaccord was willing to allow the distribution

9  of shares to Savant members, provided that the Savant members agreed to

10  same lock-up terms as Savant Addiction.

11     866.   Yet Hurst halted the distribution of these shares to maintain con-

12  trol of the 55,000,000 voting bloc in October 2020 when Freeman refused to al-

13  low him voting rights to the Savant bloc (¶¶ 375-405).

14     867.   Hurst misrepresented the reasons for the delay: first that he faced

15  time constraints, second because of MindMed's was fundraising, and finally be-

16  cause Canaccord had not given its approval.

17     868.   Each of these reasons was pretextual and fraudulent, designed to

18  prevent Freeman from taking action.

19     869.   Freeman reasonably relied on these misrepresentations to his detri-

20  ment. Unaware of Hurst's designs to misappropriate Savant and MindMed

21  trade secrets to Ceruvia, Freeman still believed that he and Hurst were aligned

22  because of their agreement for equal compensation in the Savant entities.

23     870.   Believing this misrepresentation, Freeman understood that Hurst

24  would vote the MindMed shares in their mutual interest, even if not distrib-

25  uted, but in reality, Hurst was using the Savant voting bloc to deal with Turn-

26  bull.

27     871.   Thus, Freeman as a result of these misrepresentations not only

28

LEWIS ROCA

1    suffered delay in the distribution of shares—a delay that cost him a controlling

2    stake in MindMed and/or the monetary value of the share votes—Freeman also

3    lost $20,000 for the attorney's fee to Volk.

4        872.   Hurst instead was able to vote the Savant Addiction bloc himself at

5    the 2021 MindMed annual general meeting.

6        873.   In fact, Hurst, upon his resignation as MindMed CEO, entered into

7    a severance agreement with MindMed, which required him to vote the Savant

8    Addiction bloc with MindMed management.

9        874.   Depriving Freeman of his valuable voting rights thus conferred on

10   Hurst a personal benefit—the severance package to which he would have other-

11   wise not been entitled.

12       875.   Freeman also lost value of MindMed shares that weren't distributed

13   to him in a timely manner: because of Hurst's misconduct at MindMed, the

14   MindMed share price plummeted, and Freeman could neither remove him as

15   managing member of Savant nor prevent him from voting the MindMed shares.

16              d.    FRAUD IN THE FORMATION OF CERUVIA

17   ***Hurst's fraud in the formation of Ceruvia***

18       876.   Hurst made material misrepresentations or omissions of fact re-

19   garding his intent to steal Savant Holdings's BOL-148/LSD trade secrets for Sa-

20   vant TAC, which eventually became Ceruvia (¶¶ 34-55, 59-63, 70-117).

21       877.   While conspiring with Turnbull and Ceruvia, Hurst falsely repre-

22   sented to plaintiff that

23              a.    BOL-148/LSD was a joint development between Savant and

24   Turnbull;

25              b.    the only reason for Turnbull/Ceruvia's involvement was be-

26   cause Savant did not have the resources to license the Sewell patent;

27

28

                                        166

LEWIS ROCA

c.     since the Sewell patent was public, Hurst fraudulently misrepresented that Turnbull licensed the Sewell patent independently, based on public information; and

d.     the reason that Hurst was working with Turnbull/Ceruvia was that the BOL-148/LSD and other Ceruvia studies were coming to MindMed, where Freeman had a significant equity stake, since Savant was a development partner.

878.   In furtherance of these misrepresentations, Hurst and Turnbull also concealed from Freeman the creation of Ceruvia's predecessor, Savant TAC, and the fact that Savant TAC had taken the assignment of the BOL-148 Sewell patent from Sewell's widow for nominal consideration—an upfront payment of $1 rather than $45,000—then immediately changed the assignee to CH TAC (later Ceruvia).

879.   Hurst then signed the micro-entity form to the USPTO for the Sewell patent a few months later.

880.   Specifically, Hurst represented to Freeman that the Savant Entities could not afford the $45,000 license fee for the Sewell patent and that Turnbull licensed the patent since it was a publicly known patent.

881.   Hurst fraudulently misrepresented that Turnbull did not use Savant's confidential information in licensing the patent.

882.   Hurst further misrepresented that Freeman did not need to worry about Turnbull's license because Turnbull was going to collaborate with the Savant Entities in developing BOL-148.

883.   Hurst further misrepresented the nature of his relationship with Turnbull and concealed that he and Turnbull had been secretly collaborating since at least 2012.

884.   Hurst repeated those misrepresentations to Freeman, Rahn, and

LEWIS ROCA

Latchman in the fall of 2019.

885.   Hurst made those misrepresentations and omissions of fact directly to Freeman in face-to-face meetings, e-mail, and telephone conversations.

886.   Hurst concealed the fact that he was transferring the BOL-148/LSD trade secrets to Savant TAC, an entity that never appeared in the Savant capitalization tables.

887.   He was supported by Ng who filed the certification of formation for Savant TAC.

888.   Neither Hurst nor Ng told members, as they were required to do. Hurst, and later Burbank, misrepresented the capitalization table as accurate.

889.   Freeman reasonably relied on Hurst's misrepresentations because Freeman and Hurst had agreed to split equity and salary equally, so their interests should have been aligned.

890.   As a result, Freeman did not challenge Hurst's account or take action to halt Turnbull's misappropriation of Savant's trade secrets.

891.   Hurst's statements were false because, in fact, Hurst had no intention of equally splitting equity and salary with Freeman and using Ng to further the business in both their interests. Hurst made Turnbull an authorized person in Savant TAC, and Turnbull then transferred trade secrets to CH TAC which later became Ceruvia.

892.   Hurst knew that those statements were false when he made them directly to Freeman.

893.   Freeman was directly damaged. Absent Hurst's misrepresentations, he would have been unable to transfer the Savant BOL-148/LSD program to Ceruvia, and as Savant Inc. CMO, Freeman would have received salary, bonus, stock options from Savant Inc. in the development of BOL-148/LSD. These benefits instead went to Ceruvia, where Freeman has no employment or ownership

168

LEWIS ROCA

1  interest.

2  ***Turnbull and Ceruvia's fraud in the formation of Ceruvia***

3  894.   Turnbull made material misrepresentations or omissions of fact re-

4  garding his intent to steal Savant Holdings's BOL-148/LSD trade secrets for Sa-

5  vant TAC, which eventually became Ceruvia (¶¶ 75-117).

6  895.   Specifically, he concealed from Freeman and other members that he

7  had dealt with Hurst in 2012 over these assets (¶¶ 116-117).

8  896.   Turnbull knew about Hurst's misrepresentations regarding the

9  Sewell license and the concealment of Savant TAC's existence. Turnbull had an

10  independent duty under the Savant Addiction operating agreement not to use

11  Savant's proprietary confidential information (including the BOL-148 program)

12  in a competing company and also to correct Hurst's misrepresentations. He did

13  not, instead aiding and abetting Hurst with his silence and his own false state-

14  ments regarding Ceruvia's independence.

15  897.   Turnbull omitted disclosing that as an authorized person he trans-

16  ferred the BOL-148/LSD trade secrets from Savant TAC to CH TAC.

17  898.   According to Savant Addiction's operating agreement, which Turn-

18  bull signed, Turnbull knew he needed member approval to transfer assets be-

19  longing to Savant Addiction's affiliates, including Savant Inc. and Savant Hold-

20  ings, to another entity such as Savant TAC / CH TAC.

21  899.   CH TAC subsequently became Ceruvia Lifesciences. Hurst and

22  Turnbull continued to change the company's name to hide its existence from Sa-

23  vant members and used Ng, Savant counsel, to assist in concealing this com-

24  pany from the Savant members.

25  900.   Turnbull also defrauded Freeman in publishing the Ceruvia website

26  around June 2021, in which Turnbull and Ceruvia falsely represented Ceruvia's

27  BOL-148 program and its trade secrets as independently developed, omitting

28

169

LEWIS ROCA

1  mention of Savant's BOL-148 program.

2      901.   Turnbull and Ceruvia knew that Freeman would see the public

3  website and intended to prevent Freeman from discovering that these trade se-

4  crets had previously belonged to Savant.

5      902.   It was only in September 2022, after Turnbull learned that Free-

6  man had discovered Savant TAC, that he updated the Ceruvia website to show

7  Turnbull's involvement with Savant in 2012 and 2017 (¶ 116-117).

8      903.   Turnbull made those misrepresentations and omissions of fact to

9  Freeman and through e-mail and internet, knowing Freeman would read the

10  public website.

11      904.   Those misrepresentation and omissions were false because, in fact,

12  Turnbull had no intention of compensating Savant members for their trade se-

13  crets. Turnbull was using BOL-148/LSD trade secrets for his personal gain.

14  Moreover, Turnbull continued his dealing with Hurst for over a decade at both

15  Savant and MindMed while CEO of CH TAC/Ceruvia.

16      905.   Freeman reasonably relied to his detriment on Turnbull's misrepre-

17  sentations on the Ceruvia website, not having any reason to doubt them, and

18  relied on Turnbull's omissions, which prevented Freeman from finding out that

19  Ceruvia had stolen Savant trade secrets from BOL-148/LSD.

20      906.   As a result, Freeman did not challenge Turnbull or take action to

21  halt Turnbull's misappropriation of Savant's trade secrets.

22      907.   Freeman was directly damaged, including by losing the salary, bo-

23  nus, and stock options he would have received as Savant Inc. CMO for its devel-

24  opment had the program remained at Savant instead of being stolen to Ceruvia.

25  **_Burbank's and BPM's Misrepresentations Regarding Formation of_**
**_Ceruvia_**

26

27      908.   To conceal and legitimize Hurst's misconduct, including the fraudu-

28  lent misrepresentations described in paragraphs 406-437, 459-463, and 478-

170

488, Hurst caused Savant Addiction and Savant Holdings to retain Burbank as a liquidating trustee.

909.   Burbank aided and abetted Hurst's fraud, including by fraudulently misrepresenting that he was acting as an independent liquidating trustee, serving the companies' interests rather than Hurst's personal interests.

910.   Burbank's purported accomplishments are also highlighted on BPM's website and bio pages.

911.   BPM likewise represented on its public website that it provides transparency when its partners act as fiduciary trustees.

912.   Burbank made material misrepresentations or omissions of fact regarding his intent to cover up for Hurst.

913.   Specifically, Burbank and BPM misrepresented that Burbank was an independent liquidating trustee.

914.   Burbank himself and through Olson, conflicted counsel also working for Hurst's interests, made those misrepresentations and omissions of fact directly to Freeman through e-mail.

915.   Those statements and omissions were false because, in fact, Burbank had no intention of being independent and Weems/BPM had no intention assuring there would be transparency. Burbank used his position of authority to protect Hurst.

916.   Burbank promulgated fraudulent capitalization tables that omit the existence of Savant TAC or Ceruvia, yet falsely represented them to be accurate and distributed shares on the basis of these inaccurate tables.

917.   Burbank knew that these capitalization tables were fraudulent and inaccurate. And even if he did not, he knows today, yet continues to do nothing to investigate or correct the misrepresentations on the capitalization tables.

918.   Moreover, Burbank has done nothing to protect assets even though

171

1  Savant Holdings members voted and instructed him to do so.

2      919.   Burbank also aided and abetted Hurst's fraudulent misrepresenta-

3  tions, including by refusing the instruction from the majority-in-interest of Sa-

4  vant Holdings to terminate Dorsey & Whitney as counsel so that an appropri-

5  ate, independent investigation could be done and so that the current assets un-

6  der management could be protected from further fraud and misconduct.

7      920.   BPM and Burbank's supervisor, Weems, have continued to allow

8  Burbank to serve as liquidating trustee despite knowing about his misrepresen-

9  tations.

10     921.   Freeman relied to his detriment on Burbank's false misrepresenta-

11  tions on the capitalization tables which excluded Savant TAC and Burbank's

12  2012 investment in Savant, believing there was no reason to doubt Burbank's

13  misrepresentation and omissions, which prevented Freeman from finding out

14  that Ceruvia had stolen Savant trade secrets from BOL-148/LSD.

15     922.   These misrepresentations directed harmed Freeman, not only in al-

16  lowing distributions based on inaccurate ownership percentages in the fraudu-

17  lent capitalization tables, but also costing Freeman the salary, bonus, and stock

18  options he would have received as Savant Inc. CMO for the development of

19  BOL-148/LSD.

20              e.    BURBANK'S AND BPM'S MISREPRESENTATIONS IN
                      PROMULGATING FRAUDULENT CAPITALIZATION
21                    TABLES TO DISTRIBUTE MINDMED SHARES

22     923.   To conceal and legitimize Hurst's misconduct, including the fraudu-

23  lent misrepresentations described in paragraphs 406-437, 459-463 and 478-488,

24  Hurst caused Savant Addiction and Savant Holdings to retain Burbank as a liq-

25  uidating trustee.

26     924.   Burbank aided and abetted Hurst's fraud, including by fraudulently

27  misrepresenting that he was acting as an independent liquidating trustee,

28

LEWIS ROCA

1   serving the companies' interests rather than Hurst's personal interests.

2        925.   Burbank's purported accomplishments are on the BPM website as a

3   further inducement for Savant Holdings members to agree to his retention.

4        926.   BPM likewise represented on its public website that it provides

5   transparency when its partners act as fiduciary trustees.

6        927.   Burbank made material misrepresentations or omissions of fact re-

7   garding his intent to cover up for Hurst.

8        928.   Specifically, Burbank and BPM misrepresented that Burbank was

9   an independent liquidating trustee.

10        929.   Burbank himself and through Olson, conflicted counsel also work-

11   ing for Hurst's interests, made those misrepresentations and omissions of fact

12   directly to Freeman through e-mail.

13        930.   Those statements and omissions were false because, in fact, Bur-

14   bank had no intention of being independent and Weems/BPM had no intention

15   assuring there would be transparency. Burbank used his position of authority

16   to protect Hurst.

17        931.   As discussed, Burbank promulgated fraudulent capitalization tables

18   that omit the existence of Savant TAC or Ceruvia, yet falsely represented them

19   to be accurate and distributed shares on the basis of these inaccurate tables.

20        932.   The capitalization tables were inaccurate in other ways, too:

21          a.   Burbank also concealed and misrepresented the backdated

22   Savant Inc. options that he issued to Belga through Dorsey Whitney, Olson's

23   firm, without shareholder approval under the pretense that they were options

24   gifted from Hurst's own shares.

25          b.   The tender falsely represented that the options were dated

26   February 26, 2019, prior to MindMed formation, even though the agreement

27   was dated October 28, 2019, after MindMed formation.

28

LEWIS ROCA

      c.     Issuing new stock options from Savant Inc., rather than gifting options on Hurst's shares, had the effect of diluting the stock of the other Savant Inc. shareholders.

      d.     Hurst and Burbank have not disclosed the purpose or even existence of these options to shareholders or to the Savant Investors in capitalization tables.

      e.     In concealing the nature of these options, Burbank did not inform plaintiff or Savant Inc. shareholders that these stock options were out of the ordinary course of business. Hurst concealed that these stock options were in fact intended as a personal gift, funded by the shareholders of Savant Inc.

      f.     The tables also omit Turnbull's investment in Savant Inc. from 2012.

      g.     Because Burbank has refused access to the books and records, it is impossible to tell whether the capitalization tables are fraudulent in other ways.

933.    Rather than independently investigate, Burbank used Olson, a conflicted Dorsey & Whitney attorney, to communicate with Freeman and other members and to avoid accountability.

934.    Burbank also aided and abetted Hurst's fraudulent misrepresentations, including by refusing the instruction from the majority-in-interest of Savant Holdings to terminate Dorsey & Whitney as counsel so that an appropriate, independent investigation could be done and so that the current assets under management at Savant Inc. and Savant Holdings could be protected from further fraud and misconduct.

935.    Before Freeman was able to uncover the illegal backdated options, Savant TAC, and Turnbull's 2012 investment, and their omission from the capitalization tables, Burbank had already issued to Hurst MindMed shares from

174

LEWIS ROCA

Savant Addiction according to the inaccurate ownership percentages in the fraudulent capitalization table.

936.   Burbank knew that these capitalization tables were fraudulent and inaccurate. And even if he did not, he knows today, yet continues to do nothing to investigate or correct the misrepresentations on the capitalization tables.

937.   Moreover, Burbank has done nothing to protect assets even though Savant Holdings members voted and instructed him to do so.

938.   Burbank also aided and abetted Hurst's fraudulent misrepresentations, including by refusing the instruction from the majority-in-interest of Savant Holdings to terminate Dorsey & Whitney as counsel so that an appropriate, independent investigation could be done and so that the current assets under management could be protected from further fraud and misconduct.

939.   BPM and Burbank's supervisor, Weems, have continued to allow Burbank to serve as liquidating trustee despite knowing about his misrepresentations.

940.   Freeman relied to his detriment on Burbank's misrepresentations on the capitalization tables, which excluded Savant TAC and Burbank's 2012 investment in Savant, believing there was no reason to doubt Burbank's misrepresentation and omissions, which prevented Freeman from finding out that Ceruvia had stolen Savant trade secrets from BOL-148/LSD.

941.   In reliance on the fraudulent capitalization tables, Freeman paid $20,000 to have his MindMed shares distributed according to the tables, ultimately received an inaccurate number of diluted shares from Savant Addiction.

942.   Burbank's misrepresentations also caused Freeman to forgo taking action to contest Burbank's appointment or have him removed, or to otherwise independently investigate his and Hurst's misconduct.

175

LEWIS ROCA

f.   HURST'S AND TURNBULL'S FRAUD IN FREEMAN'S
SEPARATION FROM MINDMED

943.   Hurst and Turnbull made material misrepresentations or omissions of fact in connection with Freeman's separation from MindMed (¶¶ 246-308).

944.   Specifically, Hurst misrepresented the reasons for Freeman's separation and Hurst's independence from the investigation leading to that separation, and Hurst and Turnbull misrepresented that Turnbull was an unrelated third party in their November 13, 2020 deal between MindMed and Ceruvia, further concealing the real purpose of Freeman's ouster and dissuading Freeman from taking action to try to regain his position or invalidate the separation agreement.

945.   Part of the Savant Enterprise's purpose was to concoct a manufacturing crisis as a pretext for MindMed to transfer trade secrets and other intellectual property to Ceruvia.

946.   Because Freeman would have avoided such a crisis, as he had identified another LSD manufacturer, LipoMed, and prevented this theft of trade secrets, Hurst and Turnbull needed Freeman to be removed from MindMed. Not only was Freeman halting unsafe 18-MC clinical trials until animal safety data could be performed, but he was working on two other MindMed drug programs, MM-120 and BOL-148, whose trade secrets and other intellectual property Hurst and Turnbull planned to steal for Ceruvia, as they had done at Savant to further the Enterprise.

947.   In June 2020, Hurst and Turnbull arranged for Kathleen Monroe, a CH TAC employee who was also working at MindMed, to falsely accuse Freeman of a workplace violation, which Freeman was told led to Freeman's suspension on June 15, 2020 and a MindMed "investigation," which lasted until August 31, 2020.

948.   Hurst also misrepresented that Freeman had committed corporate

176

LEWIS ROCA

theft, on the basis that Freeman accepted a $100,000 sign-on bonus that Hurst and MindMed's CFO had personally approved. Hurst even threatened to have Freeman arrested for corporate theft, and MindMed's outside counsel supported the criminal threats.

949.   During MindMed's investigation, Hurst fraudulently misrepresented that he had recused himself.

950.   Hurst made those misrepresentations and omissions of fact directly to Freeman and in face-to-face meetings, e-mail, and telephone conversations.

951.   This created the false impression that when Freeman was presented with a separation agreement that—to preserve his reputation—Freeman had no choice in accepting, Hurst was uninvolved.

952.   This veneer of independence and impartiality created by Hurst's misrepresentations fraudulently induced Freeman to sign the separation agreement.

953.   In fact, Freeman later learned that Hurst, far from recusing himself, had personally led the effort to terminate Freeman's employment, clearing the path to transact with Ceruvia.

954.   Hurst and Turnbull also defrauded Freeman in falsely representing that they negotiated the November 2020 MindMed deal at arm's length.

955.   Hurst and Turnbull knew that the statements that Turnbull was an unrelated third party was false.

956.   Hurst and Turnbull had no intention of correcting these misrepresentations and revealing that they were co-founders and equity owners of CH TAC/Ceruvia, which would have exposed their self-dealing and the true reason for Freeman's ouster.

957.   Moreover, Hurst and Turnbull continued their dealing for almost a decade, since 2012.

177

LEWIS ROCA

1    958.   Hurst and Turnbull knew that those statements were false when

2  they made them.

3    959.   Freeman reasonably relied on Hurst's and Turnbull's representa-

4  tions of independence in concluding that his termination was unrelated, thus

5  preventing Freeman from challenging his termination from MindMed and or

6  the fraudulently induced separation agreement. (¶ 325.)

7    960.   Had Freeman been able to show that Hurst had not recused him-

8  self, but with Turnbull had personally sought Freeman's ouster specifically to

9  facilitate the Ceruvia transaction, Freeman would have exposed Hurst's fraud,

10  challenged the validity of the fraudulently induced separation agreement and

11  reclaimed his lost job as MindMed CMO—along with salary, benefits, and half

12  of his promised stock options. (¶¶ 346-351.)

13    961.   These misrepresentations have also caused Freeman substantial

14  harm in that the fraudulently induced separation agreement has been used by

15  MindMed to attempt to silence Freeman as an equity owner in MindMed and to

16  subject him to civil liability for statements made in a proxy campaign.

17          g.   HURST'S AND TURNBULL'S FRAUD IN THE NOVEMBER
               2020 CERUVIA DEAL
18

19    962.   Hurst and Turnbull made material misrepresentations or omissions

20  of fact regarding their intent to self-deal in the November 13, 2020 transaction

    between MindMed and Ceruvia. (¶¶ 246-308.)
21

22    963.   Hurst and Turnbull misrepresented that Hurst was independent

   from CH TAC (as it was then known).
23

24    964.   Specifically, to avoid scrutiny of their relationship and conflicts of

25  interest, Hurst and Turnbull performatively negotiated CH TAC's sale of LSD

26  for use in MindMed's clinical trials, fraudulently portraying that the November

27  2020 agreement transferring trade secrets and other intellectual property from

28  MindMed to Ceruvia was an arm's-length transaction, prompted by a genuine

LEWIS ROCA

1    emergency in sourcing LSD.

2         965.   In fact, both Hurst and Turnbull were co-founders and equity own-

3    ers of CH TAC, which had previously misappropriated trade secrets for BOL-

4    148/LSD from Savant Holdings.

5         966.   Although Freeman was not initially included on the communica-

6    tions, Hurst's and Turnbull's e-mails were forwarded to Freeman. At the time,

7    Freeman was unaware of the existence of CH-TAC, which later became Ceru-

8    via, and Freeman had been led to believe through Hurst's misrepresentations

9    that any Turnbull would work with Savant on the BOL-148 program that Free-

10   man had developed.

11        967.   In appearing to make the Ceruvia deal seem legitimate and arm's

12   length, the misrepresentations dissuaded Freeman from challenging the loss of

13   his employment at MindMed. Freeman reasonably relied on the misrepresenta-

14   tions in accepting that—although the deal was detrimental to MindMed—he

15   could not prove that Hurst and Turnbull shared a financial interest so as doubt

16   the reasons for which Freeman had been terminated or to invalidate the separa-

17   tion agreement.

18        968.   Hurst and Turnbull knew that their statements were false when

19   they made them.

20        969.   Freeman did not discover that in fact they were related third par-

21   ties as equity owners in CH TAC, and that their desire to create a deal based on

22   the bogus manufacturing crisis in fact was a principal reason for Freeman's

23   ouster as CMO at MindMed.

24        970.   The misrepresentations surrounding the November 2020 deal were

25   directly linked to Freeman's termination from MindMed and were made in the

26   interest of keeping Freeman from discovering the true reason for his termina-

27   tion so as to challenge it or the separation agreement. (¶ 325.)

28
                                         179

LEWIS ROCA

971.   Since at the time Freeman did not know CH TAC even existed, the ploy worked. Freeman signed the separation agreement, and even after he learned about the November 2020 deal and Hurst's and Turnbull's representations that it had been negotiated at arm's length, he did not challenge the separation agreement.

972.   Had Freeman been able to show that Hurst and Turnbull were in fact co-owners in CH TAC with an interest in misappropriating MindMed's trade secrets and that Freeman was terminated because he stood in the way of this transaction, Freeman would have exposed Hurst's and Turnbull's fraud, challenged the validity of the fraudulently induced separation agreement and reclaimed his lost job as MindMed CMO—along with salary, benefits, and half of his promised stock options.

973.   These misrepresentations have also caused Freeman substantial harm in that the fraudulently induced separation agreement has been used by MindMed to attempt to silence Freeman as an equity owner in MindMed and to subject him to civil liability for statements made in a proxy campaign.

***Freeman's Reliance and Damages***

974.   Defendants Hurst, Forte, Burbank, BPM, Turnbull, and Ceruvia knew or believed that all of these representations were false, or else had insufficient basis to make the representation.

975.   Defendants Hurst, Burbank, Turnbull, and Ceruvia intended for Freeman to rely on the misrepresentations regarding the BOL-148/LSD program, to not discover that Ceruvia had been created as Savant TAC and that the Sewell patent had been licensed under the Savant TAC name, and to not investigate the self-dealing resulting from Hurst's and Turnbull's misappropriation of the BOL-148/LSD project and assets for Ceruvia.

976.   Freeman in fact relied on the misrepresentations and was unable to

180

1  preserve the Savant BOL-148/LSD program or its associated trade secrets and

2  intellectual property before their diversion to Ceruvia.

3       977.   And because Freeman has no stake in Ceruvia and is not Ceruvia's

4  CMO, Freeman lost all of the salary, bonus, and equity incentives that he would

5  have received had the project remained with Savant or MindMed, where Free-

6  man was CMO.

7       978.   Freeman also relied on Hurst's and Burbank's misrepresentations

8  regarding the distribution of MindMed shares, including the capitalization ta-

9  bles on which those distributions would be made, in paying $20,000 to facilitate

10 the distribution. Had he known that Hurst would block the release of shares to

11 control the MindMed board of directors and self-deal with Turnbull, Freeman

12 would not have done so.

13      979.   Freeman relied on Hurst's and Turnbull's misrepresentations and

14 omissions concealing the reasons for his termination from MindMed and

15 Hurst's misrepresentations regarding recusal from the investigation giving the

16 investigation an air of independence when Hurst led it. Freeman signed the

17 fraudulently induced separation agreement and lost his job at MindMed. This

18 allowed Hurst and Turnbull unopposed self-dealing at MindMed to steal the

19 LSD/BOL-148 intellectual property and trade secrets from MindMed as they did

20 at Savant.

21             h.   HURST'S FRAUD IN THE CONTRACT WITH BELGA

22      980.   As detailed in paragraphs 120-163, on October 2, 2018, Hurst fraud-

23 ulently misrepresented to Belga that if he were able to raise $5 million for Sa-

24 vant Addiction, Belga would become CEO and receive a 20% equity interest in

25 Savant Addiction. Hurst also fraudulently misrepresented that for raising $2

26 million before October 1, 2019, Belga would be CEO and Hurst would become

27 executive chairman.

28

LEWIS ROCA

981.   Hurst did not intend to give Belga the equity or the position, but instead intended to usurp any fundraising opportunity Belga identified so that it would close formally under Hurst's name, not Belga's.

982.   Belga relied to his detriment, immediately proceeding to work to identify investors that—had he known Hurst would usurp—Belga would not have done.

983.   After Belga identified JR Rahn as a potential investor and created a term sheet, Hurst rejected it on Savant Addiction Medicine's behalf and instead secretly re-engaged JR himself.

984.   Doing so allowed Hurst to cut Belga out withhold the equity, salary, and title to which Belga would have been entitled.

985.   Belga's injury is not simply the loss of the title, but given the size of the anticipated investment from JR, the full 20% equity-interest bounty, 11,000,000 MindMed shares.

986.   Freeman has a valid assignment of Belga's rights in this claim.

* * *

987.   As a sole, direct and proximate result of the foregoing, plaintiff has been damaged in a sum in excess of $15,000 and is entitled to punitive damages.

988.   Plaintiff has also been forced to retain counsel to pursue this action and has incurred attorney's fees as a result of defendants' breach.

### 2.   *Derivative Claims*

a.   HURST'S FRAUD IN THE FORMATION OF CERUVIA

989.   As detailed in paragraphs 34-117, while conspiring with Turnbull and Ceruvia, Hurst falsely represented to plaintiff that

a.   BOL-148/LSD was a joint development between Savant and Turnbull;

182

LEWIS ROCA

       b.     the only reason for Turnbull's involvement was because Savant did not have the resources to develop it;

       c.     since, the Sewell patent was public, Turnbull licensed the Sewell patent independently, based on public information; and

       d.     the reason that Hurst was working with Turnbull was that the BOL-148 and other Ceruvia studies were coming to MindMed since Savant was a development partner.

990.   In furtherance of these misrepresentations, Hurst also concealed from plaintiff the creation of Ceruvia's predecessor, Savant TAC, and the fact that Savant TAC had taken the assignment of the BOL-148 Sewell patent from Sewell's widow for nominal consideration, then immediately changed the assignee to CH TAC (later Ceruvia).

991.   Hurst then signed the micro-entity form to the USPTO for the Sewell patent a few months later.

992.   Savant Inc. and Savant Holdings members relied on Hurst's misrepresentation that he has been working in their best interest and did not take action to protect the theft of Savant trade secrets for Ceruvia.

993.   As a result, Savant Holdings and Savant Inc. members lost the value of the BOL-148/LSD trade secrets.

       b.   HURST'S, BURBANK'S, AND BPM'S FRAUD IN RELEASE OF SHARES BASED ON INACCURATE CAPITALIZATION TABLES

994.   Hurst fraudulently promulgated capitalization tables for the Savant entities that omitted Savant TAC's existence and Turnbull's 2012 investment in Savant Inc. (¶¶ 117-118, 406-437, 459-488.)

995.   In addition to omitting the existence of Savant TAC and Turnbull's investment, these tables omit the illegally backdated options that Hurst issued to Belga as a personal "gift" and the fact Hurst as CEO had already

183

LEWIS ROCA

misappropriated MindMed shares to himself. (¶ 163.)

996.   Hurst issued these options to Belga without shareholder approval under the pretense that they were options gifted from Hurst's own shares. The tender falsely represented that the options were dated February 26, 2019, even though the agreement was dated October 28, 2019. Issuing new stock options from Savant Inc., rather than gifting options on Hurst's shares, had the effect of diluting the stock of the other Savant Inc. shareholders.

997.   Hurst and Burbank have not disclosed the purpose or even existence of these options to shareholders or to the Savant Investors in capitalization tables.

998.   Hurst and Burbank have provided Savant Investors inaccurate and fraudulent capitalization tables and distributed shares based on those table.

999.   Burbank refused to release audited books and records as Hurst represented and even though Savant Holdings majority-in-interest voted to have him do so.

1000. Burbank relied on Olson, the conflicted attorney, to investigate.

1001. Burbank refused to investigate Savant Inc., a subsidiary of Savant Holdings, or investigate Hurst and Dorsey & Whitney, contrary to instructions by the Savant Holdings majority-in-interest.

1002. Savant Holdings and Savant Addiction members relied to their detriment on Hurst's, Burbank's, and BPM's misrepresentations that Burbank would be working in their interest.

1003. Had they known that Burbank was not independent and would simply act in Hurst's interests and promulgate inaccurate capitalization tables, the Savant Holdings and Savant Addiction members would not have agreed to his retention as liquidating.

LEWIS ROCA

### c.   HURST'S, BURBANK'S, AND BPM'S FRAUD IN BURBANK'S APPOINTMENT

1004. Hurst and Burbank fraudulently misrepresented that Burbank was a liquidating trustee working in the members best interest as a fiduciary to handle the "Scott issue." (¶¶ 406-488.)

1005. Burbank highlighted his purported achievements on the BPM website to induce Savant members to vote for him.

1006. The BPM website misrepresented transparency of its trustees.

1007. In reality, Burbank is neither independent nor transparent. This is evidenced by Burbank's deference to and reliance on Olson, conflicted counsel, to communicate with members and to investigate.

1008. Olson is highly conflicted because Dorsey & Whitney

    a.   refused to distribute MindMed shares to members in accordance with the Hurst/Freeman agreement and the Savant Holdings dissolution resolution,

    b.   Issued back dated options,

    c.   filed the certificate of formation for Savant TAC

    d.   refused to give members proxy rights to their locked shares and undistributed unlocked shares.

1009. Savant Holdings and Savant Members relied on these misrepresentations of independence to vote for Burbank as liquidating trustee.

1010. This injured them because Burbank, acting in Hurst's interests rather than independently, did not timely release MindMed shares before the stock price plummeted, refused to allow members to vote their MindMed shares in the 2022 and 2023 annual general meetings, refused to investigate Hurst, and released MindMed shares to Hurst and members based on fraudulent and inaccurate capitalization tables.

185

d.   TURNBULL AND CERUVIA'S FRAUD IN THE FORMATION
OF CERUVIA

1011. Upon information and belief, Turnbull knew about Hurst's misrepresentations regarding the Sewell license and the concealment of Savant TAC's existence. Turnbull then as an authorized person renamed Savant TAC to CH TAC, which later became Ceruvia. He also facilitated the transfer of the Sewell patent from Savant Holdings to Savant TAC / CH TAC. (¶¶ 64-117.)

1012. Turnbull had an independent duty under the Savant Addiction operating agreement not to use Savant's proprietary confidential information (including the BOL-148 program) in a competing company and also to correct Hurst's misrepresentations.

1013. He did not, instead aiding and abetting Hurst with his silence and his own false statements regarding Ceruvia's independence on the Ceruvia website in June 2021

1014. Turnbull misrepresented to Freeman and Savant members in publishing the Ceruvia website on the internet around June 2021, in which Turnbull and Ceruvia falsely represented Ceruvia's BOL-148 program as independently developing, omitting mention of Savant's BOL-148 program.

1015. In September 2022, after Turnbull learned that Freeman discovered Savant TAC, Turnbull updated the Ceruvia website to detail the relationship with Savant Inc. dating back to 2012.

1016. Savant Holdings members relied to their detriment on Turnbull's and Ceruvia's misrepresentations, believing that there was no reason to doubt Turnbull's account of Ceruvia's independence from Savant.

1017. As a result of this reliance, Turnbull was able to steal Savant's proprietary BOL-148 program without interference to develop Ceruvia, which—culminating in the November 2020 Transaction—has eliminated both Savant and MindMed as competitors.

186

LEWIS ROCA

1018. Savant Holdings and Savant Inc. lost the value of the BOL-148/LSD trade secrets.

e.   HURST'S AND FORTE'S FRAUD IN THE FORMATION OF MINDMED

1019. As detailed in paragraphs 164-181, Hurst had not obtained the required authorization from a majority-in-interest of Savant Holdings and Savant Addiction to sign the MindMed foundation agreement which transferred the 55,000,000 MindMed shares to Savant Addiction Medicine..

1020. Instead, Hurst kept the structure of the transaction secret from the Savant members until the deal closed and that the 55,000,000 MindMed shares would be transferred to Savant Addiction Medicine without shareholder approval.

1021. Hurst through e-mail represented to Savant members that the MindMed shares would remain in Savant Addiction for the foreseeable future based on a letter of intent signed by Hurst with MindMed investors Latchman and Rahn.

1022. But according to the operating agreement Hurst needed shareholder approval to sign the MindMed deal, which Hurst did not have.

1023. In addition, when 18-MC was sold to MindMed, it should have triggered the dissolution clause in the Savant Addiction operating agreement.

1024. But Hurst misrepresented to Savant Holdings members that the Savant Addiction voting bloc, 55,000,000 MindMed shares, would benefit all members because keeping the bloc together gives Savant control.

1025. This created the impression that Hurst would vote the Savant Addiction bloc of MindMed shares in the interest of its members (including Savant Holdings).

1026. In fact, Hurst voted the Savant bloc based on his personal interests. He never consulted the other members, and he used the Savant bloc as leverage

187

over the MindMed board to self-deal with Turnbull and transfer trade secrets and other intellectual property to Ceruvia.

1027. Ng and Forte were aware of Hurst's misrepresentation since only Hurst and Ng, and Forte read the agreement prior to Hurst signing the agreement, but abetted it rather than alert the Savant Addiction members.

1028. Savant Holdings and Savant Addiction members relied on these misrepresentations to their detriment, losing the value of the voting rights to their shares.

1029. Further, Savant Holdings and Savant Addiction members lost value of MindMed shares because Hurst delayed distribution of shares as share price plummeted due to Hurst's misconduct.

### f.   HURST'S, FORTE'S, AND BURBANK'S FRAUD AT SAVANT INC.

1030. Savant Inc. was the management company for the drug-development LLCs such as Savant Addiction Medicine (¶ 464-488).

1031. In July 2019, when 18-MC was sold to MindMed, there were no remaining drugs in development, and Savant Inc. should not have expenses after receiving a 10% profit share of 5,500,000 MindMed shares.

1032. Hurst, Forte, Burbank made material misrepresentations or omissions of fact regarding Savant Inc.

1033. Specifically, they represented that capitalizations had not changed since 2019, after the sale of 18-MC to MindMed. They represented that MindMed shares would be distributed when all expenses had been paid and audit was completed.

1034. Burbank fraudulently misrepresented that he had no role in supervising Savant Inc. and that Hurst remained solely responsible. In fact, Savant Inc. is a subsidiary of Savant Holdings, so as liquidating trustee, Burbank has responsibility to Freeman and the Savant Holdings members to oversee Savant

188

LEWIS ROCA

Inc. as a Savant Holdings asset.

1035. Hurst, Forte, and Burbank knew that those statements were false when he made them to Freeman and other members.

1036. Burbank was communicating through Olson, who directly told Freeman by e-mail that there was no business activity in Savant Inc.

1037. Hurst also told Freeman there were no changes to the Savant Inc. capitalization tables.

1038. The Savant Holdings members voted and instructed Burbank to protect their assets in Savant Inc., but Burbank fraudulently misrepresented that he did not have the authority to do so.

1039. Hurst and Forte never held a shareholder meeting or annual meeting, so there was no information provided to shareholders until 2022, when Hurst met with three ex-employees.

1040. Hurst also told the three ex-employees that shares would not be released until there is a settlement between Freeman and Savant Addiction/Savant Holdings.

1041. Burbank then misrepresented that the Savant Holdings capitalization tables, which included Savant Inc., were accurate, and he distributed MindMed shares to Hurst and other members knowing the falsity of the tables.

1042. On information and belief, 4,000,000 of the 5,500,000 MindMed shares owned by Savant Inc. have been sold based on these inaccurate tables.

1043. Had the Savant Inc. shareholders known that Hurst and Forte were selling MindMed shares, taking salary, and distributing shares, and that Burbank was not going to perform his fiduciary duty, Freeman and the other Savant Inc. shareholders would have taken action sooner, before shares and money had been distributed to Hurst, Forte, and others from Savant Inc., and before Burbank distributed MindMed shares to Hurst from Savant Addiction

189

Medicine.

1044. Thus, even though Burbank is nominally trustee of Savant Addiction/Savant Holdings, and should exercise independent oversight of Savant Inc., it appears that Hurst is still in control of Savant Addiction and Savant Holdings, along with Savant Inc.

1045. This misrepresentation delayed Freeman's action who would have convinced Savant Holdings members not to vote for Burbank as trustee, as well as take legal action against Hurst sooner, before shares were distributed by Burbank, and before Hurst could sell Savant Inc.'s MindMed shares.

1046. Savant Inc. and its shareholders have thus been harmed by the distribution of Savant Inc.'s shares according to these inaccurate tables.

### g.   ADEQUACY OF REPRESENTATION AND DEMAND FUTILITY

1047. At all relevant times, Freeman has been a shareholder of Savant Inc. and a member of Savant Holdings, which in turn is a 52% owner of Savant Addiction.

1048. This claim is not collusive or brought to confer jurisdiction that this Court would otherwise lack.

1049. Freeman fairly and adequately represents the interests of the Savant Inc. shareholder and Savant Holdings and Savant Addiction members:

a.   Freeman is a major shareholder of Savant Inc., as indicated in the chart at paragraph 11, holding 27.7% of the shares.

b.   Freeman is a major owner of Savant Holdings, as indicated in the chart at paragraph 11, holding 38.89% of the shares.

c.   Freeman is a major owner of Savant Addiction through his 38.89% ownership in Savant Holdings, as indicated in the chart at paragraph 11, which makes him a 34.4% beneficial owner Savant Addiction.

LEWIS ROCA

d.      Freeman is well-positioned to represent the interests of simi-
larly situated shareholders and members because he has extensive
knowledge of the misconduct that gives rise to the Savant Entities'
claims, as detailed in the e-mails and other communications described
above and attached to this complaint.

e.      In particular, Freeman obtained the consent of a majority-in-
interest of the members of Savant Holdings to vote to dissolve the com-
pany to force distributions, as detailed in paragraphs 378-385, which
Hurst and Savant counsel refused to do.

f.      Freeman also obtained the consent of a majority-in-interest of
the members of Savant Holdings to issue instructions to Burbank, as de-
tailed in paragraphs 459-463, which he ignored.

g.      Because Savant Holdings is the parent company of both Sa-
vant Inc. and Savant Addiction, a majority-in-interest of Savant Holdings
could—had Hurst and Burbank not disregarded their instructions—have
controlled the direction of all three companies.

h.      In a private meeting with just three Savant Inc. shareholders,
those shareholders also expressed frustration over the delay in distribu-
tion of MindMed shares, "whether it be from Savant HWP Holdings or Sa-
vant HWP Inc."

i.      The only shareholders and members whose interests diverge
from Freeman's are Hurst and Turnbull, who are committing the miscon-
duct that gives rise to the Savant Entities' claims.

1050. Freeman has repeatedly made efforts to obtain action from those
with the authority of directors, and otherwise demand is excused as futile:

a.      *Savant Inc.* has never held any annual or other shareholder
meetings to elect a valid board of directors. Although Hurst purported to

appoint a board unilaterally, as described in paragraph 636, that action is void, so there is no validly elected board on whom to make a demand. The identities of the so-called "directors" was not even shared with shareholders until recently, and the board has prevented Savant Inc. from holding shareholder meetings. Alternatively, two of the three directors—Hurst and Forte—are not independent, as they are implicated in the RICO conspiracy and cannot be expected to take action against their own misconduct. Burbank, who as liquidating trustee of Savant Holdings has stewardship over its subsidiaries, Savant Inc. and Savant Addiction, has also refused to investigate Freeman's claims and has instead deferred to Savant's conflicted counsel, who have assisted Hurst, Turnbull, and Burbank in the fraudulent misrepresentations as described above.

b.   *Savant Holdings* does not have a board of directors on whom demand could be made, and under provisions of the operating agreement that are challenged in this complaint, Hurst as managing member holds veto power over his own removal or investigation into his misconduct. Moreover, although Burbank now disclaims that he is the managing member of Savant Holdings and lacks authority to investigate Hurst, Burbank also specifically refused the demand of the majority-in-interest to investigate this claim. Neither is independent because they are implicated in the fraudulent misrepresentations and cannot be expected to take action against their own misconduct.

c.   *Savant Addiction* is likewise under the sole control of Hurst as managing member or Burbank as liquidating trustee and acting managing member. Like the Savant Holdings operating agreement, the Savant Addiction operating agreement gives the managing member veto

192

power over removal or other action to investigate the managing member's misconduct.

      d.    Freeman brought his concerns about Hurst's mismanagement of all three Savant Entities to the attention of Hurst, Savant's counsel, and Burbank.

      e.    This includes Freeman's October 2021 e-mail to Hurst and Ng addressing Hurst's self-dealing.

      f.    As discussed, Ng and Dorsey & Whitney, rather than investigating the allegations, wrote Freeman a cease-and-desist letter.

      g.    Likewise, since Burbank's appointment as trustee to address the so-called "Scott issue," Burbank has refused to turn over the books and records and refused to investigate any of the allegations in this complaint, and has instead deferred to Hurst and Savant's counsel, which have declined to address the issues.

      h.    John Weems, BPM's Director of Business Development and Partnerships, was copied on Freeman's communications with Burbank, Ng, and Olson informing him of the issues that Burbank was unwilling to address.

      i.    No one at BPM has responded to address these issues.

      j.    Freeman and a majority-in-interest of the Savant Holdings members also instructed Burbank, in the August 3, 2023 e-mail and subsequent resolution, described in paragraphs 478-484, to take specific actions relevant to this claim, but Burbank and BPM have refused.

1051. Under these circumstances, making a separate demand on the Savant Entities, who remain under the effective control of Hurst, either directly or with Burbank and Forte, would be futile.

193

*Reliance and Damages*

1052. Hurst and Burbank used fraudulent capitalization tables to have Freeman and members rely on them so he could distribute shares to Hurst, and Burbank never investigated but relied on Olson, a conflicted Dorsey & Whitney attorney, even though Savant Holdings members majority-in-interest voted for him to protect their assets. Burbank is still liquidating trustee and has not investigated or corrected his fraudulent capitalization misrepresentations.

1053. Without access to the audited books and records, which Hurst had misrepresented would be distributed to members, or an independent investigation, the Savant members have relied to their detriment on these misrepresentations and have been diluted.

1054. Defendants intended for Freeman and the shareholders of Savant Inc. to rely on the concealment and misrepresentations resulting in newly issued, backdated stock options to dilute Savant's shareholders and effect Hurst's personal "gift."

1055. They also relied on misrepresentations that Savant Inc. was not doing business while Hurst and Forte were distributing salary and stock to themselves and others.

1056. Freeman and the shareholders of Savant Inc. relied to their detriment; although Freeman raised the alarm as soon as he learned about the improper personal nature of these backdated, newly issued options, the lack of notice to shareholders meant he was unable to recognize the impropriety and stop it in its tracks.

\* \* \*

1057. As a sole, direct and proximate result of the foregoing, plaintiff has been damaged in a sum in excess of $15,000 and is entitled to punitive damages.

194

LEWIS ROCA

1058. Plaintiff has also been forced to retain counsel to pursue this action and has incurred attorney's fees as a result of defendants' breach.

**NINTH CLAIM FOR RELIEF**
**<u>CONSPIRACY (HURST, TURNBULL, FORTE, BURBANK, AND BPM)</u>**

***Direct and Derivative for Savant Inc. and Savant Holdings***

1059. Plaintiff incorporates the foregoing allegations in this claim.

1060. Defendants, acting in concert, intended to accomplish an unlawful objective for the purpose of harming plaintiff and Savant Holdings members, including the specific conspiracies alleged below.

> ***1.    Conspiracy by Turnbull, Hurst, Burbank, and BPM in the Theft of Savant Trade Secrets***

1061. Turnbull and Hurst, together with Ng and Olson, conspired to defraud Freeman and the other Savant Holdings members by orchestrating the transfer to Ceruvia (via "Savant TAC") of Savant's trade-secret drug-development program in BOL-148/LSD. This transfer of trade secrets occurred from 2017 to 2021.

1062. After the transfer, Turnbull, Hurst, and Burbank, together with Ng and Olson, conspired to cover up the theft to prevent Freeman from pursuing the claim in the belief that doing so would bar his claim, including by

> a.    Hurst's fraudulently misrepresenting to Freeman the circumstances and intent of Turnbull's licensing the Sewell patent, as described in paragraphs 34-55, 76-117;

> b.    Hurst's and Turnbull's concealing the existence of Savant TAC/Ceruvia, as described in paragraphs 114-117;

> c.    Hurst's and Turnbull's concealing Hurst's equity investment in and employment by Ceruvia, as described in paragraphs 292-301; and

> d.    Hurst's and Turnbull's concealing Ceruvia's payment of $500,000 to Hurst, which was arranged and accepted with the corrupt

195

intent of having Hurst, with Ng's assistance, set up Savant TAC and transfer the trade-secret BOL-148 program to Ceruvia, as described in paragraphs 292-301;

     e.    Since Hurst was an equity owner in Ceruvia and Turnbull knew it, the $500,000 payment from 2017-2020 was essentially a salary payment to an employee while Hurst was also an employee of Savant and MindMed working on the same projects;

     f.    Turnbull's and Ceruvia's false representations of independence of BOL-148/LSD on Ceruvia's website in June 2021;

     g.    Hurst and Turnbull's fraudulent communications surrounding the November 2020 MindMed-Ceruvia agreement in which they pretended to be unrelated third parties, as described in paragraphs 292-301;

     h.    Hurst's causing Savant Addiction and Savant Holdings to retain Burbank as a liquidating trustee;

     i.    Burbank's fraudulently misrepresenting his independence and authority to investigate, as described in paragraphs 406-437;

     j.    Burbank's deference to Dorsey & Whitney, who ordered Freeman to cease and desist his inquiries into Hurst and Turnbull's conflict of interest, and his initial refusal to terminate Dorsey & Whitney to facilitate an independent investigation, as described in paragraphs 478-488;

     k.    Burbank's eventual hiring of Locke Lord as new counsel out of an "abundance of caution" but not requesting an investigation of Freeman's allegations.

     l.    Hurst's and Burbank's promulgation of fraudulent capitalization tables omitting the existence of Savant TAC/Ceruvia, as described in paragraphs 459-488; and

196

LEWIS ROCA

m.     Hurst's and Burbank's refusal to allow Freeman or other Savant members to review the books and records, as Hurst represented would be permitted once the audit was complete, as described in paragraphs 629-645.

1063. Burbank knew about Hurst's wrongdoing, but even if he did not initially, he knows about that misconduct today, and yet—with the approval of BPM and his supervisor John Weems—remains liquidating trustee and continues to do nothing to investigate Freeman's claims or allow Freeman or the other Savant members to review the books and records.

1064. In August 2021, the majority-in-interest instructed Burbank, among other things, to undertake this investigation, yet he has ignored their instructions.

1065. This claim has both direct and derivative components:

a.     Freeman is harmed directly because he lost all of the salary, bonus, and equity incentives that he would have received had the BOL-148/LSD project remained with Savant Inc. or Savant Holdings, where Freeman was CMO, and/or had the Savant BOL-148/LSD project become part of the assets transferred to MindMed, where Freeman was also CMO, resulting in additional salary, bonus, stock, stock options, and other incentives.

b.     Freeman also claims damage on behalf of the investors in Savant Holdings, which owned the BOL-148/LSD program and whose value declined with the theft of this program to Ceruvia.

### 2.     *Conspiracy by Hurst and Turnbull to Interfere with Freeman's Employment, Investment, and Influence at MindMed*

1066. Turnbull and Hurst conspired to interfere with and deprive Freeman of his employment, investment, and influence at MindMed.

197

LEWIS ROCA

1067. Hurst and Turnbull, with the intent of transferring MindMed intellectual property and trade secrets to Ceruvia, conspired to force Freeman's resignation as MindMed's CMO.

1068. As CMO, Freeman had offered to make timely arrangements with a manufacturer of LSD for MindMed's upcoming clinical trials, as described in paragraphs 234-238.

1069. Freeman also understood the value of MindMed's drug-development projects for 18-MC, BOL-148, and LSD, which Freeman had developed, and would have exercised his influence and authority as CMO to prevent MindMed from entering into any transaction that jeopardized those proprietary programs (¶¶ 229-245).

1070. Hurst and Turnbull therefore conspired to set the stage for Freeman's exit, including by infiltrating MindMed with more pliable Ceruvia employees, sabotaging MindMed's manufacturing process, and by having Hurst control the voting rights of Freeman's shares in MindMed that were held in Savant Addiction under Hurst's control, as described in paragraphs 271-289 and 326-415.

1071. Hurst was essentially an employee of CH TAC/Ceruvia since he was paid $500,000 between 2017-2020 by CH TAC/Ceruvia and was an equity owner, all while acting as CEO of Savant Inc., Savant Holdings, Savant Addiction, and MindMed. Hurst's equity ownership in CH TAC/Ceruvia belies his public claim that he was only an independent "consultant" to Turnbull/CH TAC/Ceruvia.

1072. Ceruvia paid CH TAC/Ceruvia employees, including Hurst, Monroe and others, and Hurst in turn hired these same employees at MindMed to work on the same drugs.

LEWIS ROCA

1073. Hurst and Turnbull conspired to have Kathleen Monroe, a CH TAC/Ceruvia employee, falsely accuse Freeman of a workplace violation, and have Hurst falsely represent that he would recuse himself from the subsequent investigation, when in fact he controlled the sham investigation, as described in paragraphs 246-266.

1074. When Monroe refused to elevate her work place complaint that Freeman yelled at one of his staff members to sexual harassment, Hurst and Turnbull resorted to extortion by arranging to have Hurst accuse Freeman of corporate theft—stealing the $100,000 sign on bonus which Hurst had personally signed and MindMed's CFO had approved. Hurst even threatened to have Freeman arrested for the theft, and MindMed's outside counsel supported the criminal threats.

1075. Once Freeman was pressured to resign under the threat of these false accusations, Hurst and Turnbull were free to hold MindMed's board of directors hostage in the November 2020 MindMed-Ceruvia deal, engineered to appear as though at arm's length, in which MindMed lost money, competitive advantage, and intellectual property to BOL-148 and LSD to Ceruvia in exchange for an emergency supply of LSD, as described in paragraphs 267-270 and 274-308.

1076. Hurst and Turnbull pretended to be third party unrelated because they knew it was illegal, or it would have at least to be disclosed as a related transaction.

1077. Freeman was harmed directly by the loss of his job at MindMed, along with stock options and other benefits, and the influence that came with that position; and the loss of his voting rights in the MindMed shares, which was necessary to effectuate Hurst's and Turnbull's conspiracy and to keep

199

1   Freeman from using his position as MindMed's largest shareholder from influ-

2   encing the board.

3       1078. Freeman also lost all of the salary, bonus, and equity incentives

4   that he would have received had he been able to remain as CMO of MindMed

5   and develop the BOL-148 and LSD programs for MindMed, rather than Ceru-

6   via.

7           **3.    Conspiracy by Hurst, Burbank, and BPM to Deprive**
            **Freeman and Savant Holdings Members of MindMed**
8           **Shares and Voting Rights**

9       1079. As detailed in paragraphs ___, Hurst, Burbank, and BPM con-

10  spired, together with Ng and Olson, to prevent Freman and the other Savant

11  Holdings members from exercising the voting rights of their 55 million

12  MindMed shares so that Hurst could vote the shares under the guise of manag-

13  ing member, with Ng's backing, to control the MindMed board of directors.

14      1080. This conspiracy involved concerted action to commit multiple

15  breaches of the Savant Addiction and Savant Holdings operating agreements

16  and fiduciary duties, to make multiple fraudulent misrepresentations, to usurp

17  business opportunities belonging to the Savant Entities, and to wrongfully in-

18  terfere with Freeman's prospective economic advantage.

19      1081. As part of this conspiracy, Hurst purported to take several actions

20  on behalf of Savant Addiction and/or Savant Holdings:

21          a.    Hurst initially had the 55,000,000 MindMed shares trans-

22  ferred to Savant Addiction per the MindMed Foundation Agreement.

23          b.    Hurst then entered into a two-year lockup period with Canac-

24  cord, which prevented the shares from being publicly traded but did allow pri-

25  vate sale or exercise of the shares' voting rights.

26          c.    To further control the shares, Hurst had the shares converted

27  to 55,000,000 multiple voting shares (MVS) (at a ratio of 100 common shares to

28

200

LEWIS ROCA

1 MVS), locked up and sequestered in Savant Addiction under the guise it was for tax benefits, based on fraudulent misrepresentations, as described in paragraphs 182-207.

Hurst took each of these actions without approval of a majority of the Savant Addiction and Savant Holdings members, in violation of the operating agreements and in breach of the fiduciary duties that Hurst had undertaken to Savant members, including to Savant Inc. as CEO, and to Freeman because of their special relationship of trust.[12]

1082. As part of this conspiracy to keep control of the 55 million shares (or 550,000 MSV), Hurst also

    a.    tried to amend the operating agreements of Savant Addiction and Savant Holdings to give Hurst the voting rights to these shares; and

    b.    with cover from Ng and Olson, Hurst then rejected the Savant Holdings members' motion to dissolve the company, as described in paragraphs 378-384.

1083. Hurst also induced Freeman to pay $20,000 for MindMed's legal counsel to administratively distribute the locked shares to Savant Holdings members, but Hurst blocked the distribution and, subsequently, falsely claimed that Canaccord would not agree to the distribution, when in fact it had.

1084. Hurst then fraudulently represented, in an e-mail forwarded to Freeman, that 70% of the shares would unlock on March 3, 2022 and would be

---

[12] Although the Savant operating agreements do not include an express fiduciary duty, he does have a fiduciary duty that was not validly disclaimed because the Savant members were fraudulently induced to sign the operating agreements. Had Freeman and the other Savant members known that Hurst already has a secret partnership with Turnbull in 2012, they would not have entered into any agreement giving Hurst power to act as managing member without the duties of a fiduciary. Further, Hurst acknowledged that fiduciary duty in an e-mail to Freeman (Ex. 15).

201

1  distributed in time to vote in the MindMed 2022 annual general meeting on

2  June 1, 2022.

3      1085. To continue the delay in distributing shares and to avoid providing

4  the proxy rights to the shares, and as detailed in paragraphs 426-463, Hurst

5  conspired with Burbank and BPM to

6          a.   Cause Savant Addiction and Savant Holdings to retain Bur-

7  bank as a liquidating trustee in December 2021 and March 2022, respectively;

8          b.   Have Burbank fraudulently misrepresent his independence

9  and authority to investigate;

10         c.   Have Burbank falsely represent his intent to distribute the

11  undisputed shares before the 2022 MindMed annual general meeting;

12         d.   Have Burbank fraudulently represent that regulatory issues

13  were causing delays in distributing shares, when in fact these excuses were

14  manufactured simply to keep the shares from being distributed in time for the

15  annual general meeting (although he became liquidating trustee of Savant Ad-

16  diction in December 2021, Burbank did not distribute the shares until July

17  2022, more than a month after the MindMed 2022 annual general meeting);

18         e.   Have Burbank fraudulently represent that, in the absence of

19  a timely distribution, he would have Savant counsel assist with getting the vot-

20  ing rights proxied to the Savant Addiction and Savant Holdings members, when

21  in fact he never intended to issue those proxies; and

22         f.   Have Burbank fraudulently represent his qualifications to

23  fulfill his duties as liquidating trustee, including to proxy Savant Addiction's

24  shares.

25      1086. Burbank knew about Hurst's wrongdoing, but even if he did not ini-

26  tially, he knows about that misconduct today, and yet—with the approval of

27  BPM and his supervisor John Weems—remains liquidating trustee and

28

202

LEWIS ROCA

1   continues to do nothing to investigate Freeman's claims or allow Freeman or

2   the other Savant members to review the audited books and records as promised

3   by Hurst.

4       1087. In August 2021, the majority-in-interest instructed Burbank,

5   among other things, to undertake this investigation, yet he has ignored their in-

6   structions.

7       1088. Each of these actions violate fiduciary duties undertaken by Hurst,

8   Burbank, and BPM pursuant to Savant Holdings and Savant Addiction's en-

9   gagement with BPM and Burbank, under which BPM and Burbank are to act in

10  the members' interest—including the interest of Savant Inc., with Hurst as its

11  fiduciary—and pursuant to the parties' special relationship of trust arising from

12  the circumstances of Burbank's appointment.[13]

13          a.      This claim has both direct and derivative components:

14          b.      Freeman is harmed directly because not only did he suffer de-

15  lay in the distribution of shares—a delay that cost him an influential stake in

16  MindMed and the monetary value of the share vote—but Freeman also lost

17  $20,000 for the attorney's fee to Volk. Freeman, who as Hurst confirmed, was

18  MindMed's largest shareholder, was effectively silenced and lost the value of his

19  shares: without access to his shares, he could neither vote them to prevent

20  Hurst's and the MindMed board's misconduct nor sell the shares in time to

21  avoid the losses caused by that misconduct.

22

23

24

_____

25  [13] Burbank contends that his engagement letter excludes a fiduciary duty, but
26  in fact the Burbank had concealed his relationship with those whose fraud he
    had a responsibility to investigate—Hurst, Ng, and Olson—making ineffective
27  any disclaimer of a fiduciary duty while stepping into the shoes of Hurst, him-
28  self a fiduciary.

LEWIS ROCA

c.    Freeman also claims damage on behalf of the investors in Savant Holdings, whose valuable voting rights were also eliminated in favor of Hurst during the period of Hurst's and Burbank's conspiracy.

### 4.    Conspiracy by Hurst, Burbank, and BPM, together with Ng and Olson, to Defraud Freeman in the Loan Accord

1089. Burbank has conspired with Hurst to deprive Freeman of the 5 million MindMed shares that Savant Addiction is obligated to distribute under the accord and satisfaction. Burbank, BPM, and Hurst have elected to protect Hurst's self-dealing with Turnbull and Ceruvia rather than provide an accurate accounting—an accounting vital to ensure that shares and membership interests do not pass irretrievably into the wrong hands—before the dissolution of Savant Addiction.

1090. In 2014, Freeman had entered into a short-term loan agreement with Savant Addiction for $450,000. The loan was to be paid off within 6 months, when Savant Addiction received $450,000 in indirect costs from a government grant.

1091. Hurst had multiple opportunities to repay the loans, but did not because he wanted to use the repayment as leverage to obtain a personal benefit:

a.    When Savant Addiction received the grant money in December 2014, Hurst reneged and claimed he had already spent the money.

b.    In 2016, when Savant received $3.5 million from the sale of Savant Neglected Disease, Hurst paid all creditors including himself, but didn't pay Freeman a penny of the $645,000 in loans he was owed between Savant Addiction ($450,000) and Savant Inc. ($195,000).

c.    When Savant's 18-MC program was sold to MindMed for 55,000,000 MindMed shares, there again was something of value to pay off Freeman's loans.

LEWIS ROCA

1092. The 55,000,000 shares provided the opportunity for Hurst to exert leverage over Freeman through a settlement of the unpaid loans.

      a.      Freeman demanded payment of his loans in June 2019, but Hurst knew that Savant Addiction did not have cash assets to repay the loans.

      b.      Instead, to avoid bankruptcy, Hurst fraudulently offered as a settlement MindMed shares, which were locked up and could not be sold for two years, but he intended to string Freeman along by not distributing the shares during this lock-up period until Savant Addiction obtained funds by selling the unlocked shares. After two years, once Savant Addiction had the funds to repay the original loans, Hurst would then decide whether it was in his interest to distribute shares (if they were worth less than the face value of the original loans) or to disclaim the accord and satisfaction and offer cash (if the shares were worth more than the face value of the loans and nominal interest).

      c.      Thus, in reality, Hurst intended only to expose Freeman to the downside risk that the shares would become less valuable; or, if the shares became more valuable, Freeman would have to agree to give Hurst something in return: let Hurst vote the Savant bloc.

1093. Initially, Hurst defrauded Freeman by falsely representing the value of the MindMed shares at $0.10 USD per share, as opposed to its actual value of $0.10 CAD/$0.058 USD.

1094. Based on that fraudulent valuation, Freeman accepted Hurst's offer that he would cause Savant Addiction to distribute 5 million MindMed common shares, at $0.10 USD per share, to Freeman to settle Freeman's claims for non-payment of notes and warrants totaling $645,000, plus interest, as detailed in paragraphs 346-352.

1095. In reality, given the actual value of MindMed's shares ($0.10 CAD/$0.058 USD), Freeman would be entitled to 7.75 million shares.

LEWIS ROCA

1096. Hurst, between June and October 2020, falsely confirmed that he would distribute these 5 million shares to Freeman, but he now sought to link distribution to Hurst's continued control of the voting rights of those shares.

1097. Hurst and Burbank conspired to cover up the fraud (1) to prevent Freeman from obtaining the 5 million MindMed shares, which would make Freeman MindMed's largest (and controlling) shareholder; (2) to maintain Hurst's control over the full 55 million MindMed shares in Savant Addiction; and (3) to prevent Freeman from pursuing the claim, including by

a.      Hurst's falsely assuring Freeman in multiple e-mails and other communications that Freeman would be issued these shares but fore-stalling enforcement by suggesting that the sole cause of delay was a need to "document" the settlement, and later for Freeman to get "tax advice";

b.      Hurst's efforts to amend the operating agreements of Savant Addiction and Savant Holdings so that he could continue to exercise the voting rights of the members' shares, even if Hurst was unable to extract a voting-rights agreement from Freeman;

c.      Hurst's rejection, through Ng and Olson, of the Savant Hold-ings members' motion to dissolve Savant Holdings;

d.      Hurst's causing Savant Addiction and Savant Holdings to re-tain Burbank as a liquidating trustee, specifically to have Burbank withhold the 5 million shares and reject the accord;

e.      Burbank's fraudulently misrepresenting his independence and authority to investigate, as described in paragraphs 406-437;

f.      Burbank's fraudulently misrepresenting that he did not have the authority to investigate Hurst, Olson, or Ng and left it to Olson, the con-flicted Dorsey Whitney, attorney to investigate;

206

LEWIS ROCA

g.      Burbank's deference to Dorsey & Whitney in rejecting Freeman's claims to the 5 million shares, the attorney ordering Freeman to cease and desist his inquiries, and Burbank's refusal to terminate Dorsey & Whitney to facilitate an independent investigation;

h.      Burbank's eventual hiring of Locke Lord as new counsel out of an "abundance of caution" but not requesting an investigation of Freeman's allegations; and

i.      Hurst's and Burbank's promulgation of fraudulent capitalization tables omitting Freeman's 5 million shares, as described in paragraph 450.

1098. The conspiracy harmed Freeman directly, allowing Hurst to maintain control over Savant Addiction's 55 million shares in MindMed as a bloc, even though Freeman with the 5 million shares was MindMed's largest shareholder, which constituted a controlling influence in MindMed. Had Freeman known at any point between 2019 and 2022, when Hurst was misrepresenting his agreement to the loan accord, that Hurst would not authorize the distribution, Freeman would have taken action to enforce the agreement earlier, and would have protested Burbank's appointment when the price of MindMed shares was at its peak.

1099. As a result of the conspiracy, however, Hurst was able to control MindMed, including to transfer MindMed's BOL-148 and LSD programs—unimpeded by Freeman, who (together with his other shares in MindMed) would have been MindMed's largest shareholder.[14] That transaction, once publicized in this litigation, caused a 27% drop in the price of MindMed stock.

---

[14] Freeman should also have received about 18,000,000 of the 55,000,000 MindMed shares Savant had received; up to 20% ownership in MindMed at certain times. Had Freeman received those shares he could have, as the company's largest individual shareholder, negotiated a better salary, equity, and severance package, as well as a director position during the time he worked at MindMed. Freeman would also have been in a unique position to be able to call a general

LEWIS ROCA

1100. Freeman was thus directly injured by this conspiracy. Not only was he deprived of his 5 million shares, which should have been 7.75 million, but the consequential damages of that fraud include the loss of the voting rights of MindMed's largest shareholder at a time when he could have safeguarded the value of those shares and the monetary value of the voting rights.

### 5.   Conspiracy by Hurst, Burbank, BPM, and Forte to Embezzle from Savant Inc.

1101. In addition, Hurst and Forte conspired to prevent annual shareholder meetings and shareholder votes for board of directors for Savant Inc. Instead, Hurst and Forte, whom Hurst purported to appoint to the board, have treated Savant Inc. as their personal piggy bank by taking salaries and giving themselves stock grants, despite the absence of a business reason for doing so, and fraudulently misrepresenting, until confronted in May 2022, that the capitalization tables had not changed.

1102. These acts constituted common-law conversion and embezzlement under NRS 205.300(1), as Hurst and Forte represented that they were directors entrusted with the property of Savant Inc. and its shareholders, yet took, stole, converted, used, and appropriated Savant Inc.'s money and stock for their own use, with the intent to take, steal, use, and appropriate this money and property contrary to the purposes for which they were entrusted and to defraud the true owners—the shareholders of Savant Inc. and its parent company, Savant Holdings.

1103. Hurst, Forte, and Burbank have also conspired to defraud the Savant Investors in allowing Hurst to issue backdated stock options, not disclosing

_____

company meeting and put initiatives on the MindMed ballot for voting at general meetings. Alternatively, Freeman could have sold his shares on the public or private equity markets. Further, the voting rights of shares have a monetary value which Freeman lost.

LEWIS ROCA

the options or the existence of Savant TAC on the capitalization tables issued to Savant Investors, then aiding and abetting the release to Hurst of shares in MindMed based on the inflated ownership percentages in the inaccurate capitalization tables, as described in paragraphs 459-488.

1104. As liquidating trustee and acting managing member of Savant Holdings, whose members own a majority of Savant Inc., Burbank misrepresented his independence. Because Savant Inc. is Savant Holdings's subsidiary, an independent liquidating trustee should have forced Savant Inc. to hold annual shareholder meetings and elect a valid board of directors or should force its dissolution—or at least forced an investigation, an accounting, and production of the books and records—and thus could have prevented Hurst and Forte from embezzling from Savant Inc.

1105. Instead, Burbank has aided and abetted Hurst and Forte by turning a blind eye to these activities and Hurst's other misconduct, and claiming that he had no authority because Hurst remained managing member of Savant Holdings.

1106. Burbank falsely claims that his retention agreement does not include authority to investigate. His retention agreement gives him the authority to close open accounts, which necessarily includes the power to investigate any fraud in resolving those accounts. In addition, the operating agreement the operating agreement gives him the authority of managing member, which includes the authority to investigate misconduct in the company.

1107. Burbank further aided and abetted Hurst by ignoring instruction from a majority in interest of Savant Holdings, who in August 2021 alerted Burbank to Hurst's and Forte's misconduct, to investigate and protect Savant Inc. as an asset of Savant Holdings.

LEWIS ROCA

1108. Had Burbank not participated in the conspiracy to embezzle from Savant Inc., and instead dissolved Savant Holdings, and its subsidiary Savant Inc., the Savant Holdings members could have together prevented Hurst's and Forte's embezzlement.

1109. Freeman asserts this claim derivatively on behalf of Savant Inc. and Savant Holdings for the loss of funds and dilution of their shares due to the acts of the conspiracy.

* * *

1110. As a sole, direct and proximate result of the foregoing conspiracies, plaintiff has been damaged in a sum in excess of $15,000 and is entitled to general, special, and punitive damages.

1111. Plaintiff has also been forced to retain counsel to pursue this action and has incurred attorney's fees as a result of defendants' actions.

### 6. Conspiracy by Hurst, Burbank, BPM, to Embezzle from Savant Holdings and Savant Addiction Using Fraudulent Capitalization Tables

1112. Hurst and Burbank have treated Savant Holdings and Savant Addiction as their personal piggy bank by accepting a trustee's fee and distributing shares based on fraudulent capitalization tables.

1113. These acts constituted common-law conversion and embezzlement under NRS 205.300(1), as Hurst and Burbank represented that they were working in members' best interest, yet Hurst and Burbank took, stole, converted, used, and appropriated Savant Holdings and Savant Addiction money and stock for their own use, with the intent to take, steal, use, and appropriate this money and property contrary to the purposes for which they were entrusted and to defraud the true owners—the members of Savant Holdings and Savant Addiction.

210

1114. Hurst and Burbank have also conspired to defraud the Savant members in allowing Hurst to issue backdated stock options, not disclosing the options, concealing the existence of Savant TAC, and concealing Turnbull's 2012 investment in Savant Inc. on the capitalization tables issued to Savant Investors, then aiding and abetting the release to Hurst of shares in MindMed based on inaccurate ownership percentages, as described in paragraphs 70-117, 149-163, and 406-450.

1115. As liquidating trustee and acting managing member of Savant Holdings, whose members own a majority of Savant Inc., Burbank misrepresented his independence.

1116. Instead, Burbank has aided and abetted Hurst by turning a blind eye to these activities and Hurst's other misconduct, and claiming that he had no authority and left investigations to Olson, the conflicted Dorsey Whitney attorney. Burbank claims his contract does not give him authority to investigate which is a misrepresentation since the control gives him the authority to close open accounts, and the operating agreement makes him the managing member. Regardless, the contract was written by Hurst, who has been accused of fraud, so of course he would eliminate any investigative authority.

1117. Hurst had represented that audited books and records would be released to Savant Investors, but instead Hurst hired Burbank, who never released them.

1118. Burbank further aided and abetted Hurst by ignoring instruction from a majority in interest of Savant Holdings, who in August 2021 instructed Burbank to investigate Hurst's misconduct and protect their assets.

1119. Had Burbank not participated in Hurst's conspiracy to embezzle, for which he was paid at least $50,000, and instead investigated Hurst, Burbank could have prevented Hurst's embezzlement.

LEWIS ROCA

1120. Burbank remains a liquidating trustee of Savant Holdings and Savant Addiction and still has done nothing.

1121. Freeman asserts this claim derivatively on behalf of Savant Inc. and Savant Holdings for the loss of funds and dilution of their shares due to the acts of the conspiracy.

\* \* \*

1122. As a sole, direct and proximate result of the foregoing conspiracies, plaintiff has been damaged in a sum in excess of $15,000 and is entitled to general, special, and punitive damages.

1123. Plaintiff has also been forced to retain counsel to pursue this action and has incurred attorney's fees as a result of defendants' actions.

### 7.    *Adequacy of representation and demand futility*

1124. At all relevant times, Freeman has been a shareholder of Savant Inc. and a member of Savant Holdings.

1125. This claim is not collusive or brought to confer jurisdiction that this Court would otherwise lack.

1126. Freeman fairly and adequately represents the interests of the Savant Inc. shareholder and Savant Holdings members:

a.    Freeman is a major shareholder of Savant Inc., as indicated in the chart at paragraph 11, holding 27.7% of the shares.

b.    Freeman is a major owner of Savant Holdings, as indicated in the chart at paragraph 11, holding 38.89% of the shares.

c.    Freeman is well-positioned to represent the interests of similarly situated shareholders and members because he has extensive knowledge of BOL-148/LSD program that was stolen and the misconduct by Hurst, Turnbull, and Ceruvia that gives rise to this claim, as detailed

212

LEWIS ROCA

1   in the e-mails and other communications described above and attached to

2   this complaint.

3        d.      Freeman's personal claim does not create a conflict because

4   his personal claim is predicated on salary and other benefits that would

5   flow from the BOL-148/LSD program returning to Savant Holdings and/or

6   Savant Inc. Those benefits are not different or above the status quo before

7   the misappropriation to Ceruvia.

8        e.      The only shareholders and members whose interests diverge

9   from Freeman's are Hurst and Turnbull, who are committing the miscon-

10  duct that gives rise to the Savant Entities' claims.

11  1127. Freeman has repeatedly made efforts to obtain action from those

12  with the authority of directors, and otherwise demand is excused as futile:

13       a.      *Savant Inc.* has never held any annual or other shareholder

14  meetings to elect a valid board of directors. Although Hurst purported to

15  appoint a board unilaterally, as described in paragraph 636, that action is

16  void, so there is no validly elected board on whom to make a demand. The

17  identities of the so-called "directors" was not even shared with sharehold-

18  ers until recently, and the board has prevented Savant Inc. from holding

19  shareholder meetings. Alternatively, two of the three directors—Hurst

20  and Forte—are not independent, as they are implicated in the theft of

21  trade secrets (Hurst orchestrated it, and Forte while having access to Sa-

22  vant Inc.'s books and records has not corrected the capitalization tables to

23  reflect Turnbull's 2012 investment into the BOL-148/LSD program). Bur-

24  bank, who as liquidating trustee of Savant Holdings has stewardship over

25  its subsidiaries, Savant Inc. and Savant Addiction, has also refused to in-

26  vestigate Freeman's claims or correct the capitalization tables that would

27

28

213

have revealed Savant TAC's existence and revealed the theft of trade secrets.

b. *Savant Holdings* does not have a board of directors on whom demand could be made, and under provisions of the operating agreement that are challenged in this complaint, Hurst as managing member holds veto power over his own removal or investigation into his misconduct. Moreover, although Burbank now disclaims that he is the managing member of Savant Holdings and lacks authority to investigate Hurst, Burbank also specifically refused the demand of the majority-in-interest to investigate this claim. Neither is independent because they are implicated in the theft of the BOL-148/LSD program or its coverup and cannot be expected to take action against their own misconduct.

c. Freeman brought his concerns about Hurst's mismanagement of all three Savant Entities to the attention of Hurst, Savant's counsel, and Burbank.

d. This includes Freeman's October 2021 e-mail to Hurst and Ng addressing Hurst's self-dealing.

e. As discussed, Ng and Dorsey & Whitney, rather than investigating the allegations, wrote Freeman a cease-and-desist letter.

f. Likewise, since Burbank's appointment as trustee to address the so-called "Scott issue," Burbank has refused to turn over the books and records and refused to investigate any of the allegations in this complaint, and has instead deferred to Hurst and Savant's counsel, which have declined to address the issues.

g. John Weems, BPM's Director of Business Development and Partnerships, was copied on Freeman's communications with Burbank,

214

Ng, and Olson informing him of the issues that Burbank was unwilling to address.

  h.  No one at BPM has responded to address these issues.

  i.  Freeman and a majority-in-interest of the Savant Holdings members also instructed Burbank, in the August 3, 2023 e-mail and subsequent resolution, described in paragraphs 478-484, to take specific actions relevant to this claim, but Burbank and BPM have refused.

1128. Under these circumstances, making a separate demand on the Savant Entities, who remain under the effective control of Hurst, either directly or with Burbank and Forte, would be futile.

**C.** **Belga Consulting Agreement**

<strong>TENTH CLAIM FOR RELIEF<br>BREACH OF CONTRACT AND BAD FAITH<br><u>(SAVANT ADDICTION)</u></strong>

1129. Plaintiff incorporates the foregoing allegations in this claim.

1130. Belga and Savant Addiction, acting through Hurst, entered into a valid and existing contract with respect to fundraising for Savant.

1131. Belga performed under the contract by securing more than $5 million in fundraising, including through the opportunities that led to the financing of Savant Addiction's reverse takeover of MindMed.

1132. Alternatively, Belga was excused from performance because Hurst's usurping of the opportunity and signing the financing agreement made it impossible for Belga to perform.

1133. Savant Addiction, acting through Hurst, breached the agreement in failing to provide the promised equity, position, title, and salary.

1134. The acts and omissions of defendant Savant Addiction as described above also constitute a breach of the covenant of good faith and fair dealing—including, but not limited to, Hurst's actions to step in to finalize the financing

LEWIS ROCA

1  deal that Belga initiated and that would not have been possible but for Belga's

2  diligent fundraising efforts.

3      1135. These actions have deprived plaintiff of the benefits bargained for.

4      1136. In addition, there is a special relationship of trust or a fiduciary re-

5  lationship between Belga and Hurst. Belga had an expectation that Hurst

6  would cooperate in allowing Belga to earn his equity in Savant Addiction and

7  step into the CEO role.

8      1137. Hurst had an obligation not to place his own interests above Belga's

9  or to in any way thwart or undermine Belga from counting his fundraising ef-

10  forts toward the $5 million needed to obtain the 20 percent equity interest and

11  the $2 million needed to become CEO.

12      1138. The breach of this special relationship of trust was made in tortious

13  bad faith.

14      1139. As a direct and proximate result of defendants' breach, plaintiff has

15  suffered general and special damages in excess of $15,000.

16      1140. Plaintiff has also been forced to retain counsel to pursue this action

17  and has incurred attorney's fees as a result of defendants' breach.

18                    **ELEVENTH ALTERNATIVE CLAIM FOR RELIEF**
                            **UNJUST ENRICHMENT**

19             **(HURST, SAVANT INC., AND SAVANT ADDICTION)**

20      1141. Plaintiff incorporates the foregoing allegations in this claim. Plain-

21  tiff has not been paid for the amount it has enriched defendants, including the

22  labor and other services provided to secure fundraising for Savant.

23      1142. Belga raised $5MM for the MindMed Foundation Agreement with

24  the expectation that he would receive 20% equity of Savant Addiction Medi-

25  cine's 55,000,000 MindMed shares: 11,000,000 MindMed shares. Belga also had

26  an expectation that he would serve as CEO of MindMed—with attendant sal-

27  ary, stock options, and other benefits. The total value of Belga's contribution in

28

216

LEWIS ROCA

1  raising $5 million for MindMed actually exceeds the face value of the contribu-

2  tion because that $5 million investment facilitated the creation of MindMed it-

3  self, a multimillion-dollar enterprise. Without Belga's efforts, MindMed would

4  not exist today.

5       1143. In the event that Belga is found not to have an enforceable contract,

6  Hurst was unjustly enriched by plaintiff through assuming the role of CEO—

7  with attendant salary, stock options, and other benefits—by approximately

8  3,650,000 of the 11,000,000 MindMed shares Belga would have received (20%

9  equity), since Hurst's beneficial interest in the Savant entities is approximately

10  33%.

11       1144. In the event that Belga is found not to have an enforceable contract,

12  Savant Addiction was unjustly enriched by plaintiff by obtaining the value of

13  the $5 million investment—worth at least the face value of the $5 million itself

14  up to and including the full value of the 11 million MindMed shares Belga

15  would have received (20% equity)—as without that investment MindMed would

16  not exist and Savant Addiction would not have any equity in it.

17       1145. If the shares representing the value of plaintiff's contribution have

18  been alienated, plaintiff is entitled to trace the proceeds and impose a construc-

19  tive trust on Hurst and any other transferee of the 55 million MindMed shares

20  distributed by Hurst or Savant Addiction.

21       1146. So long as Burbank serves as the trustee of Savant Addiction, Bur-

22  bank, too, must also be (1) directed to distribute to plaintiff the value by which

23  Hurst and Savant Addiction have been unjustly enriched and (2) enjoined from

24  transferring any such value to Hurst or any other person.

25       1147. Plaintiff has also been forced to retain counsel to pursue this action

26  and has incurred attorney's fees as a result of defendants' actions.

27

28

LEWIS ROCA

**TWELFTH CLAIM FOR RELIEF**
**PROMISSORY OR EQUITABLE ESTOPPEL**
**(SAVANT ADDICTION)**

1148. Plaintiff incorporates the foregoing allegations in this claim.

1149. Hurst, acting through Savant Addiction, knew his true intent when Hurst promised plaintiff that it would provide Belga equity in the company and the role of CEO based on his fundraising abilities.

1150. Hurst intended that his promise would be acted upon—i.e., that Belga would actually expend substantial efforts and resources to raise funds for Savant.

1151. Belga was ignorant of the true state of facts—that Hurst did not intend to honor the promise and would simply give Belga nothing after a sustained and successful fundraising effort.

1152. Belga relied to his detriment on Hurst's words and conduct, as he would not have committed the time and resources toward locating valuable opportunities for Savant—ultimately worth in excess of $5 million—without compensation.

1153. Burbank, as trustee of Savant Addiction, is likewise estopped to deny Hurst's and Savant's promises to Belga.

1154. As a direct and proximate result of defendants' breach, plaintiff has suffered general and special damages in excess of $15,000, and punitive damages.

1155. Plaintiff has also been forced to retain counsel to pursue this action and has incurred attorney's fees as a result of defendants' actions.

**D.    Freeman Accord and Satisfaction**

**THIRTEENTH CLAIM FOR RELIEF**
**BREACH OF CONTRACT AND BAD FAITH**
**(SAVANT INC. AND SAVANT ADDICTION)**

1156. Plaintiff incorporates the foregoing allegations in this claim.

218

LEWIS ROCA

1157. Freeman and Hurst, as CEO of Savant Inc. and managing member of Savant Addiction, entered into a valid and existing contract with respect to a settlement of loans, constituting an accord and satisfaction of the original loans of Savant Inc. and Savant Addiction, if paid.

1158. Freeman performed under the contract by (1) covenanting not to bring a claim against the Savant Entities under the original loans, (2) paying for and facilitating the reconversion of the multiple voting shares into common shares and their distribution to Freeman in his name, and (3) refraining from enforcing the executory accord until Hurst defaulted on the obligations under the accord.

1159. Alternatively, Freeman was excused from performance because Hurst anticipatorily breached the agreement in July 2021, when, through Savant's counsel, Hurst indicated that he considered the agreement invalid.

1160. Savant Addiction and Savant Inc. breached the agreement by failing to provide the promised shares of MindMed.

1161. The accord and satisfaction in settlement of Freeman's loans also includes an implied, if not express, covenant of good faith and fair dealing.

1162. The acts and omissions of defendant Hurst, as described above—including but not limited to (1) converting the 55 million Class A common shares (including the 5 million owed to Freeman) to multiple voting shares, (2) failing to obtain any authorizations necessary to effectuate the agreement and distribution of shares, and failing to put the loan modification to a vote of the members, (3) after Hurst's own unexcused delays for over a year, attempting to renegotiate the number of shares based on the increased share price, and (4) retaliating against Freeman for seeking to exercise his voting rights in the shares due to be distributed to him—have deprived plaintiff of the benefits that he bargained for.

219

LEWIS ROCA

1163. Regardless of whether Hurst's acts on behalf of Savant Inc. and Savant Addiction constitute a technical breach of contract, those acts breach the covenant of good faith and fair dealing.

1164. In breaching this accord and satisfaction and withholding the additional 5 million MindMed shares owed to Freeman, Hurst has effectively diluted plaintiff's shares that he has from his equity contributions in Savant Holdings and Savant Inc.

1165. As a corollary, plaintiff has also been improperly diluted in the exercise of voting rights and the other rights of stock ownership. The voting rights alone in Freeman's approximately 12 million shares—the total from the accord and satisfaction and his preexisting equity—would have been worth at least $4,620,000 at the time the accord was breached.

1166. This caused significant consequential damage beyond the loss of the shares themselves.

1167. Freeman's MindMed shares represented a major-shareholder interest in MindMed—over five percent of the outstanding shares—and thus he could have become or appointed a board member and prevented Hurst's mismanagement and commingling of Ceruvia and MindMed assets. This in turn would have prevented the catastrophic decline in the overall value of MindMed's stock.

1168. As a direct and proximate result of defendants' breach, plaintiff has suffered general and special damages in excess of $15,000.

1169. Plaintiff is also entitled to specific performance of the agreement by Savant Addiction. If the shares have been alienated, plaintiff is entitled to trace the proceeds and impose a constructive trust on Hurst and any other transferee of the 55 million MindMed shares distributed by Hurst or Savant Addiction.

LEWIS ROCA

220

1170. Plaintiff has also been forced to retain counsel to pursue this action and has incurred attorney's fees as a result of defendants' breach.

### FOURTEENTHCLAIM FOR RELIEF
### BREACH OF FIDUCIARY DUTY
### (HURST)

1171. Plaintiff incorporates the foregoing allegations in this claim.

1172. Hurst, as CEO of Savant Inc., owes Freeman, a shareholder, a fiduciary duty.

1173. There is also a special relationship of trust and a fiduciary relationship between Freeman and Hurst. Freeman and Hurst have been partners for more than a decade, and Freeman has always trusted Hurst to act in Freeman's best interest because of their agreement for common equity in the Savant Entities.

1174. Freeman agreed to allow Hurst to become chairman and CEO of Savant Inc. only because of their agreement for equal equity, which Freeman believed would ensue that their interests were aligned.

1175. These fiduciary duties applied when Hurst entered the accord and satisfaction with Freeman, who was both an equity holder and a lender to Savant Inc. and Savant Addiction.

1176. Considering Hurst's status as a fiduciary, Freeman anticipated that Hurst would act in Freeman's interest in honoring the accord and satisfaction.

1177. Freeman could not have anticipated that Hurst's interest in Ceruvia would cause Hurst to act in Ceruvia's best interests rather than Freeman's.

1178. The acts and omissions of Hurst in breaching, disavowing, or otherwise failing to execute the accord and satisfaction constitute a breach of Hurst's fiduciary duties.

1179. The breach of this special relationship of trust was made in tortious bad faith.

221

1180. As a sole, direct, and proximate result of the foregoing, plaintiff has been damaged in a sum in excess of $15,000 and is entitled to general, special, and punitive damages.

1181. Plaintiff has also been forced to retain counsel to pursue this action and has incurred attorney's fees as a result of defendants' breach.

**FIFTEENTH ALTERNATIVE CLAIM FOR RELIEF**
**UNJUST ENRICHMENT**
**(HURST, SAVANT INC., AND SAVANT ADDICTION)**

### 1.   *Unjust Enrichment from Leveraging Freeman's Loans*

1182.  Freeman had lent $450,000 to Savant Addiction and $195,000 to Savant Inc.

1183. Hurst caused Savant Addiction and Savant Inc. to renege on those loans. In settling the breach of that agreement, Freeman and Hurst agreed that Hurst would cause Savant Addiction to distribute to Freeman 5 million MindMed shares in satisfaction of the loans.

1184. The loan accord was itself based on Hurst's misrepresentation regarding the value of MindMed's shares:

a.   Initially, Hurst defrauded Freeman by falsely representing the value of the MindMed shares at $0.10 USD per share, as opposed to its actual value of $0.10 CAD/$0.058 USD.

b.   Based on that fraudulent valuation, Freeman accepted Hurst's offer that he would cause Savant Addiction to distribute 5 million MindMed common shares, at $0.10 USD per share, to Freeman to settle Freeman's claims for nonpayment of notes and warrants totaling $645,000, plus interest.

1185. Thus, the benefit Freeman provided to Hurst and Savant Addiction, considering the actual value of MindMed's shares ($0.10 CAD/$0.058 USD), is equivalent to 7.75 million MindMed shares.

222

LEWIS ROCA

1186. Plaintiff has not been paid for the amount it has enriched defendants, including (1) the loans and other contributions by plaintiff that enabled Savant Addiction to develop MC-18 for sale to MindMed; and (2) plaintiff's forbearance in not bringing an action to enforce the loan agreements or, during the pendency of the lock-out period, the accord and satisfaction.

1187. In the event that Freeman is found not to have an enforceable loan satisfaction agreement, Hurst was unjustly enriched by approximately 2.5 million MindMed shares of the 7.75 million shares, since Hurst's beneficial interest in the Savant entities is approximately 33%.

1188. In the event that Freeman is found not to have an enforceable loan satisfaction agreement, Savant Addiction was unjustly enriched by 7.75 million MindMed shares.

1189. Plaintiff is entitled to compensation for the amount defendants have been unjustly enriched and is entitled to punitive damages.

1190. If the shares representing the value of plaintiff's contribution have been alienated, plaintiff is entitled to trace the proceeds and impose a constructive trust on Hurst and any other transferee of the 55 million MindMed shares distributed by Hurst or Savant Addiction.

1191. So long as Burbank serves as the trustee of Savant Addiction, Burbank, too, must also be (1) directed to distribute to plaintiff the value by which Hurst and Savant Addiction have been unjustly enriched and (2) enjoined from transferring any such value to Hurst or any other person.

1192. Plaintiff has also been forced to retain counsel to pursue this action and has incurred attorney's fees as a result of defendants' actions.

### 2.  Delay in Distributing MindMed Shares

1193. The 55,000,000 shares received by Savant Addiction from the MindMed Foundation Agreement had voting rights.

223

LEWIS ROCA

1194. The voting of a share has a monetary value which should have been realized by the members of Savant Addiction and Savant Holdings.

1195. That value was significant because, according to Hurst, the 55 million shares constitute a controlling interest in MindMed.

1196. Hurst and Burbank had a duty to distribute the 55,000,000 MindMed shares (and their voting rights) to the members of Savant Addiction and Savant Holdings, for several reasons:

a.     Savant Addiction's operating agreement requires the company's dissolution when all assets are sold, as they were here, under the MindMed Foundation Agreement.

b.     A majority-in-interest of the Savant Addiction and Savant Holdings members did not approve the Foundation Agreement, which sequestered the MindMed shares in SAM, contrary to the operating agreement.

c.     Freeman, Hurst, and MindMed contractually agreed that Freeman could pay $20,000 to have the MindMed shares distributed to himself and the members, which he did.

d.     Savant Holdings members voted to dissolve Savant Holdings and have their shares distributed.

e.     Hurst pledged to Savant Holdings members that MindMed shares would be distributed to members for the MindMed 2022 annual general meeting, and Burbank did not disavow that pledge.

f.     Alternatively, in the event that the shares would not be distributed in time for the 2022 annual general meeting, the Savant Holdings members directed Burbank to issue proxy rights to be able to vote their shares in that meeting.

1197. By not receiving a distribution of shares or their voting rights, the Savant Holdings members conferred on Hurst the monetary value of those

LEWIS ROCA

voting rights.

1198. Hurst was thus unjustly enriched by the value of the voting rights of the 55 million-share Savant bloc.

1199. This claim has both direct and derivative components:

a.      Freeman is harmed directly because not only did he suffer delay in the distribution of shares—a delay that cost him a controlling stake in MindMed and the monetary value of the share vote—but Freeman also lost $20,000 for the attorney's fee to Volk. Freeman, who as Hurst confirmed, was MindMed's largest shareholder, was effectively silenced and lost the value of his shares: without access to his shares, he could neither vote them to prevent Hurst's and the MindMed board misconduct nor sell the shares in time to avoid the losses caused by that misconduct.

b.      Freeman also claims damage on behalf of the investors in Savant Holdings and Savant Addiction, whose valuable voting rights were also eliminated in favor of Hurst.

### 3.      *Unjust Enrichment from the Savant Trade Secrets*

1200. Hurst and Turnbull stole the BOL-148/LSD trade secrets from Savant Holdings to Savant TAC, which eventually became Ceruvia.

1201. This was done without Savant Holdings member approval, contrary to the operating agreement.

1202. Hurst and Turnbull enriched themselves by the value of the BOL-148/LSD trade secrets and by the further value of excluding Freeman from sharing in the equity, compensation, and other incentives that would have been paid to Freeman had the trade secret project remained with Savant.

1203. This claim has both direct and derivative components:

a.      Freeman is harmed directly because, having no stake in Ceruvia and not being Ceruvia's CMO, Freeman lost all of the salary, bonus, stock

options, membership interests, and other incentives that he would have received had the project remained with Savant or MindMed, where Freeman was CMO. Since Freeman equally split compensation with Hurst, salary, bonus, equity, and other benefits, Freeman is owed half of what Hurst received.

b.      Freeman also claims damage on behalf of the investors in Savant Holdings, who lost the value of the BOL-148/LSD project.

### 4.   *Burbank's Unjust Enrichment from his Trustee Fees*

1204. Burbank was voted as the liquidating trustee on the recommendation of Hurst to members of Savant Addiction and Savant Holdings.

1205. Burbank has represented that he is independent trustee acting in the members' best interest, as corroborated by representations on BPM's own website.

1206. Based on those representations, Burbank collected at least $50,000 in trustee fees from Savant Addiction and Savant Holdings.

1207. In reality, Burbank has acted as a co-conspirator of Hurst. Hurst sought him out solely to transfer liability from Hurst to Burbank so that Burbank could distribute Hurst's shares based on fraudulent capitalization tables, which did not include Savant TAC or back dated options given to Belga. Hurst and Burbank arranged that Hurst would claim that the distributions were independent by the trustee and that Burbank would claim immunity as a trustee under Delaware law.

1208. Although Savant Holdings and Savant Addiction have conferred on Burbank the benefit of his trustee fees, Burbank has not followed the instructions of the majority-in-interest of Savant Holdings in their August 2021 e-mail.

1209. Instead, Burbank has

a.      refused to communicate directly with the Savant Holdings members, instead deferring to conflicted counsel Olson;

226

LEWIS ROCA

b.      deferred to Olson's sham investigations of members' complaints, notwithstanding Olson's conflicts of interest;

c.      refused to release the companies' books and records, even though Hurst pledged to members they would be released after the audit was completed, as it has been; and

d.      delayed transferring MindMed shares to members until after the MindMed 2022 annual general meeting, and

e.      refused to issue proxies for the members to exercise their voting rights for that annual general meeting.

1210. Burbank has been unjustly enriched by the more than $50,000 in trustee fees that he has accepted without performance.

1211. Freeman makes this claim derivatively on behalf of Savant Addiction Medicine and Savant HWP Holdings.

### 5.      *Hurst's and Forte's Unjust Enrichment at Savant Inc.*

1212. Hurst is CEO of Savant Inc., a Delaware corporation and a management company for the drug development LLC, Savant Addiction.

1213. Since July 2019, there has been no drug development because Savant Addiction's only purported asset, a drug program relating to 18-MC, was sold, and Hurst has represented that Savant Inc. has not had any activity and that capitalization tables have not changed.

1214. Savant Inc. has never had a shareholders meeting of any kind. The shareholders have never elected a valid board of directors.

1215. In May 2022, a group of ex-employees met with Hurst, who told them for the first time that Hurst had unilaterally appointed a board of directors, including Forte, and that salaries and stock have been distributed to Hurst and directors.

1216. Hurst and Forte have been unjustly enriched by the amount of

227

LEWIS ROCA

1 those salaries and stock they distributed to themselves, at the expense of the

2 Savant Inc. shareholders and Savant Holdings members, since Savant Holdings

3 is a 52% owner..

4     1217. Freeman brings this claim derivatively on behalf of Savant Inc. and

5 Savant Holdings.

6     1218. Plaintiff and Savant entities are entitled to compensation for the

7 amount defendants have been unjustly enriched and is entitled to punitive

8 damages.

9     1219. If the shares representing the value of plaintiff's contribution have

10 been alienated, plaintiff is entitled to trace the proceeds and impose a construc-

11 tive trust on Hurst and any other transferee of the 55 million MindMed shares

12 distributed by Hurst or Savant Addiction.

13     1220. So long as Burbank serves as the trustee of Savant Addiction, Bur-

14 bank, too, must also be (1) directed to distribute to plaintiff the value by which

15 Hurst and Savant Addiction have been unjustly enriched and (2) enjoined from

16 transferring any such value to Hurst or any other person.

17     1221. Plaintiff has also been forced to retain counsel to pursue this action

18 and has incurred attorney's fees as a result of defendants' actions.

19

20 **FIFTEENTH CLAIM FOR RELIEF**
**PROMISSORY OR EQUITABLE ESTOPPEL**
**(SAVANT INC., AND SAVANT ADDICTION)**

21

22     1222. Plaintiff incorporates the foregoing allegations in this claim.

23     1223. Hurst, as CEO of Savant Inc. and managing member of Savant Ad-

24 diction, knew his true intent when he promised plaintiff that he would settle

25 plaintiff's loans for a distribution of 5 million MindMed Class A shares.

26     1224. Hurst intended that his promises would be acted upon. Indeed,

27 Hurst wanted to placate plaintiff so that plaintiff would not pursue a lawsuit or

28

LEWIS ROCA

other claim just as Hurst was consolidating power over MindMed. That is why Hurst continued to reinforce the promise for months after it was made.

1225. Plaintiff was ignorant of the true state of facts—that Hurst did not intend to honor the promise and intended to, for the first time, suggest that he could not proceed without shareholder approval and the drop in stock price more than a year after the promise would warrant a renegotiation.

1226. Plaintiff relied to his detriment on Hurst's words and conduct, allowing Hurst to exercise control over Savant Addiction with the promise that Hurst would ultimately distribute plaintiff's shares.

1227. As a sole, direct, and proximate result of the foregoing, plaintiff has been damaged in a sum in excess of $15,000 and is entitled to general, special, and punitive damages.

1228. Plaintiff has also been forced to retain counsel to pursue this action and has incurred attorney's fees as a result of defendants' actions.

### SEVENTEENTH CLAIM FOR RELIEF
### FRAUDULENT MISREPRESENTATION
### (HURST, SAVANT INC., SAVANT ADDICTION, AND BURBANK)

1229. Plaintiff incorporates the foregoing allegations in this claim.

1230. In addition to the foregoing specific acts of fraud, defendants made the following misrepresentations:

### 1.  *Hurst's Fraud in the Loan Accord to Maintain Control of Savant Addiction's Voting Bloc*

1231. Hurst, as CEO of Savant Inc. and managing member of Savant Addiction, made false representations to Freeman, including specifically the offer in June through October 2019 to settle his claims for nonpayment of his loans for 5 million MindMed shares, as discussed in multiple e-mails (¶¶ 325-405).

1232. Freeman demanded payment of his loans, but Hurst knew that when he entered into the accord and satisfaction, Savant Addiction did not have

LEWIS ROCA

1  cash assets to repay the loans.

2      1233. Instead, to avoid bankruptcy, Hurst fraudulently offered as a settle-

3  ment MindMed shares, which were locked up and could not be sold for two

4  years, but he intended to string Freeman along by not distributing the shares

5  during this lock-up period until Savant Addiction obtained funds by selling the

6  unlocked shares. After two years, once Savant Addiction had the funds to repay

7  the original loans, Hurst would then decide whether it was in his interest to dis-

8  tribute shares (if they were worth less than the face value of the original loans)

9  or to disclaim the accord and satisfaction and offer cash (if the shares were

10  worth more than the face value of the loans and nominal interest).

11      1234. Thus, in reality, Hurst intended only to expose Freeman to the

12  downside risk that the shares would become *less* valuable; or, if the shares be-

13  came more valuable, Freeman would have to agree to give Hurst something in

14  return: let Hurst vote the Savant bloc.

15      1235. Hurst also planned to unilaterally enter a two-year lockup agree-

16  ment and convert all 55 million shares from MindMed to multiple voting shares

17  rather than common shares to give him more control over the voting rights of

18  the shares and to avoid distribution of the shares (including the shares to sat-

19  isfy the accord) when they unlocked.

20      1236. In inducing Freeman to enter the settlement agreement for 5 mil-

21  lion MindMed shares, Hurst also misrepresented the value of MindMed shares

22  as $0.10 USD, when in fact the MindMed shares were worth just $0.10 CAD, or

23  $0.058 USD.

24      1237. Freeman thus agreed to settle the $450,000 in Savant Addiction

25  loans for 4,500,000 shares based on that $0.10 USD represented value.

26      1238. Freeman accepted the 5 million shares because he and Hurst had

27

28

230

LEWIS ROCA

1  an agreement.[15]

2  1239. Alternatively, based on the MindMed's actual share price of $0.10

3  CAD, Freeman would have been entitled to more than 7.75 million shares for

4  the $450,000 in Savant Addiction loans.

5  1240. From July 2019 to June 2021, Hurst indicated that he would honor

6  the loan agreement. Freeman relied on these Hurst misrepresentations.

7  1241. Hurst made various excuses for why the distributions had to be

8  postponed, but he had no intention of actually making a distribution in Free-

9  man's name, because that would have jeopardized Hurst's voting bloc and its

10  concomitant control over Savant and MindMed.

11  1242. Hurst also falsely represented to Freeman that he could not ap-

12  prove the 5 million shares without membership approval, despite a long history

13  of other agreements Hurst entered into without that approval—including the

14  formation of MindMed itself—and despite the fact that Hurst and Freeman to-

15  gether constituted a majority in interest for purposes of any required approval.

16  1243. In any event, Hurst had the authority to put the settlement agree-

17  ment to a vote of the members at the time when the agreement was entered,

18  when Savant Addiction faced a choice between bankruptcy or the settlement

19  that Hurst and Freeman had reached.

20  1244. Hurst knew or believed that all of these representations were false,

21  or else had insufficient basis to make the representation.

22  1245. Hurst intended to induce Freeman to rely on the misrepresenta-

23  tions. That is why Hurst had no problem with Freeman paying Volk,

24  MindMed's counsel, $20,000 to reconvert shares from MVS to common shares,

25  even though Hurst had no intention of distributing the 5 million shares to

26

27  [15] Hurst and Freeman agreed to setting the $195,000 in Savant Inc. loans at a

28  discount, for an additional 500,000 shares instead of 1,950,000 shares.

LEWIS ROCA

Freeman.

1246. Freeman in fact relied, justifiably, on defendants' misrepresentations, to his detriment.

1247. Had Freeman known about Hurst's misrepresentations, Freeman would not have waited for Hurst—and later Burbank—to distribute the shares. And had Freeman known about the actual value of MindMed shares at the time, Freeman could have demanded nearly 7.75 million MindMed shares for settlement of the $450,000 Savant Addiction loans—or if Savant Addiction had actually paid the loans, Freeman could have purchased those shares himself at that price.

1248. Since these shares haven't been distributed, the value has plummeted because of Hurst's fraud and misconduct at MindMed. The misrepresentations also delayed Freeman's action so that Burbank was able to distribute Hurst's shares based on fraudulent capitalization tables.

### 2. *Burbank's and BPM's aiding and abetting Hurst's Fraud in the Accord*

1249. Burbank has aided and abetted these fraudulent misrepresentations, including by refusing to honor the accord and satisfaction, and by ignoring the instruction from the majority-in-interest of Savant Holdings to terminate Dorsey & Whitney as counsel so that an appropriate, independent investigation can be done and so that the current assets under management can be protected from further fraud and misconduct.

1250. To conceal and legitimize Hurst's misconduct, including the fraudulent misrepresentations described in paragraphs 406-488, Hurst caused Savant Addiction and Savant Holdings to retain Burbank as a liquidating trustee.

1251. Hurst knew that he could not resist Freeman's pressure to distribute the shares that he had contractually agreed to release in October 2021, so he used Burbank as a cover to reject Freeman's claim and parrot Hurst's claim

232

that the loan was invalid.

1252. Burbank aided and abetted Hurst's acts of mail and wire fraud, including by fraudulently misrepresenting that he was acting as an independent liquidating trustee, serving the companies' interests rather than Hurst's personal interests (¶386-443).

1253. BPM likewise represented on its public website that it provides transparency when its partners act as fiduciary trustees.

1254. Burbank's affirmative statements, along with his failure to correct Hurst's misstatements—created the impression that Burbank would independently investigate Freeman's claim to the $5 million MindMed shares, which Burbank had the authority to execute in Hurst's stead.

1255. In reality, Burbank was hired to provide cover to Hurst and Savant's counsel, Olson and Ng.

1256. Burbank fraudulently misrepresented that he did not have the authority to investigate Hurst, Olson, or Ng and consequently deferred to Olson and Ng—who were conflicted and not independent—in evaluating Freeman's claim to the 5 million MindMed shares.

1257. Thus, Burbank's conclusion—that Freeman's settlement for the 5 million shares was invalid—was neither independent nor the result of an investigation, as had been promised, but was simply fulfilling Hurst's scheme.

1258. Freeman detrimentally relied on the misrepresentations by seeking to present his claim to Burbank and work with him on securing distribution of the promised 5 million MindMed shares. This delay allowed Hurst—now through Burbank, Ng, and Olson—to maintain control over Savant Addiction's 55 million shares in MindMed as a bloc, which constituted a controlling interest in MindMed.

1259. Had Freeman known that Burbank would not independently

233

investigate Hurst but instead would adopt wholesale Hurst's preferred conclu-
sion to deprive Scott of the 5 million promised shares, Freeman would have
taken action to protest Burbank's appointment and enforce the agreement ear-
lier, before the price of MindMed shares fell yet further.

\* \* \*

1260. As a sole, direct, and proximate result of the foregoing, plaintiff has
been damaged in a sum in excess of $15,000 and is entitled to punitive dam-
ages.

1261. Plaintiff has also been forced to retain counsel to pursue this action
and has incurred attorney's fees as a result of defendants' breach.

**E.    Accounting and Declaratory Relief**

**SIXTEENTHCLAIM FOR RELIEF**
**ACCOUNTING (SAVANT ADDICTION,**
**SAVANT HOLDINGS, AND SAVANT INC.)**

1262. Plaintiff incorporates the foregoing allegations in this claim.

1263. Plaintiff seeks an accounting of all membership interests owed to
plaintiff—whether as trustee of the Trust or as assignee of Belga—in Savant
Holdings, Savant Inc., Savant Addiction, and MindMed, including MindMed
shares held by Savant Addiction.

1264. Plaintiff has made a demand upon Savant Addiction and hereby
makes a demand upon Savant Holdings and Savant Inc. to provide a full ac-
counting of membership interests.

1265. Plaintiff seeks an order from this Court directing defendants to pro-
vide an accounting.

1266. Plaintiff has also been forced to retain counsel to pursue this action
and has incurred attorney's fees as a result of defendants' actions.

LEWIS ROCA

234

**SEVENTEENTH CLAIM FOR RELIEF**
**DECLARATORY JUDGMENT (ALL DEFENDANTS)**

1267. Plaintiff incorporates the foregoing allegations in this claim.

1268. An actual legal controversy exists between plaintiff and defendants, including as to

      a.     whether the operating agreements for Savant Addiction and Savant Holdings are valid or were fraudulently induced;

      b.     whether Savant Addiction and Savant Holdings are dissolved, such that all outstanding MindMed shares should be distributed to plaintiff according to his ownership interest and pursuant to the terms of the accord and satisfaction; and

      c.     whether the majority-in-interest of Savant Holdings and Savant Addiction have properly instructed Burbank to withdraw as trustee and Dorsey & Whitney to withdraw as counsel.

1269. Plaintiff and defendants have adverse legal positions with respect to their existing legal controversy, and plaintiff has a legally protectable interest as to whether he is entitled to relief under the contract or as a member of Savant Holdings and Savant Inc.

1270. The existing legal controversy between plaintiff and defendants is ripe for judicial determination.

1271. As a result of the parties' dispute, plaintiff seeks a declaratory judgment from this Court declaring that plaintiff is entitled to enforce his right to membership interests in MindMed and Savant Addiction to obtain damages.

LEWIS ROCA

### PRAYER FOR RELIEF

Wherefore, Plaintiff prays for judgment and an accounting against defendants, as follows:

1. A jury trial on all issues so triable;

2. An award of declaratory relief, injunctive and other equitable relief, general and special damages, treble damages, and exemplary or punitive damages; and

3. Such other and further relief as the Court determines to be appropriate under the circumstances.

4. As a further remedy, plaintiff reserves the right to amend the complaint to hold all defendants liable for a judgment, if any defendant lacks assets sufficient to satisfy the judgment.

Dated this 10th day of June, 2024.

LEWIS ROCA ROTHGERBER CHRISTIE LLP


By: */s/ Abraham G. Smith*

DANIEL F. POLSENBERG (SBN 2376)
J. CHRISTOPHER JORGENSEN (SBN 5382)
ABRAHAM G. SMITH (SBN 13,250)
KORY J. KOERPERICH (SBN 14,559)
3993 Howard Hughes Parkway, Suite 600
Las Vegas, Nevada 89169

*Attorneys for Plaintiff*

236

LEWIS ROCA

## VERIFICATION

SCOTT FREEMAN, M.D., deposes and says,

1.     I am the plaintiff in this action.

2.     I know or believe to be true all allegations of which I have personal knowledge.

3.     I believe to be true all allegations of which I do not have personal knowledge based on specified information, documents, or both.

4.     I make this declaration under penalty of perjury.

Dated this 19th day of June, 2024.

SCOTT FREEMAN, M.D.

237

1

<u>CERTIFICATE OF SERVICE</u>

2

Pursuant to Fed. R. Civ. P. 5, I certify that I served the foregoing "Third

3

Amended Complaint" through the United States District Court's CM/ECF sys-

4

tem electronic mail to the following:

5

REW R. GOODENOW
MICHAEL R. KEALY
6 ZACKARY S. SHEA
PARSONS BEHLE & LATIMER
7 50 W. Liberty Street, Suite 750
Reno, Nevada 89501

8

ALEX N. VANDIVER
9 PARSONS BEHLE & LATIMER
201 S. Main Street, Suite 1800
10 Salt Lake City, Utah 84111

11

*Attorneys for Stephen Hurst,*
12 *Sunray Asset Management, Inc.,*
*Savant HWP Holdings, Inc., and*
13 *Nico Forte*

14

BRODY R. WIGHT
15 TROUTMAN PEPPER HAMILTON
SANDERS LLP
16 8985 S. Eastern Ave., Ste 200
Las Vegas, NV 89123
17

18 *Attorneys for Savant Addiction*
*Medicine LLC and Savant HWP*
19 *Holdings, LLC*

ROBERT MCCOY
BRITTNEY LEHTINEN
KAEMPFER CROWELL
1980 Festival Plaza Drive, Suite 650
Las Vegas, Nevada

*Attorneys for Russell Burbank, as liq-*
*uidating trustee for nominal defend-*
*ants Savant Addiction Medicine, LLC*
*and Savant HWP Holdings, LLC*

NICHOLAS J. SANTORO
JASON D. SMITH
SANTORO WHITMIRE
10100 W. Charleston Blvd., Suite 250
Las Vegas, Nevada 89135

JOHN M. GRIEM
MEREDITH B. SPELMAN
GARY D. SESSER
CARTER LEDYARD & MILBURN LLP
28 Liberty Street, 41st Floor
New York, New York 10005

*Attorneys for Ceruvia Lifesciences*
*LLC and Carey Turnbull*

20

21

Dated this 19th day of June, 2024.

22

23

*/s/ Raquel Gomez*
An Employee of Lewis Roca Rothgerber Christie LLP

24

25

26

27

28

238

LEWIS ROCA